## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**EVELYN ARTHUR**
1221 M Street NW, Apt. 409
Washington, D.C. 20009,

**ROBERT ARTHUR, SR.**
c/o Evelyn Arthur
1221 M Street NW, Apt. 409
Washington, D.C. 20009,

      Plaintiffs,

  v.                                                    No. 1:18-cv-2037

**DISTRICT OF COLUMBIA HOUSING**                     **JURY TRIAL DEMANDED**
**AUTHORITY**
1333 North Capitol Street, NE
Washington, DC 20002,

**CIH PROPERTIES, INC.**
9316 Piney Branch Road, Suite 106
Silver Spring, MD 20903,

**BUTLER SECURITY, INC.**
3604 Annapolis Road
Halethorpe, Maryland  21227,

**EDWARD TRAYNHAM**
c/o Butler Security, Inc.,
3604 Annapolis Road
Halethorpe, Maryland  21227,

**HARRY SINGLETON**
c/o MPD, 300 Indiana Avenue, NW
Washington, DC 20001,

**TAMMY WHITTINGTON**
c/o MPD, 300 Indiana Avenue, NW
Washington, DC 20001,

**JOHN AND JANE DOE MPD OFFICERS**
c/o MPD, 300 Indiana Avenue, NW
Washington, DC 20001,

**DISTRICT OF COLUMBIA**
c/o Office of Attorney General
441 4th Street, NW
Washington, DC 20001.

        Defendants.

## COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND EXPUNGEMENT
(Failure to accommodate disability; retaliation; excessive force; assault and battery)

### INTRODUCTION

1.      Plaintiff Evelyn Arthur is a 77-year-old, profoundly deaf resident of District of Columbia public housing, who uses American Sign language ("ASL") to communicate. She requires reasonable accommodation for her disability, and the District of Columbia Housing Authority and its building management company are required by federal and local law to provide it. They have failed to do so, despite repeated requests by Ms. Arthur and by her son and primary caregiver, Plaintiff Robert Arthur. To the contrary, her son repeatedly was barred from going to her apartment, including when his mother was in medical distress. Mr. Arthur was eventually arrested in her apartment for continuing to assist her. On that occasion, D.C. police officers also failed to accommodate Ms. Arthur's disability and used excessive force against her. As a result, Plaintiffs have suffered grievous harm at the hands of the Defendants. Plaintiffs seek appropriate injunctive relief, expungement, and damages.

### JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1343, over claims brought under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§

701, et seq., and Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, et seq.

3.      This Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, over claims under the Fourth Amendment to the United States Constitution, which are asserted here pursuant to 42 U.S.C. § 1983.

4.      This Court has supplemental jurisdiction over claims under the laws of the District of Columbia pursuant to 28 U.S.C. § 1367 because those claims arise from the same events as Plaintiffs' federal claims and form part of the same case or controversy.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to all claims occurred in the District of Columbia.

6.      This Court has personal jurisdiction over the Defendants because they reside or work in the District of Columbia and took the alleged actions against Plaintiffs within the District of Columbia.

**PRE-SUIT REQUIREMENTS**

7.      The Mayor of the District of Columbia was timely given notice of the "approximate time, place, cause, and circumstances" of the injuries of Plaintiffs Evelyn and Robert Arthur pursuant to D.C. Code § 12–309. A Notice of Claim was hand-delivered to the District of Columbia Office of Risk Management ("ORM") on December 15, 2017. ORM assigned claim numbers 1701353-000, 1701354-000, and 1701355-000 to the claims identified in the notice.

8.      The Executive Director of the D.C. Housing Authority was timely given notice of the approximate time, place, cause, and circumstances of the injuries of Plaintiffs Evelyn and Robert Arthur pursuant to D.C. Code § 6-205 on December 15, 2017.

**PARTIES**

9.     Plaintiff Evelyn Arthur is 77 years old and resides in Claridge Towers, which is public housing for indigent senior and disabled citizens in the District of Columbia. She is retired from a civilian job with the U.S. Army, having served her nation for approximately 24 years. She has been a resident of Claridge Towers since 2014. Plaintiff is profoundly deaf and is therefore an individual with a disability under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities," including "hearing" and "communicating." 42 U.S.C. § 12102(1)-(2)(A). The Rehabilitation Act incorporates the ADA's definition of disability, *see* 29 U.S.C § 705(20)(B), and specifically defines "individual with a disability" as encompassing "deafness," *id.* at § 705(21)(A)(iii).

10.     Plaintiff Robert Arthur, Sr., is Evelyn Arthur's son and her primary caregiver. He is and has been responsible for doing her grocery shopping, picking up her medications (including for high blood pressure and breathing issues, recently diagnosed as chronic obstructive pulmonary disease), doing her laundry, paying her rent and bills, and taking care of many other tasks for her at all times since his mother has resided at Claridge Towers.

11.     Defendant District of Columbia Housing Authority ("DCHA") is the local governmental entity charged with the operation of public housing programs within the District of Columbia. DCHA is "an independent authority of the District government" which has "a legal existence separate from the District government."  D.C. Code § 6–202(a). DCHA is a public entity within the definition of the ADA, 42 U.S.C. § 12131. DCHA receives federal funds and is therefore subject to the Rehabilitation Act, 29 U.S.C. § 794.

12.     Defendant CIH Properties, Inc., is a Maryland corporation doing business in the District of Columbia as the property management company for Claridge Towers, as agent for DCHA. CIH Properties "operates a place of public accommodation," within the definition of the ADA, 42 U.S.C. §§ 12181(7)(A); 12182(a).

13.     Defendant Butler Security, Inc., which upon information and belief is a trade name for Armed Security Inc., is a Maryland corporation doing business in the District of Columbia as a provider of security services at DCHA properties, including Claridge Towers, as agent for DCHA.

14.     Defendant Edward Traynham is a Special Police Officer ("SPO") who was employed by Butler Security, Inc., as a security guard at Claridge Towers at all times relevant to this action.

15.     Defendants Harry Singleton and Tammy Whittington are sworn members of the D.C. Metropolitan Police Department ("MPD"). Defendants John and Jane Doe MPD Officers are sworn members of the MPD whose real names are unknown at this time. These "MPD Defendants" were acting within the scope of their employment and under the color of law at all times relevant to this action. They are sued in their individual capacities.

16.     Defendant District of Columbia is a municipal corporation, the local government of Washington, D.C. The District of Columbia is a public entity within the definition of the ADA, 42 U.S.C. § 12131. The District of Columbia receives federal funds and is therefore subject to the Rehabilitation Act, 29 U.S.C. § 794.

## FACTS

17.     DCHA owns and operates approximately 56 public housing properties in the

District of Columbia. Approximately 20,000 people, or nearly three percent of the population of

the District of Columbia, live in DCHA properties.

18.     DCHA has a "Phone Call Policy" for visitors to DCHA properties. A visitor must

present identification to the security officer on duty. The security officer records the visitor's

name in a log book and then calls the resident to confirm that the resident is at home and wishes

to receive the guest. If the resident does not answer the phone, the visitor must leave the

property.

19.     Because Plaintiff Evelyn Arthur cannot hear a telephone ring, DCHA initially

allowed Plaintiff Robert Arthur, her son and caretaker, who was well known to the staff at

Claridge Towers, to enter the building and go to his mother's apartment upon presenting

identification and signing in only; no phone call to his mother's apartment was required.

Additionally, when other guests wishing to visit Evelyn Arthur appeared at Claridge Towers, the

security officers called Robert Arthur's cell phone and allowed him to authorize their admittance.

20.     In January 2017, Robert Arthur had a Video Relay System installed in his

mother's apartment. A Video Relay System enables a deaf person to communicate with a hearing

person by connecting both parties to a trained sign-language interpreter; the deaf person can sign

to the interpreter and see the interpreter's signs on a live video connection; the hearing person

can speak to and hear the interpreter over a voice telephone connection. The Federal

Communications Commission pays for this service, which is free to users.

21.     The Video Relay System equipment was connected to the television in Ms.

Arthur's bedroom. Accordingly, incoming calls would be visible to her only when she was in her

6

bedroom, awake and looking in the direction of the television. When she was in her kitchen, living room, or bathroom, or on her porch or asleep or otherwise distracted, she was unable to see that a call was coming in via the Video Relay System.

22.     On or about January 18, 2017, Defendant CIH Properties rescinded its prior practice of permitting Mr. Arthur to visit his mother without having the front desk call her and permitting Mr. Arthur to receive calls on behalf of his mother to admit guests, stating  in a letter to Ms. Arthur that "effective immediately the Claridge Guest/Visitor Policy is back in place. This means that you must first be called by security and then say yes before anyone requesting to see you enters the building."  On behalf of his mother, Robert Arthur verbally complained about this unexplained change in practice. He explained to Claridge Towers management that the Video Relay System was not an effective solution because of his mother's inability to see a call come in if she was not awake and directly in front of her television. CIH Properties refused to reinstate the previous accommodation.

23.     In order to continue taking care of his mother, Robert Arthur went to her apartment on several occasions even though she did not answer a telephone call from the security desk. According to security incident reports dated March 29, May 5, May 6, June 16, and June 17, 2017, Mr. Arthur was denied entry into Claridge Towers after presenting his identification and being signed into the log book when his mother did not answer the call to her Video Relay System. The security incident reports make clear that Mr. Arthur advised the security officers that he was there to take care of and/or check on his mother, including assisting with her medical needs.

*The June 2017 Emergency*

24.     On June 17, 2017, Robert Arthur received a call from his mother via the Video Relay System asking him to come over right away because she was having breathing problems. Mr. Arthur promptly rode his bicycle to Claridge Towers and presented his identification to Defendant Edward Traynham, who was on duty at the building.

25.     Defendant Traynham signed Mr. Arthur into the log book. He dialed Evelyn Arthur's phone number several times, but she did not answer the calls.

26.     Although Mr. Arthur was well known to Defendant Traynham as his mother's primary caregiver, and although he explained that his mother had called him in medical distress, Defendant Traynham refused to allow Mr. Arthur into the building. Defendant Traynham also refused to go to Ms. Arthur's apartment himself to conduct a wellness check.

27.     In fear for his mother's health and well-being, Mr. Arthur nevertheless went to his mother's apartment to check on her. He promptly returned with her to the lobby, where she confirmed that she had called him in medical distress and had asked him to come over right away.

28.     Despite explicit identification of and approval from Ms. Arthur for her son's visitation, Defendant Traynham called CIH Properties and the DCHA police, seeking the issuance of a "Bar Notice" barring Mr. Arthur from entering Claridge Towers. Officer Martin Fosso of the DCHA Police arrived on the scene and determined that a Bar Notice was not warranted. Defendant Traynham then called DCHA Police Sergeant Willie Street, who did not respond to the scene and did not speak with either Mr. Arthur or Ms. Arthur but who ordered the immediate issuance of a 60-day Bar Notice to Mr. Arthur. Defendant Traynham issued the Bar Notice on the spot.

*DCHA's Barring Policy*

29.     DCHA has a "Barring Policy," which is set out at 14 DCMR § 9600. It provides

that "[a]ny resident's guest who engages in any activity that threatens the health, safety or right

to peaceful enjoyment of the premises by other residents or DCHA employees or violates DCHA

policy is an unauthorized person and may be barred for a Temporary or extended period of

time."  14 DCMR § 9600.5(a). The Barring Policy further provides that a person who enters

DCHA property "without presenting identification or properly signing the visitor log" may be

barred, "unless identified as a guest by the resident they are visiting."  14 DCMR § 9600.5(b)(1).

30.     The policy further provides that for activities such as improper visitation, a bar

will remain in effect 60 days for a first infraction, six months for a second infraction, and one

year for a third infraction. 14 DCMR § 9600.5(b). A five-year Extended Bar Notice may also be

issued for repeated violations or dangerous conduct. 14 DCMR § 9600.5(c).

31.     The Barring Policy provides that the Chief of the DCHA Office of Public Safety

may grant a request for a "temporary lift" of a Bar Notice. 14 DCMR § 9600.11. In addition, the

Office of Public Safety has a process and form by which aggrieved persons may request that a

Bar Notice be lifted, which is treated as a request to rescind the Bar Notice.

*Plaintiff Robert Arthur Is Barred From Visiting His Mother*

32.     The Bar Notice issued to Robert Arthur on June 17, 2017, contained checkmarks

in two boxes on a list of reasons for issuing a Bar Notice: (i) "Entering DCHA property without

presenting identification or properly signing the visitor log," and (ii) "Excessively loud or

disruptive conduct or disturbing the peace of DCHA residents/employees."  (Capitalization

altered.)  However, the June 17, 2017 security incident report, completed by Defendant

Traynham, states that "[a]t approximately 2144, I SPO Traynham sign [sic] Mr. Robert Arthur

. . . into the visitor log book. . . ."  Mr. Arthur also promptly returned to the lobby with his mother who confirmed she had called her son for her medical emergency and that he was a welcome guest. The DCHA Barring Policy makes clear that when a resident confirms that an individual is a guest, there is not a basis to issue a Bar Notice for failure to sign in. Specifically, the policy states that a Bar Notice can be issued for "[e]ntering DCHA property without presenting identification or properly signing the visitor log, unless identified as a guest by the resident they are visiting."  14 DCMR 9600.5(b)(1).

33.      At all times that Evelyn Arthur has been a resident at Claridge Towers, her son Robert has been her caretaker, and since January 18, 2017, he has continued to oppose DCHA's failure to reasonably accommodate her disability. Under the circumstances on June 17, 2017, there was no objectively reasonable basis for DCHA to issue the Bar Notice because Mr. Arthur was an invited guest, as confirmed by Evelyn Arthur to Defendant Traynham. Mr. Arthur was not excessively loud or disruptive and did not disturb the peace. Issuance of the Bar Notice constituted retaliation against Robert and Evelyn Arthur for their continued opposition to DCHA's failure to accommodate Ms. Arthur's disability, and barring Mr. Arthur from Claridge Towers constituted a failure reasonably to accommodate Evelyn Arthur's disability and a breach of her implied covenant of quiet enjoyment including the right to invite guests into her home

34.      As a result of the conduct of Butler Security's officer, Defendant Traynham, Ms. Arthur suffered emotional distress.

*Plaintiffs' Continuing Attempts to Obtain Reasonable Accommodation*

35.      By letter dated June 17, 2017, and notarized on June 19, 2017, Evelyn Arthur provided written notice in a letter to "Housing Authority/Claridge Towers" that was hand delivered by her son to them that stated that she was granting permission to allow Robert Arthur

to enter her residence without calling her after signing in, because, due to her well-known and

documented disability, she was unable to hear the phone ringing and would be unaware she has a

phone call unless she was sitting directly in front of her television monitor in her bedroom on

which the Video Relay System hardware is installed.

36.     In her June 17, 2017 letter, Ms. Arthur explained that she is dependent on her son

Robert for her daily care and requested that Claridge Towers resume its prior practice of

allowing her son to visit her without requiring her to answer the phone and of having security

call her son to approve other visitors on her behalf. Mr. Arthur delivered this letter to DCHA and

CIH Properties by facsimile on or about June 19, 2017.

37.     Ms. Arthur received no response to her June 17, 2017 letter.

38.     Evelyn Arthur wrote a second letter, dated June 19, 2017, hand delivered by

Robert Arthur  to "Claridge Towers Management," in which she reiterated her request for an

accommodation of her disability so that her son would be allowed to enter her home after signing

in but without having to call first and without being harassed by "any officer."  Her letter pointed

out that her son was her only family in Washington and "the only person I have to help me."

39.     Ms. Arthur received no response to her June 19, 2017 letter.

40.     On June 26, 2017, Ms. Arthur received a letter from Claridge Towers informing

her that a Bar Notice had been issued against Robert Arthur, effective from June 17 to August

17, 2017, and that she could be evicted and subject to proceedings in landlord-tenant court if she

were to permit Mr. Arthur to enter her home or Claridge Towers. The letter contained no

reference to Ms. Arthur's June 17, 2017 or June 19, 2017 letters.

41.     On July 6, 2017, Evelyn Arthur granted Robert Arthur a written general power of

attorney to perform any act or deed or matter or thing whatsoever and without limitation that

ought to be done, performed, executed, or delivered in any matter relating to her personal or business dealings. She provided a copy of this power of attorney to Claridge Towers' management in order to make clear that her son was her caretaker. Claridge Towers' management did not respond to that communication.

42.     On June 20 and July 18, 2017, Ms. Arthur submitted formal requests for reasonable accommodation to DCHA. She asked for permission to have a live-in aide, and for additional hearing-impaired hardware. By memorandum dated July 20, she was notified that her requests had been approved. However, DCHA later rejected Robert Arthur as her live-in aide and she cannot afford to hire anyone else; no live-in aide has been approved at this time. Additional hardware for her Video Relay System was installed sometime in 2018, but it has never worked properly.

43.     Robert Arthur twice applied to have the Bar Notice lifted. His request was denied each time, as set forth below.

44.     On June 20, 2017, Mr. Arthur submitted a written request to the DCHA Office of Public Safety to lift the 60-day Bar Notice that had been issued on June 17, 2017. He used a form provided by DCHA with a subject line "Request for Bar Notification (LIFT)." He explained that he was his mother's primary caregiver, that she needed daily care, and that he had entered to check on her and had then brought her downstairs "so I could be signed in," but that Defendant Traynham had refused and called the police.

45.     DCHA Police Officer Carla Simms was assigned to investigate the facts. As part of her investigation, she reviewed Evelyn Arthur's June 17, 2017 letter confirming that her son is her primary caregiver and that she wanted her son to be allowed into the building without calling because she cannot hear the phone ring and cannot look at the Video Relay System on her

television all day. Officer Simms also spoke with Defendant Traynham, who confirmed that he knew that Mr. Arthur was his mother's primary caregiver. Officer Simms nevertheless concluded that Robert Arthur "did not properly sign in" and "became loud and disruptive," and recommended that the Bar not be lifted. Upon information and belief, Officer Simms' determination was unreasonable and retaliatory conduct. The DCHA Chief of Police concurred, thereby failing to accommodate Ms. Arthur's disability and further violating her right to quiet enjoyment of her home.

46.     On July 18, 2017, Mr. Arthur submitted another written request to the DCHA Police Department to lift the June 17 Bar Notice. Officer Simms was again assigned to investigate the facts, and this time she also considered a doctor's letter dated July 13, 2017 regarding Ms. Arthur's need for assistance, the July 6, 2017 power of attorney Plaintiff granted to Mr. Arthur, and the January 18, 2017 letter from Claridge Towers rescinding its prior practice of allowing her son to visit her without requiring her to answer the phone and having security call her son to approve other visitors on her behalf. This time, Officer Simms recommended that the Bar be rescinded, "given the circumstances of his mother's disability and her well-being." However, the DCHA Police Chief again denied the request, thereby again failing to accommodate Ms. Arthur's disability and further violating her right to quiet enjoyment of her home. Upon information and belief, the DCHA Police Chief's denial was unreasonable and retaliatory conduct.

47.     On August 10, 2017, Mr. Arthur confirmed with DCHA Police Sergeant Michelle Miller that the last day of his Bar Notice was August 17, 2017, and that he could once again enter Claridge Towers on August 18, 2017.

48.     On August 18, 2017, Mr. Arthur called DCHA and spoke with Mr. Robert McGruder, who confirmed that there was no Bar Notice in effect for him at Claridge Towers.

49.     On August 18, 2017, Mr. Arthur arrived at Claridge Towers at approximately 2:00 p.m. and was signed in by Officer Sarah Baker. Ms. Baker signed him out at about 2:50 p.m., when he left to pick up his mother's medications.

50.     When Mr. Arthur returned from picking up the medications, Defendant Traynham was on duty and refused to allow Mr. Arthur up to his mother's apartment with her medicine.

51.     Defendant Traynham stated that a *second* Bar Notice had been issued against Mr. Arthur on July 11, 2017, for a six-month period on the ground that he had been reported to have been on the Claridge Towers property in violation of the June 17 Bar Notice. Neither Plaintiff had ever been served with, or informed of, the second Bar Notice, although it had purportedly been issued on July 11, 2017. It was stamped with a fax date of August 18, 2017.

52.     The second Bar Notice extended for an additional five months Mr. Arthur's inability to visit and assist his mother, depriving her of reasonable accommodation for her disability and causing her fear, emotional distress, and loss of quiet enjoyment in her home.

53.     Under DCHA's Barring Policy, if Mr. Arthur were barred for a third time, the Bar Notice would be in effect for a one-year period. Absent expungement of the Bar Notices, Mr. Arthur is at risk for being barred in the future for even longer periods if Defendants DCHA and CIH Properties continue to fail to accommodate Ms. Arthur's disability or retaliate against him.

*Additional Failures to Accommodate*

54.     On August 22, 2017, Defendant Traynham refused to allow a service technician to visit Ms. Arthur for the purpose of fixing her Video Relay System equipment. Ms. Arthur had notified Claridge Towers' staff in advance and in writing that her Video Relay System was not

working and had notified them of the date and time the service technician would arrive. The basis for Defendant Traynham's refusal to allow the service technician to sign in was that Ms. Arthur did not answer the Video Relay System; however, the service technician was there to fix the non-working Video Relay System, which is the only means of communicating by phone with Ms. Arthur.

55.     On August 24, 2017, Ms. Arthur submitted a written Grievance Report to DCHA regarding the incident in which the service technician was refused entrance into the building to fix her Video Relay System. Plaintiff did not receive any response.

56.     During the week of November 13, 2017, Ms. J. Jackson, a deaf and elderly friend of Ms. Arthur's, was turned away by Claridge Towers security because Ms. Arthur did not answer phone calls from the security desk. Plaintiff was at home and would have welcomed a visit from her friend.

57.     Ms. Arthur has repeatedly informed DCHA that the Video Relay System installed in 2017 is not a reasonable or effective accommodation for her disability, because she cannot see an incoming call unless she is awake and facing the television monitor in her bedroom.

58.     Ms. Arthur has repeatedly requested that Defendants DCHA and CIH Properties allow her son, Mr. Arthur, to visit her without requiring her to answer the phone. Ms. Arthur also has repeatedly requested that her son be allowed to accept calls from security and approve her other visitors on her behalf.

59.     Although DCHA and CIH Properties have never formally rescinded the January 18, 2017 letter, they began allowing Mr. Arthur to enter Claridge Towers without a phone call once they knew that Plaintiffs had legal representation.

60.     However, DCHA and CIH Properties are not allowing the security officers to call Mr. Arthur's cell phone for authorization for admittance of guests or visitors into the building to visit with his mother.

61.     DCHA has failed to provide adequate hearing-impaired hardware.

62.     Defendants DCHA and CIH Properties have failed in the past and have continued to fail to provide reasonable accommodation for Ms. Arthur's disability, and thereby caused her to suffer loss of caregiving, loss of association with family and friends, and anxiety.

63.     As a result, Ms. Arthur is not receiving a reasonable accommodation as required under federal and D.C. law and is being denied her right to quiet enjoyment, which includes the right to receive guests.

*Events of August 30, 2017*

64.     On August 24, 2017, an arrest warrant for unlawful entry was issued for Plaintiff Robert Arthur based on his alleged violations of the Bar Notices. On information and belief, DCHA requested the issuance of this arrest warrant.

65.     On August 30, 2017, at approximately 10:00 a.m., the MPD Defendants arrived at Evelyn Arthur's apartment with an arrest warrant for Robert Arthur. The officers did not bring an ASL interpreter with them, although they knew or should have known that Ms. Arthur was deaf. As the officers approached her apartment, they could clearly see the special doorbell system for hearing-impaired persons on the outside of her apartment, and each officer therefore knew or should have known that the resident was hearing-impaired or deaf.

66.     Mr. Arthur was in the apartment and heard a noise at the door. He looked through the peephole and saw the MPD officers. One officer stated that they knew Mr. Arthur was in the apartment and that they had a warrant for his arrest. Mr. Arthur responded that he would go with them but needed to get dressed.

67.     As Mr. Arthur began to explain to his mother in sign language that MPD officers had arrived with a warrant for his arrest, the officers used a key to enter the apartment.

68.     Ms. Arthur was surprised, confused and frightened by the entry of the MPD officers into her home. She became agitated and began to make noises.

69.     Mr. Arthur tried to explain to his mother in sign language what was happening, and he told the officers that she had a disability. The officers could plainly see that Ms. Arthur was non-verbal and was trying to communicate with her hands and moaning. By that point, it was obvious that Ms. Arthur was deaf and did not know what was happening. The officers were nevertheless indifferent to her disability. They told Mr. Arthur that he had had enough time to explain things to his mother, and began to handcuff him.

70.     Another officer restrained Ms. Arthur by holding her wrists or arms, thereby cutting off her ability to communicate with her son.

71.     Although Mr. Arthur continued to state that he needed to communicate with his mother and was not resisting arrest, several officers forcibly took him into the bedroom where they slammed him on the bed, punched him in the back, and caused him to suffer a laceration to his head. He was handcuffed, shackled with chains at his ankles, removed from the building, and taken to the police station. The charges against him were later dropped.

72.     After Mr. Arthur had been moved to the bedroom, one of the officers commented that he was tired of Ms. Arthur's moaning and trying to free her hands. That officer told another officer, believed to be Defendant Whittington, to handcuff Ms. Arthur. One of the Defendant MPD officers, believed to be Defendant Whittington, did so, although Ms. Arthur presented no threat of any kind. She was made to sit on her couch for several minutes with her hands cuffed behind her back.

73.     Watching the police use excessive force on her son, and being restrained and prevented from communicating with him, caused Ms. Arthur extreme emotional distress.

74.     After Mr. Arthur was removed from the apartment, the officers removed the handcuffs from Ms. Arthur and used a hand-held device to contact an ASL interpreter. Ms. Arthur explained to the interpreter that she was experiencing physical injuries from being grabbed by her wrists and arms and being handcuffed. An ASL interpreter from MPD subsequently arrived. Because of Ms. Arthur's injuries, an ambulance was called and she was transported to a hospital and treated for acute lower back pain, left and right shoulder strains, and significant bruising on her arms and elsewhere, which were the result of having been restrained and handcuffed with excessive force.

75.     As a result of these injuries, Ms. Arthur has had continued pain in her shoulders that has limited her range of motion. As a result of the MPD Defendants' conduct described above, she suffered stress, anxiety and distress on June 17, 2017, and August 30, 2017, and on an ongoing basis. She has found it harder to trust and confide in people. She is now fearful of any encounter with MPD officers and fears she may again become a target of MPD violence. She remains haunted by what she experienced.

## CLAIMS FOR RELIEF

### Claim 1:  Title II of the ADA (42 U.S.C. § 12132) for failure to accommodate disability
### (Plaintiff Evelyn Arthur against Defendant DCHA)

76.     Through their actions described above, Defendant DCHA failed to accommodate Plaintiff Evelyn Arthur's disability and intentionally discriminated against her on the basis of her disability in violation of the ADA.

77.     Evelyn Arthur is a qualified individual with a disability within the meaning of the ADA because she is profoundly deaf.

78.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

79.     Defendant DCHA is a public entity within the meaning of the ADA, and is required to make reasonable modifications in policies, practices and/or procedures where the modifications are necessary to avoid discrimination on the basis of disability and would not fundamentally alter the nature of its programs, services or activities. *See* 28 C.F.R. § 35.130(b)(7). Although 42 U.S.C. § 12131 uses the term "reasonable modification," Plaintiffs use the term "reasonable accommodation" interchangeably with "reasonable modification."

80.     Plaintiff Evelyn Arthur meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity because she resides in District of Columbia public housing.

81.     Both Evelyn Arthur and Robert Arthur informed Defendant DCHA of Evelyn Arthur's disability and requested that Defendant DCHA provide reasonable accommodation therefor.

82.     Ms. Arthur requires a reasonable accommodation for her hearing impairment. A reasonable accommodation would not fundamentally alter the nature of Defendant DCHA's programs, services or activities.

83.     The Video Relay System installed in January 2017 does not eliminate Evelyn Arthur's need for or entitlement to a reasonable accommodation for her disability because she cannot be aware of an incoming call unless she is in her bedroom, awake, and looking directly at her television screen.

84.     Although a live-in aide was approved in July 2017, no aide has ever been approved. And although additional hardware for the Video Relay System was approved in July 2017 and delivered in 2018, it has never worked properly; accordingly, it did not constitute a reasonable accommodation.

85.     Evelyn Arthur has suffered damages by reason of DCHA's failure reasonably to accommodate her disability.

86.     Defendant DCHA is liable to Plaintiff Evelyn Arthur pursuant to Title II of the ADA, 42 U.S.C. § 12132.

**Claim 2:  Title II of the ADA (42 U.S.C. §§ 12181 & 12182) for failure to accommodate disability**
**(Plaintiff Evelyn Arthur against Defendant CIH Properties, Inc.)**

87.     Through its actions described above, Defendant CIH Properties failed to accommodate Plaintiff Evelyn Arthur's disability and intentionally discriminated against her on the basis of her disability in violation of the ADA.

88.     CIH Properties "operates a place of public accommodation," within the definition of the ADA, 42 U.S.C. §§ 12181(7)(A); 12182(a), and is required to make reasonable modifications in policies, practices and/or procedures where the modifications are necessary to avoid discrimination on the basis of disability and would not fundamentally alter the nature of its services.

89.     Both Evelyn and Robert Arthur informed Defendant CIH Properties of Ms. Arthur's disability and requested that Defendant CIH Properties provide reasonable accommodation therefor.

90.     Ms. Arthur requires a reasonable accommodation to avoid discriminating against her on the basis of her hearing impairment and an accommodation would not fundamentally alter the nature of Defendant CIH Properties' services.

91.     The Video Relay System installed in January 2017 does not eliminate Evelyn Arthur's need for or entitlement to a reasonable accommodation for her disability because she cannot be aware of an incoming call unless she is in her bedroom, awake, and looking directly at her television screen.

92.     Although additional hardware for the Video Relay System was installed in 2018 it has never worked properly; accordingly, it did not constitute a reasonable accommodation

93.     Evelyn Arthur has suffered damages by reason of CIH Properties' failure reasonably to accommodate her disability.

94.     Defendant CIH Properties is liable to Plaintiff Evelyn Arthur pursuant to Title II of the ADA, 42 U.S.C. §§ 12181 & 12182.

**Claim 3:  Title II of the ADA (42 U.S.C. § 12132) for failure to accommodate disability
(Plaintiff Evelyn Arthur against Defendant District of Columbia)**

95.     Through its actions described above, Defendant District of Columbia failed to accommodate Plaintiff Evelyn Arthur's disability and intentionally discriminated against her on the basis of her disability in violation of the ADA.

96.     Defendant District of Columbia is a public entity within the meaning of the ADA, and is required to make reasonable modifications in policies, practices and/or procedures where the modifications are necessary to avoid discrimination on the basis of disability and would not fundamentally alter the nature of its programs, services or activities.

97.     Defendant District of Columbia failed to make a reasonable accommodation for Evelyn Arthur's disability when it failed to provide an ASL interpreter to accompany the MPD Defendants when they went to Ms. Arthur's apartment on August 30, 2017, to execute an arrest warrant against Mr. Arthur.

98.     Defendant District of Columbia further failed to make a reasonable accommodation for Evelyn Arthur's disability on August 30, 2017, when it refused to allow Robert Arthur a reasonable time before handcuffing him to explain to her, in sign language, what was happening when the MPD Officers came to her apartment.

99.     Through the conduct described above, Defendants District of Columbia was deliberately indifferent to Evelyn Arthur's disability and failed to ensure equally effective communications through the provision of necessary accommodations in violation of the ADA.

100.     Evelyn Arthur has suffered damages by reason of CIH Properties' failure reasonably to accommodate her disability.

101.     Defendant District of Columbia is liable to Plaintiff Evelyn Arthur pursuant to Title II of the ADA, 42 U.S.C. § 12132.

**Claim 4:  Section 504 of the Rehabilitation Act (29 U.S.C. § 794) for failure to accommodate disability
(Plaintiff Evelyn Arthur against Defendant DCHA)**

102.     Through Defendant's actions described above, Defendant DCHA failed to accommodate Plaintiff Evelyn Arthur's disability and intentionally discriminated against her solely on the basis of her disability in violation of the Rehabilitation Act, 29 U.S.C. § 794. The same actions or failures that support Claim 1 equally support Claim 4.

103.     The Rehabilitation Act provides: "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id.*

104.     Failure to reasonably modify government programs and services to accommodate participants with disabilities constitutes discrimination under the Rehabilitation Act.

105.     Through the conduct described above, Defendant DCHA was deliberately indifferent to Evelyn Arthur's disability and failed to ensure equally effective communications through the provision of necessary accommodations in violation of the Rehabilitation Act.

106.     Evelyn Arthur has suffered damages by reason of CIH Properties' failure reasonably to accommodate her disability.

107.     Defendant DCHA is liable to Plaintiff Evelyn Arthur pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

**Claim 5:  Section 504 of the Rehabilitation Act (29 U.S.C. § 794) for failure to accommodate disability
(Plaintiff Evelyn Arthur against Defendant District of Columbia)**

108.     Through Defendant's actions described above, Defendant District of Columbia failed to accommodate Plaintiff Evelyn Arthur's disability and intentionally discriminated against her solely on the basis of her disability in violation of the Rehabilitation Act, 29 U.S.C. § 794. The same actions or failures that support Claim 4 equally support Claim 5.

109.     The Rehabilitation Act provides: "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id.*

110.     Failure to reasonably modify government programs and services to accommodate participants with disabilities constitutes discrimination under the Rehabilitation Act.

111.     Through the conduct described above, the District of Columbia was deliberately indifferent to Evelyn Arthur's disability and failed to ensure equally effective communications through the provision of necessary accommodations in violation of the Rehabilitation Act

112.     Evelyn Arthur has suffered damages by reason of the District of Columbia's failure reasonably to accommodate her disability.

113.     Defendant District of Columbia is liable to Plaintiff pursuant to Section 504 of the

Rehabilitation Act, 29 U.S.C. § 794.

**Claim 6:  Section 503 of the ADA (42 U.S.C. § 12203(a)-(c)) for retaliation and intimidation
(Plaintiffs Evelyn and Robert Arthur against Defendants DCHA, Butler Security, and
Traynham)**

114.     Through their actions described above, Defendants DCHA and Traynham

retaliated against and intimidated Plaintiffs Evelyn and Robert Arthur, in violation of Section

503 the ADA, for asserting Evelyn Arthur's rights to a reasonable accommodation for her

disability.

115.     The ADA prohibits adverse action taken in retaliation for or to intimidate

protected activity. 42 U.S.C. § 12203(a)-(c).

116.     Requesting a reasonable accommodation from DCHA, as Plaintiffs repeatedly

did, is a protected activity under the ADA.

117.     In response to the continued advocacy by Plaintiffs for a reasonable

accommodation following the January 18, 2017 rescission of the exemption from the Phone Call

Policy, Defendants DCHA and Traynham responded by issuing or causing to be issued the first

Bar Notice, thereby denying Evelyn Arthur the ability to receive care and visits from her son,

even though she confirmed that Mr. Arthur was her invited guest and had been called to help her

during her medical emergency.

118.     Adverse actions by Defendants DCHA and Traynham continued in retaliation for

Plaintiffs' protected activity. Defendant DCHA's continued strict enforcement of the Phone Call

Policy, thereby denying Evelyn Arthur visitation by her caretaker, repairman and other guests

notwithstanding her requests for accommodation; the dubious issuance of the second Bar Notice

transmitted by Defendant Traynham to Defendant DCHA more than a month after it was

purportedly issued and never having been served on Ms. Arthur; DCHA's two denials of Mr.

Arthur's appeals of the first Bar Notice; and DCHA's request to MPD to arrest Robert Arthur for violating the unjustified Bar Notices, all constituted unlawful retaliation under the ADA.

119.    Evelyn Arthur and Robert Arthur suffered damages by reason of Defendants' retaliation and intimidation.

120.    Defendants DCHA, Butler Security, and Traynham are liable to Plaintiffs pursuant to Section 503 of the ADA.

121.    Defendant DCHA also is liable to Plaintiffs for the actions of its agents, CIH Properties, Butler Security, and Traynham.

122.    Defendant Butler Security is liable to Plaintiffs under the doctrine of *respondeat superior* for the acts committed by its employee Defendant Traynham while acting within the scope of his employment and on behalf of and in the interests of his employer.

**Claim 7:  Section 504 of the Rehabilitation Act (29 U.S.C. § 794) for retaliation
             (Plaintiffs Evelyn and Robert Arthur against Defendant DCHA)**

123.    Through its actions described above, Defendant DCHA retaliated against Plaintiffs Evelyn and Robert Arthur, in violation of Section 504 of the Rehabilitation Act, for asserting Evelyn Arthur's rights to a reasonable accommodation for her disability.

124.    The Rehabilitation Act prohibits adverse action taken in retaliation for protected activity.

125.    Requesting a reasonable accommodation from Defendant DCHA, as Plaintiffs repeatedly did, is a protected activity under the Rehabilitation Act.

126.    In response to the continued advocacy by Plaintiffs for a reasonable accommodation following the January 18, 2017 rescission of the exemption of the Phone Call Policy, Defendant DCHA responded by issuing or causing to be issued the first Bar Notice, thereby denying Plaintiff Evelyn Arthur the ability to receive care and visits from her son, even

though she confirmed that Mr. Arthur was her invited guest and had been called to help her during her medical emergency.

127.     Adverse actions by Defendant DCHA continued in retaliation for Plaintiffs' protected activity. Defendant DCHA continued strict enforcement of the Phone Call Policy, thereby denying Plaintiff visitation by her caretaker, repairman and other guests notwithstanding her requests for accommodation; the dubious issuance of the second Bar Notice transmitted by Defendant Traynham to Defendant DCHA more than a month after it was purportedly issued and never having been served on Ms. Arthur; DCHA's two denials of Mr. Arthur's appeals of the first Bar Notice; and DCHA's request to MPD to arrest Robert Arthur for violating the unjustified Bar Notices, all constituted unlawful retaliation under the Rehabilitation Act.

128.     Evelyn Arthur and Robert Arthur suffered damages by reason of Defendants' retaliation and intimidation.

129.     Defendant DCHA is liable to Plaintiffs pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

130.     Defendant DCHA also is liable to Plaintiffs for the actions of Defendant Traynham, because he was acting as an agent of DCHA's agent, Butler Security, pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

### Claim 8:  Fourth Amendment to the U.S. Constitution for excessive force
### (Plaintiff Evelyn Arthur against the MPD Defendants)

131.     Plaintiff Evelyn Arthur has a constitutionally protected right under the Fourth Amendment to the United States Constitution to be free from the use of excessive force by government officials.

132.     The actions of the MPD Defendants, described above, namely their use of physical restraints and handcuffs against Evelyn Arthur, causing injuries requiring medical

treatment, violated her rights under the Fourth Amendment to the United States Constitution to be free from excessive force.

133.     The MPD Defendants are liable to Plaintiff Evelyn Arthur for this violation of her rights, pursuant to 42 U.S.C. § 1983.

### Claim 9:  D.C. Human Rights Act, D.C. Code §§ 2-1402.21(d)(3)(B) and 2-1402.73 (Plaintiff Evelyn Arthur against Defendants DCHA and CIH Properties)

134.     The actions, described above, of Defendants DCHA and CIH Properties, namely their failure to provide a reasonable accommodation for Plaintiff Evelyn Arthur's disability so that she could have an equal opportunity to use and enjoy her home, violated her rights under the District of Columbia Human Rights Act, D.C. Code §§ 2-1402.21(d)(3)(B) and 2-1402.73.

135.     Defendants DCHA and CIH Properties are liable to Plaintiff Evelyn Arthur for these violations of her rights.

### Claim 10:  D.C. Code § 42-3505.02 for retaliation (Plaintiffs Evelyn Arthur and Robert Arthur against Defendants DCHA, Butler Security, and Traynham)

136.     The actions, described above, of Defendants DCHA and Traynham, namely their retaliation against Plaintiffs for exercising or advocating the right to be free from disability-based discrimination, violated Plaintiffs' rights under D.C. Code § 42-3505.02.

137.     Defendants DCHA and Traynham are liable to Plaintiffs for these violations of their rights.

138.     Defendant DCHA also is liable to Plaintiffs for the actions of Defendant Traynham, because he was acting as an agent of DCHA's agent, Butler Security.

139.     Defendant Butler Security is liable to Plaintiffs under the doctrine of *respondeat superior* for the acts committed by its employee Defendant Traynham while acting within the scope of his employment and on behalf of and in the interests of his employer.

## Claim 11:  D.C. Common Law Right of Quiet Enjoyment
### (Plaintiff Evelyn Arthur against Defendants DCHA and CIH Properties)

140.     The actions, described above, of Defendants DCHA and CIH Properties, namely their unreasonable and discriminatory enforcement of DCHA's Phone Call Policy and their unreasonable issuance and enforcement of Bar Notices against Robert Arthur, unreasonably obstructed Plaintiff Evelyn Arthur's right to receive guests, caregivers, and repairmen, all permissible uses of her apartment, and thereby violated the common-law implied covenant of quiet enjoyment that is a fundamental aspect of her residential lease.

141.     Defendants DCHA and CIH Properties are liable to Plaintiff Evelyn Arthur for these violations of her rights.

## Claim 12:  Assault and Battery
### (Plaintiff Evelyn Arthur against the MPD Defendants and the District of Columbia)

142.     The actions, described above, of the MPD Defendants, namely the use of physical restraint and handcuffs on Plaintiff Evelyn Arthur, a nonviolent, disabled and elderly bystander during the arrest of her son, resulting in injuries that required medical attention, constituted assault and battery.

143.     The MPD Defendants are liable to Plaintiff Evelyn Arthur for these tortious acts.

144.     Defendant District of Columbia is liable to Plaintiff Evelyn Arthur under the doctrine of *respondeat superior* for these tortious acts committed by its employees and agents while acting within the scope of their employment and on behalf of and in the interest of their employer.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.     Rule that Defendants' actions violated Plaintiffs' rights under the Fourth Amendment to the U.S. Constitution, the ADA, the Rehabilitation Act, and the laws of the District of Columbia;

B.      Order Defendants DCHA and CIH Properties to provide Plaintiff Evelyn Arthur reasonable accommodation for her disability, including an exemption from the Phone Call Policy and appropriate communications technology in her apartment;

C.      Expunge the Bar Notices issued to Plaintiff Robert Arthur;

D.      Enter judgment awarding Plaintiffs compensatory damages against all Defendants in amounts appropriate to the evidence adduced at trial;

E.      Enter judgment awarding Plaintiffs punitive damages against Defendants DCHA and CIH Properties;

F.      Enter judgment awarding Plaintiff Evelyn Arthur punitive damages against Defendants Singleton, Whittington, and MPD Officers John/Jane Does in their individual capacities in amounts appropriate to the evidence adduced at trial;

G.      Enter judgment awarding Plaintiffs their costs and reasonable attorneys' fees in this action; and

H.      Grant Plaintiffs such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff requests a trial by jury.

By   */s/ Arthur B. Spitzer*
Brian D. Israel (D.C. Bar No. 471023)*
Rebecca J. Michael (D.C. Bar No. 450808)*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001-3743
Telephone:  +1 202.942.5000
Fax:  +1 202.942.5999
E-mail:  brian.israel@arnoldporter.com
            rebecca.michael@arnoldporter.com


Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation of
   the District of Columbia
915 15th St. NW, 2nd Floor
Washington, D.C. 20005
Telephone:  +1 202.457.0800
E-mail:  aspitzer@acludc.org
            smichelman@acludc.org

Attorneys for Plaintiffs


## CERTIFICATION

In accordance with D.D.C. Local Civil Rule 83.2(g), the attorneys whose names are marked with asterisks above certify that: (i) they are members in good standing of the D.C. bar; (ii) they are representing Plaintiffs who are indigent within the meaning of Local Rule 83.2(g), at no cost to Plaintiffs; (iii) they have never been subject to disciplinary complaint or sanction by any court or other disciplinary authority; (iv) they possess a copy of the Local Rules of this District and are familiar with the rules generally and as they pertain to this proceeding.


Dated:  August 30, 2018