## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EVELYN ARTHUR, *et al.,*

      Plaintiffs,

v.

DISTRICT OF COLUMBIA HOUSING
AUTHORITY, *et al.*,

      Defendants.

No. 1:18-cv-2037 (DLF)

**PLAINTIFFS' OPPOSITION TO DEFENDANTS DISTRICT OF COLUMBIA,
RODNEY ANDERSON, ELDRICK CREAMER, KENNETH DANIELS, WILLIAM
LYKE, HARRY SINGLETON, ORLANDO TEEL AND TAMMY WHITTINGTON'S
MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT
AND FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS ...................................................................................................... 2

LEGAL STANDARD FOR MOTION TO DISMISS ............................................................ 4

LEGAL STANDARD FOR MOTION FOR SUMMARY JUDGMENT ..................................... 5

ARGUMENT ........................................................................................................................... 5

I.    Defendants' Motion to Dismiss Evelyn Arthur's ADA and Rehabilitation Act
      Claims Should Be Denied. .......................................................................................... 5

      A.    Ms. Arthur was Entitled to the Protections of the ADA and the
            Rehabilitation Act. ........................................................................................... 5

      B.    Ms. Arthur is Entitled to Pursue Her Claim for Damages. ......................... 10

II.   Ms. Arthur's Section 1983 Claim Should Not Be Dismissed ................................. 12

      A.    A Section 1983 Claim Can be Brought to Vindicate Rights Under the
            ADA and the Rehabilitation Act ..................................................................... 13

      B.    Ms. Arthur Sufficiently Pled Her Section 1983 Claim ............................... 14

III.  The Individual Defendants Are Not Entitled to Qualified Immunity on
      Plaintiffs' Fourth Amendment Claims. ..................................................................... 15

IV.   The Individual Defendants Are Not Entitled to Qualified Privilege as to
      Plaintiffs' Assault and Battery Claims. .................................................................... 18

CONCLUSION ....................................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aikins v. St. Helena Hosp.*,
843 F. Supp. 1329 (N.D. Cal. 1994) ........................................................................................8

*Am. Council of The Blind v. Snow*,
311 F. Supp. 2d 86 (D.D.C. 2004) ...........................................................................................6

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................................................................................5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................................................4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................................................4

*Browning v. Clinton*,
292 F.3d 235 (D.C. Cir. 2002) ..................................................................................................4

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..................................................................................................................5

*Connick v. Thompson*,
563 U.S. 51 (2011) ..................................................................................................................15

*Delano–Pyle v. Victoria County*,
302 F.3d 567 (5th Cir. 2002) ..................................................................................................12

*Dixon v. County of Roscommon*,
479 Fed. Appx. 680 (6th Cir. 2012) ........................................................................................17

*Dormu v. District of Columbia*,
795 F. Supp. 2d 7 (D.D.C. 2011) ............................................................................................18

*Duckworth v. Warren*,
10 So. 3d 433 (Miss. 2009) .....................................................................................................17

*Duvall v. Cty. of Kitsap*,
260 F.3d 1124 (9th Cir. 2001) ................................................................................................12

*EEOC v. AIC Security Investigations, Ltd.*,
55 F.3d 1276 (7th Cir. 1995) ..................................................................................................12

i

*Fitzgerald v. Barnstable School Committee,*
    555 U.S. 246 (2009)..................................................................................................................13

*Hasemeier v. Shepard,*
    252 Fed. Appx. 282 (11th Cir. 2007)........................................................................................17

*Howard v. Office of Chief Admin. Officer of U.S. House of Representatives,*
    720 F.3d 939 (D.C. Cir. 2013)....................................................................................................4

*Hundley v. District of Columbia,*
    494 F.3d 1097 (D.C. Cir. 2007)................................................................................................18

*Ingram v. Shipman-Meyer,*
    241 F. Supp. 3d 124 (D.D.C. 2017)..........................................................................................18

*Johnson v. City of Saline,*
    151 F.3d 564 (6th Cir. 1998) .....................................................................................................8

*Johnson v. District of Columbia,*
    528 F.3d 969 (D.C. Cir. 2008)............................................................................................16, 17

*Lewis v. Charter Twp. of Flint,*
    660 Fed. Appx. 339 (6th Cir. 2016)..........................................................................................17

*Lewis v. Truitt,*
    960 F. Supp. 175 (S.D. Ind. 1997)...................................................................................7, 8, 12

*Loeffler v. Staten Island Univ. Hosp.,*
    582 F.3d 268 (2d Cir. 2009)......................................................................................................12

*Masel v. Barrett,*
    707 F. Supp. 4 (D.D.C. 1989)...................................................................................................17

*Mason v. Stallings,*
    82 F.3d 1007 (11th Cir. 1996) ..................................................................................................11

*Monell v. Dep't of Social Servs.,*
    436 U.S. 658 (1978)............................................................................................................11, 12

*Noel v. New York City Taxi & Limousine Comm'n,*
    687 F.3d 63 (2d Cir. 2012)..........................................................................................................7

*Owens v. BNP Paribas, S.A.,*
    897 F.3d 266 (D.C. Cir. 2018).....................................................................................................4

*Parker v. Grand Hyatt Hotel,*
    124 F. Supp. 2d 79 (D.D.C. 2000)............................................................................................17

*Pierce v. District of Columbia*,
  128 F. Supp. 3d 250 (D.D.C. 2015) ........................................................................11

*Pourmoghani-Esfahani v. Gee*,
  625 F.3d 1313 (11th Cir. 2010) ..............................................................................17

*Rosen v. Montgomery County*,
  121 F.3d 154 (4th Cir. 1997) ..................................................................................12

*Rudder v. Williams*,
  666 F.3d 790 (D.C. Cir. 2012) ...............................................................................16

*Salinas v. City of New Braunfels*,
  557 F. Supp. 2d 777 (W.D. Tex. 2008)................................................................8, 12

*Scales v. District of Columbia*,
  973 A.2d 722 (D.C. 2009) ......................................................................................18

*Scott v. Harris*,
  550 U.S. 372 (2007)...........................................................................................16, 17

*Sista v. CDC Ixis N. Am., Inc.*,
  445 F.3d 161 (2d Cir. 2006)......................................................................................5

*Warren v. District of Columbia*,
  353 F.3d 36 (D.C. Cir. 2004)..................................................................................15

*Williams v. City of New York*,
  121 F. Supp. 3d 354 (S.D.N.Y. 2015)..................................................................7, 12

*Williams v. District of Columbia*,
  268 F. Supp. 3d 178 (D.D.C. 2017) ........................................................................17

*T.W. ex rel. Wilson v. School Bd. of Seminole County*,
  610 F.3d 588 (11th Cir. 2010) ................................................................................11

**Statutes**

42 U.S.C. § 1983.....................................................................................11, 12, 13, 14

42 U.S.C. §12132.................................................................................................6, 7

Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ................................................. *passim*

Rehabilitation Act Section 504, 29 U.S.C. § 794 .................................................................. *passim*

**Other Authorities**

28 C.F.R. § 35.102(a).................................................................................................7

28 C.F.R. § 35.130(b)(7).................................................................................................................7

D.C. Mun. Regs. 6-A § 2199 .......................................................................................................18

Fed. R. Civ. P. 12(b)(6).................................................................................................................4

Fed. R. Civ. P. 56.........................................................................................................................5

U.S. Const. amend. IV ..........................................................................................................15, 16

**PLAINTIFFS' OPPOSITION TO DEFENDANTS DISTRICT OF COLUMBIA,
RODNEY ANDERSON, ELDRICK CREAMER, KENNETH DANIELS, WILLIAM
LYKE, HARRY SINGLETON, ORLANDO TEEL AND TAMMY WHITTINGTON'S
MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT
AND FOR SUMMARY JUDGMENT**

Plaintiffs Evelyn Arthur and Robert Arthur file this memorandum in opposition to the

Motion to Dismiss and for Summary Judgment filed by Defendant District of Columbia and

Metropolitan Police Department ("MPD") officers Rodney Anderson, Eldrick Creamer, Kenneth

Daniels, William Lyke, Harry Singleton, Orlando Teel, and Tammy Whittington.

## INTRODUCTION

The claims against these Defendants involve civil rights violations and common law torts

arising out of the misdemeanor arrest of Robert Arthur in the apartment of his mother, Evelyn

Arthur, an elderly deaf woman living in public housing. The charges against Mr. Arthur later

were dropped.

As alleged in the Amended Complaint, the Defendant MPD officers, knowing Ms. Arthur

to be deaf, forced entry into her apartment with no means of communicating with her, and

refused to allow her son a reasonable time to explain to her in sign language what was

happening. Although he announced that he would submit to arrest and was neither resisting nor

attempting to flee, the officers employed excessive force to place him in restraints, and also

restrained and injured his mother although she posed no threat to the safety of the five or six

armed officers crowded into her small apartment.

Defendants' motion to dismiss argues that these allegations, accepted as true, provide no

basis for liability. We show below that the law is otherwise. Defendants' motion for summary

judgment argues that these allegations are *indisputably* untrue. We show below that the material

facts are subject to genuine dispute.

## STATEMENT OF FACTS

On August 30, 2017, five or six MPD officers with a misdemeanor arrest warrant for Plaintiff Robert Arthur approached the public housing apartment of Plaintiff Evelyn Arthur, whom they knew to be deaf. Amend. Compl. ¶¶ 65, 68. The officers did not bring or call for an American Sign Language ("ASL") interpreter, nor did they establish communication with an ASL interpreter using a hand-held device that was available for that purpose. *Id.* at ¶ 66.

The MPD Officers knocked on the door, announced themselves, and called on Robert Arthur to open the door and come with them. They even threatened to break the door down. *Id*. ¶ 67.  But for approximately eight and a half minutes they never mentioned that they had a warrant. *Id*.[1]  Until they did, Mr. Arthur was under no obligation to open the door. And of course Ms. Arthur could hear none of this. Once Mr. Arthur heard that the officers had a warrant for his arrest, he agreed to leave with them and stated that he needed to get dressed. Defendants' Ex. 1 ("Video 1") 11:17–11:26.  An officer said, "Okay, get dressed." Amend. Compl. ¶ 70; Video 1 at 11:32–11:34.  But the officers did not wait for Mr. Arthur to get dressed; they entered the apartment about 45 seconds later. Video 1 at 11:10–11:55.[2]

Ms. Arthur was surprised, confused and frightened by the sudden entry of the MPD Officers into her apartment. Amend. Compl. ¶ 73. Unaware of what had preceded, she became agitated and began to make noises.  *Id.*; Video 1 at 11:55.

---

[1] Defendants' video exhibit confirms this fact.

[2] When an officer later says to Mr. Arthur, "You had to walk outside. That's all you had to do," Video 1 at 14:06, Mr. Arthur replies, "Man I was coming. Soon as you said you had a warrant, I said OK let me get dressed." *Id*. at 14:09-13. *See also* Defendants' Ex. 2 ("Video 2") at 4:06–08 (Officer: "That's why you should'a came outside." Mr. Arthur: "And I was tryin'a come. After you said I had a warrant.").

2

Mr. Arthur told the officers his mother was deaf and tried to explain to her what was happening using ASL. Amend. Compl. ¶ 74; Video 1 at 12:06–12:42. He even placed his wrists together behind his back in the handcuff position, Video 1 at 12:30, and an officer placed cuffs on one wrist. *Id*. at 12:33. This was only 37 seconds after the officers entered the apartment. *Id*. at 11:56–12:33. But his mother was still agitated, and when he again attempted to sign to her, telling her to calm down, the officers dragged him by his face into the bedroom (*id.* ¶ 76; Video 1 at 12:45), where they threw him on the bed, lacerated his head, punched him, handcuffed and shackled him. Amend. Compl. ¶ 76; Video 1 at 12:43.

These actions caused Ms. Arthur to become even more upset, and the volume of her sounds increased. *Id.* But rather than allowing her son to communicate with her, and rather than using their handheld device to access an online ASL interpreter, officers grabbed her arms, yelled at her, and issued verbal commands that she could not hear, deliberately indifferent to her disability, but expecting her to respond as if they were communicating with a hearing person. Amend. Compl. ¶ 77; Video 1 at 12:44–13:25.

Ms. Arthur presented no threat to officer safety. Contrary to Defendants' assertion, Ms. Arthur denies that she attempted to bite an MPD Officer, Declaration of Evelyn Arthur ("E. Arthur Declaration") at ¶¶ 17–18, and the video shows that in the moments before a female officer says "don't bite me," her head was nowhere near that officer's body (or any other officer's).  Video 1 at 12:40-12:50. To the contrary, the female officer was attempting to grab Ms. Arthur from behind.  *Id.*

After Ms. Arthur had calmed down, an officer says "put her in handcuffs too," Video 1 at 13:07, and a female officer does so. While she is being handcuffed, a male officer accuses her of "playing games," *id.* at 13:24—as if she had been playing games and was not deaf.

3

## LEGAL STANDARD FOR MOTION TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678, citing *Twombly*, 550 U.S. at 556, but "[t]he plausibility standard is not akin to a 'probability' requirement." *Id*. at 678 (citing *Twombly*, 550 U.S. at 556). "In determining a complaint's plausibility, [the court must] accept as true all of the complaint's factual allegations and draw all reasonable inferences in favor of the plaintiffs." *Owens v. BNP Paribas, S.A.,* 897 F.3d 266, 272 (D.C. Cir. 2018).

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only contain sufficient factual matter that when accepted as true states a claim to relief that is plausible on its face. *Twombly*, 550 U.S. at 570. "[H]eightened fact pleading of specifics" is not required. *Id*. Moreover, in evaluating such a motion, a court may only "assess the legal feasibility of the complaint" and "may not weigh the evidence that might be offered to support it." *Howard v. Office of Chief Admin. Officer of U.S. House of Representatives*, 720 F.3d 939, 950 (D.C. Cir. 2013) (internal quotations omitted). That is, a Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint; it is not a mechanism to decide the merits. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Indeed, the purpose of the complaint is merely to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (citation omitted).

4

## LEGAL STANDARD FOR MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of "show[ing] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A material fact is one that would 'affect the outcome of the suit under the governing law,' and a dispute about a genuine issue of material fact occurs if the evidence is such that 'a reasonable [factfinder] could return a verdict for the nonmoving party.'" *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The Court must accept as true any evidence supporting the party opposing summary judgment and must draw all reasonable inferences in its favor, *Anderson,* 477 U.S. at 255; in determining whether there is a genuine issue of material fact, the court must "resolve all ambiguities, and draw all inferences, against the moving party." *Sista*, 445 F.3d at 169 (citation omitted). "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a motion for summary judgment must be denied. *Anderson*, 477 U.S. at 248.

## ARGUMENT

**I.     Defendants' Motion to Dismiss Evelyn Arthur's ADA and Rehabilitation Act Claims Should Be Denied.**

### A.     Ms. Arthur was Entitled to the Protections of the ADA and the Rehabilitation Act.

Defendants properly recognize that "the purpose of the ADA and the Rehabilitation Act is to secure for disabled persons the same rights and privileges afforded to able-bodied persons." Motion at 7 (citing *Pierce v. District of Columbia,* 128 F. Supp. 3d 250, 265 (D.D.C. 2015)). The

District does not deny that deafness is a disability, and the Amended Complaint alleges that its officers knew prior to entering Ms. Arthur's apartment that she was deaf.[3]  Amend. Compl. ¶¶ 65, 68.  And the District acknowledges the case law holding that police officers must accommodate the disabilities of suspects and arrestees with whom they interact. Motion at 8. However, the District argues that, as a matter of law, it was entitled to ignore the disability of Ms. Arthur because she was a mere "bystander" to the arrest of her son. *Id.* at 7–8.  As a matter of law, the District is wrong.

Of course, Ms. Arthur was no mere "bystander" to her son's arrest, as if she had been a passing pedestrian on the street. It was her apartment that the police invaded without consent, and they knew this in advance (*e.g.,* referring to it as "momma's apartment" before entering, Video 1 at 8:10). They had every reason to anticipate that they would be interacting with a deaf senior citizen before they entered—more reason than they would often have when dealing with a suspect or a person placed under arrest on the street.

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity." 42 U.S.C. § 12132.

The ADA, and likewise the Rehabilitation Act,[4] applies to *all* of the services, programs, or activities of a public entity. There are no exclusions. The ADA's implementing regulations are

---

[3] The District's own evidence on summary judgment confirms this fact. The DCHA agent who gave the officers a key to Ms. Arthur's apartment told them that she was deaf. Video 1 at 6:02. And the exterior of her apartment had an obvious hearing-impaired "doorbell" system, as the officers acknowledged. *Id.* at 7:30–7:36.

[4] *Am. Council of The Blind v. Snow*, 311 F. Supp. 2d 86, 87 (D.D.C. 2004) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

6

unequivocally clear that Title II of the ADA "applies to *all* services, programs, and activities provided by or made available by public entities," 28 C.F.R. § 35.102(a) (emphasis added), and requires public entities to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," unless the required modification "would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7). As the Second Circuit has explained, the statutory term "'services, programs, or activities' has been interpreted to be 'a catch-all phrase that prohibits all discrimination by a public entity.'" *Noel v. New York City Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) (quoting *Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 45 (2d Cir. 1997)). "Thus, Title II applies to 'all of the operations' of the NYPD," *Williams v. City of New York*, 121 F. Supp. 3d 354, 365 n.13 (S.D.N.Y. 2015), and likewise of the MPD. The Department of Justice agrees. *See Williams*, 121 F. Supp. 3d at 365 n.12.

The District reports that it "could not find any case law" applying the ADA to "bystanders," Motion at 8, but neither has it cited any case law holding that the ADA does *not* apply to them, much less that it does not apply to the residents of dwellings that the police enter without consent. And indeed there is case law on the latter (and more relevant) point, reaching the commonsense conclusion that it does apply. In *Lewis v. Truitt*, 960 F. Supp. 175 (S.D. Ind. 1997), police officers entered the home of a deaf grandfather to take into custody from his visiting son a young child whose mother (the son's girlfriend) had recently died and whose proper custody was uncertain. Although informed that the grandfather was deaf, they assaulted him, as if he had heard and ignored their oral commands. He was neither a suspect nor an

---

under *any* program or activity receiving Federal financial assistance.") (quoting 29 U.S.C. § 794).

arrestee (until afterward, when arrest was added to his injuries), but the court had no difficulty concluding that the deaf grandfather "most assuredly had the right to be informed by what authority the officers had come upon his property and by what authority they were entering his house."). *Id*. at 178. *See also Salinas v. City of New Braunfels*, 557 F. Supp. 2d 777, 785 (W.D. Tex. 2008) (denying city's motion for summary judgment where police failed to provide ASL services to deaf woman who found her boyfriend unconscious in her apartment and had a neighbor call police); *Aikins v. St. Helena Hosp.*, 843 F. Supp. 1329, 1337 (N.D. Cal. 1994) (hospital was required to provide an interpreter to communicate with patient's deaf wife, whom the District would presumably characterize as a "bystander" to her husband's treatment; "That Mrs. Aikins was not a patient at St. Helena should not preclude her from raising claims under the Rehabilitation Act based on the hospital's failure to communicate effectively with her in connection with its treatment of her husband."). As the Sixth Circuit summarized the matter, the ADA phrase "'services, programs, or activities' encompasses virtually everything that a public entity does." *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998).

Ms. Arthur is in the same position as the grandfather in *Lewis v. Truitt.* While the police did not enter her apartment to arrest *her*, they entered *her* apartment. They knew they would be interacting with a deaf woman, who "most assuredly had the right to be informed by what authority the officers … were entering [her] house" and seizing her son. As a person with a disability, Ms. Arthur was entitled to the same benefit of communication with the police as a hearing person in the same situation. Yet the officers were completely unprepared to communicate with her, and chose not even to use the hand-held device they had on hand to connect to an interpreter. Amend. Comp. ¶¶ 66, 79. While those deliberate choices failed to meet their statutory obligations, they could have mitigated their violations by taking advantage of her

son's ability to communicate with her using ASL. But after allowing her son to try to communicate with her for all of *37 seconds*, they assaulted him, and then her.

Defendants' motion to dismiss, asking the Court to rule as a matter of law that the police had no duty to accommodate Ms. Arthur's disability under these entirely foreseeable circumstances, should be denied.

Defendants argue that exigent circumstances excused their failure to accommodate Ms. Arthur's disability. Motion at 9. Of course that argument has no relevance to their motion to dismiss. As for summary judgment, their evidence on the issue is self-refuting. They note that the officers spent "*over ten minutes* outside the door" before entering Ms. Arthur's apartment. *Id*. (emphasis in original). But if that proves anything, it proves that there was no exigency to arrest Mr. Arthur. They argue that Mr. Arthur "created exigent circumstances" by not opening the door sooner, *id*., but they offer no actual reasoning to explain why that would be true. If it was not urgent to take Robert into custody at minute 2, why was it urgent at minute 12? There was no fear of harm to Ms. Arthur; there was no threat of escape; there was no concern about destruction of evidence. It may be that the officers had lost patience, but police impatience is not an exigent circumstance. In any event, Defendants' own evidence shows that the officers never mentioned that they had a warrant until about eight and a half minutes after they began shouting through the door. As soon as they said "warrant," Mr. Arthur said he would voluntarily submit but needed to get dressed; the officers forced entry just 45 seconds later and were in such a hurry to arrest him that they would not allow him to finish getting dressed or to communicate with his mother. There was not even plausible exigency here, and certainly exigency cannot be found as a matter of *undisputed* fact.

9

Finally, Defendants argue that Ms. Arthur attempted to interfere in her son's arrest, and that this asserted fact should require the dismissal of Ms. Arthur's ADA and Rehabilitation Act claims. Motion at 9–10. Even assuming that Ms. Arthur did attempt to interfere with the arrest (which she did not), Defendants do not explain why that action would retroactively excuse their *prior* decision to enter her home without the ability to communicate with her, which caused her confusion and agitation. *See* E. Arthur Declaration, ¶ 18 ("If I had understood what was going on, I would have been much calmer during the entire incident."). In any event, Ms. Arthur affirms that she did not interfere or attempt to interfere in her son's arrest. *Id*. Defendants' video does not incontestably prove the contrary. Indeed, the MPD's own investigator concluded that Ms. Arthur was not interfering with the arrest, but "just trying to figure out what was going on."[5]

### B.      Ms. Arthur is Entitled to Pursue Her Claim for Damages.

The District also argues that Ms. Arthur's ADA and Rehabilitation Act claims are subject to dismissal or summary judgment because as a matter of law she cannot show that it acted with "deliberate indifference" when violating her rights under those statutes. Motion at 10–12. Neither the pleadings nor the record supports the District's conclusion.

Plaintiffs agree that damages are available under the ADA and the Rehabilitation Act upon a showing of deliberate indifference, and agree with the description of that standard in the case from this Court cited by Defendants:

> Deliberate indifference is "knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." The "knowledge" element is satisfied where the public entity has notice of the plaintiff's accommodation need, and the "failure to act" element is satisfied by conduct that is "more than negligent, and involves an element of deliberateness."

---

[5] Excerpt of transcript of body-worn-camera recording by Sgt. Kevin Harding, Plaintiffs' Exhibit A. The transcript was prepared by Plaintiffs' counsel from video provided by MPD in response to a Freedom of Information Act request.

*Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 278 (D.D.C. 2015) (quoting *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)).

There is no reason to believe that Ms. Arthur cannot meet this standard. She can satisfy the knowledge element because the police had "notice of the plaintiff's accommodation need." They knew that they were entering the home of a deaf resident and that they would need assistance to communicate with her; they knew Ms. Arthur was a person, not a potted plant. She can satisfy the failure to act element because the police deliberately chose not to bring an interpreter, and deliberately chose not to use the hand-held device they were carrying to make an online interpreter available. And even if those choices are not viewed as deliberate, there can be no doubt that the officers' decision to physically prevent Robert Arthur from signing with his mother was deliberate—it was not a negligent act to grab him and manhandle him into the bedroom while he was trying to explain to her what was going on, and to refuse to allow him to communicate with her as he was removed from her apartment, while she was still handcuffed on the couch.

Defendants further argue that Ms. Arthur "cannot rely merely upon the alleged conduct of the police officers." Motion at 10. They analogize liability under the ADA and the Rehabilitation Act to the liability of municipalities in § 1983 cases under the *Monell* doctrine (*Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)). *Id.* But the *Monell* doctrine has nothing to do with liability under the ADA and the Rehabilitation Act. As the Eleventh Circuit has explained, the ADA's "definition of employer includes 'any agent of such person,'" and "the 'agent' language was included to ensure *respondeat superior* liability of the employer for the acts of its agents, *a theory of liability not available for 42 U.S.C. § 1983 claims.*" *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996) (emphasis added). *See also T.W. ex rel. Wilson v. School Bd. of Seminole*

11

*County,* 610 F.3d 588, 604 (11th Cir. 2010); *Delano–Pyle v. Victoria County,* 302 F.3d 567,

574–75 (5th Cir. 2002); *Duvall v. County of Kitsap,* 260 F.3d 1124, 1141 (9th Cir. 2001); *EEOC*

*v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1279 (7th Cir. 1995); *Rosen v. Montgomery*

*County,* 121 F.3d 154, 157 n. 3 (4th Cir. 1997).  In the police cases already cited, the liability of

the governmental entities was based on the actions of their police officers, not any allegation of

official policy.  *See Williams v. City of New York*, 121 F. Supp. 3d 354 (S.D.N.Y. 2015); *Lewis v.*

*Truitt*, 960 F. Supp. 175 (S.D. Ind. 1997); *Salinas v. City of New Braunfels*, 557 F. Supp. 2d 777,

785 (W.D. Tex. 2008).

The District relies on a Second Circuit decision that noted in passing that "intentional

discrimination may be inferred when a 'policymaker acted with at least deliberate indifference

…'" *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009). Motion at 10. But

that very decision held that liability could be found despite the hospital's "general policy of

providing interpreters," based on the action of a mere physician at the defendant hospital, one Dr.

Sithian, who "laughed off" the request for an ASL interpreter. *See id.* at 276–77. There is no

support for the District's effort to import *Monell* standards into the ADA and the Rehabilitation

Act.

For these reasons, the District's motion for dismissal or judgment on Ms. Arthur's claims

under the ADA and the Rehabilitation Act should be denied.

## II.     Ms. Arthur's Section 1983 Claim Should Not Be Dismissed.

The District moves to dismiss Ms. Arthur's failure-to-train claim under 42 U.S.C. § 1983

(Claim 17) on two grounds. Neither has merit.

**A.      A Section 1983 Claim Can be Brought to Vindicate Rights Under the ADA and the Rehabilitation Act.**

The District first argues that a § 1983 claim cannot be brought to vindicate rights under the ADA or the Rehabilitation Act because those statutes contain their own "comprehensive remedial scheme[s]," Motion at 12 (quoting *Vinson v. Thomas*, 288 F.3d 1445 (9th Cir. 2002)). But in 2009, the Supreme Court provided new guidance about when a § 1983 claim may lie to vindicate rights under federal statutes. In *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246 (2009), the Court explained that "[i]f Congress intended a statute's remedial scheme to be the exclusive avenue through which a plaintiff may assert [the] claims," then "the § 1983 claims are precluded." But in other cases, it may be that "Congress meant the judicial remedy expressly authorized by [the statute] to coexist with an alternative remedy available in a § 1983 action." *Id.* at 252 (citations omitted; some alterations in original).

In deciding whether a statute should be read to preclude § 1983 suits, the Court "placed primary emphasis on the nature and extent of that statute's remedial scheme." *Id.* at 253. Thus, if a statute has "highly detailed and restrictive administrative and judicial remedies," such as "requir[ing] plaintiffs to comply with particular procedures and/or to exhaust particular administrative remedies prior to filing suit," *id.* at 254, then allowing suits under § 1983 "would have circumvented these procedures and given plaintiffs access to tangible benefits—such as damages, attorney's fees, and costs—that were unavailable under the statutes." *Id.* Such statutes typically have "'unusually elaborate,' 'carefully tailored,' and 'restrictive' enforcement schemes." *Id.* at 255. By contrast, when a statute "has no administrative exhaustion requirement and no notice provisions," and "plaintiffs can file directly in court," the opposite conclusion may more readily be inferred. *Id.*

13

The ADA and the Rehabilitation Act fall comfortably in the latter category. They do not contain unusually elaborate, carefully tailored, or restrictive enforcement schemes. They do not contain administrative exhaustion requirements or notice provisions, and plaintiffs can file directly in court, just as Ms. Arthur has filed her non-§ 1983 ADA and Rehabilitation Act claims here. Accordingly, the Court should conclude that those statutes do not preclude causes of action under § 1983.

### B.    Ms. Arthur Sufficiently Pled Her Section 1983 Claim.

The District also argues that Ms. Arthur has failed to allege sufficient facts to plausibly entitle her to relief, on the ground that her § 1983 claim does not target a municipal policy. Motion at 13–16.

Claim 17 alleges that the District's actions at her apartment "were pursuant to a policy, custom, or practice of the District of Columbia that was deliberately indifferent to the need for accommodation by individuals with disabilities in situations like that of Ms. Arthur," by "failing to train officers to provide reasonable accommodation in such circumstances." Amend. Comp. ¶ 172. That claim does target a municipal policy, custom, or practice, and the clearest evidence that the District has such a policy, custom, or practice, is its defense of that policy in this Court: the District does not train its officers to provide reasonable accommodations to individuals other than "suspects and arrestees," because it has concluded that "bystanders" such as Ms. Arthur are not entitled to accommodation. Motion at 8. That is the policy of the District, as articulated in a pleading signed by Karl A. Racine, Attorney General for the District of Columbia.  Motion at 23. What more need be shown?

In addition to there being a policy, custom, or practice, Ms. Arthur has also pled the District's deliberate indifference by alleging that there was an obvious need for the District to have a consistent and effective policy to reasonably accommodate and provide effective

communication for deaf individuals during police interactions. The amended complaint alleges, for example, that "The District of Columbia knew that in the course of their duties its police officers would encounter deaf persons who were not the direct subjects of police action, but who would require reasonable accommodation in order to interact with police officers in an equal manner as hearing persons. This is particularly true in the District of Columbia, which is the home of Gallaudet University and has a large deaf and hearing-disabled community of more than 16,000 persons." Amend. Compl. ¶ 172. *See, e.g., Warren v. District of Columbia,* 353 F.3d 36, 38 (D.C. Cir. 2004) (observing that deliberate indifference "is an objective standard . . . simply mean[ing] that, faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction") (citing *Farmer v. Brennan,* 511 U.S. 825, 841 (1994)). Nor was Ms. Arthur required to plead that there was a widespread pattern of violations in order to allege deliberate indifference. *See*, *e.g.*, *Connick v. Thompson,* 563 U.S. 51, 64 (2011) (recognizing that "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations").

Defendants' motion to dismiss Claim 17 should therefore be denied.

### III. The Individual Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' Fourth Amendment Claims.

The individual police officer Defendants have moved for summary judgment on Plaintiffs' Fourth Amendment excessive force claims. Their argument rests entirely on the proposition that the videotapes from the body-worn cameras of two officers proves, beyond dispute, that no excessive force was used against either plaintiff. Motion at 17–21. The facts are not so clear.

"A police officer's use of force is excessive and therefore violates the Fourth Amendment if it is not 'reasonable,' that is, if 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' is weightier than 'the countervailing governmental interests at stake.'" *Rudder v. Williams,* 666 F.3d 790, 795 (D.C. Cir. 2012) (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)). Factors to be considered include the severity of the crime at issue, whether the suspect poses an immediate threat to the officer or others, and whether she is actively resisting arrest or trying to flee. *Johnson v. District of Columbia,* 528 F.3d 969, 974 (D.C. Cir. 2008).

Evelyn Arthur has testified by declaration that she did not interfere in her son's arrest, or attempt to interfere in his arrest, or grab or bite any officer, or attempt to grab or bite any officer. Nevertheless, officers grabbed her arms tightly, causing bruising on her arms; handcuffed her behind her back, hurting hurt her wrists, arms, back and shoulders and causing lasting shoulder pain that has limited her range of motion. E. Arthur Declaration ¶¶ 14–21. Robert Arthur has testified by declaration that he was cooperating with the officers while trying to calm his mother, when the officers grabbed him by his face, manhandled him into the bedroom, pinned him down, and handcuffed and shackled him, at some point cutting his head. Declaration of Robert Arthur ("R. Arthur Declaration"), ¶¶ 18–35.  On Defendants' motion for summary judgment, those facts must be taken as true. They show that the force used was excessive, as no force was justified.

Ordinarily, that would be the end of the matter, as Plaintiffs' evidence must be accepted on Defendants' motion for summary judgment, even when defendants claim qualified immunity. But because there is a Supreme Court case in which videotape evidence was held to show beyond dispute that police officers had not engaged in misconduct, *Scott v. Harris*, 550 U.S. 372 (2007), the Defendants assert that their videotapes likewise constitute irrefutable proof of their

16

rectitude. However, not all videotapes meet the *Scott v. Harris* standard, and courts have frequently rebuffed police defendants' over-enthusiastic attempts to circumvent the summary judgment rules with videotapes. *See, e.g., Hasemeier v. Shepard*, 252 Fed. Appx. 282, 285 (11th Cir. 2007) ("[I]t is for a jury to decide whether the video shows injuries as noted by [the plaintiff]."); *Williams v. District of Columbia*, 268 F. Supp. 3d 178, 190–91 n.3 (D.D.C. 2017) ("[A] jury viewing the videos could conclude that a reasonable officer would perceive that Williams had ceased resisting and had been subdued."); *Pourmoghani-Esfahani v. Gee,* 625 F.3d 1313, 1317 (11th Cir. 2010); *Lewis v. Charter Twp. of Flint*, 660 Fed. Appx. 339, 347 (6th Cir. 2016); *Parker v. Grand Hyatt Hotel*, 124 F. Supp. 2d 79, 91 (D.D.C. 2000); *Masel v. Barrett*, 707 F. Supp. 4, 11 (D.D.C. 1989); *Duckworth v. Warren*, 10 So. 3d 433, 438–39 (Miss. 2009) (rejecting a *Scott* argument); *Dixon v. County of Roscommon*, 479 Fed. Appx. 680, 684 (6th Cir. 2012) (rejecting a *Scott* argument).

In evaluating claims of excessive force—and assertions of qualified immunity on such claims—courts must "give careful attention to the facts and circumstances of the particular case" *Johnson v. District of Columbia*, 528 F.3d at 974. The alleged crime involved here—Mr. Arthur's entry into his mother's apartment—was hardly severe. He posed no threat, was not attempting to flee, and, as described above, the video shows that he was attempting both to submit voluntarily to arrest and to calm his mother using the only language she could understand, which required the use of his hands. A jury might well agree that it was only the officers' impatience and anger at having waited ten minutes in the hallway that caused them to apply unjustified force to Mr. Arthur, and that under the circumstances, any reasonable police officer would have understood that assaulting Mr. Arthur as he was trying to calm his mother was unreasonable.

With respect to Ms. Arthur, there was no crime. A jury viewing the video—and hearing Ms. Arthur's testimony—might well agree that she was not interfering, that she posed no threat to the police, that the force used against her was excessive. A jury might understand that that the officers' decision to enter her apartment with no way of communicating with her was the real cause of her understandable distress, and that any reasonable police officer would have allowed her son to communicate with her and calm her down, rather than inflicting wholly unnecessary injuries on a fragile, elderly, deaf woman. Those issues are not suitable for summary judgment, including summary judgment based on qualified immunity.

## IV.    The Individual Defendants Are Not Entitled to Qualified Privilege as to Plaintiffs' Assault and Battery Claims.

As Defendants note, Motion at 22, the unreasonable use of force by a police officer may be an assault and battery under District of Columbia law. *Hundley v. District of Columbia,* 494 F.3d 1097, 1101 (D.C. Cir. 2007). And an officer's "qualified privilege to use *reasonable* force to effect an arrest" applies only if "the means employed are not in excess of those which the actor *reasonably* believes to be necessary." *Scales v. District of Columbia*, 973 A.2d 722, 730 (D.C. 2009) (emphasis added). In other words, "the test for qualified privilege in an assault and battery suit is both subjective and objective: the officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation." *Id*.

Where there is a dispute of material fact relevant to the qualified privilege issue, summary judgment must be denied. *See Ingram v. Shipman-Meyer*, 241 F. Supp. 3d 124, 148-49 (D.D.C. 2017); *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 27 (D.D.C. 2011). As explained above, the facts in the record do not *indisputably* show—or show at all—that the Defendants used only reasonable force on the Arthurs. A reasonable jury, hearing the Arthurs'

18

testimony and watching the videos, could easily conclude that the officers used an objectively unreasonable amount of force on the Plaintiffs. For those reasons, Defendants' motion for summary judgment based on their claim of qualified privilege should be denied.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss and for Summary Judgment should be denied.

Respectfully submitted,

*/s/ Rebecca J. Michael*
Brian D. Israel (D.C. Bar No. 471023)
Rebecca J. Michael (D.C. Bar No. 450808)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001-3743
Telephone: +1 202.942.5000
Fax: +1 202.942.5999
E-mail:  brian.israel@arnoldporter.com
rebecca.michael@arnoldporter.com


Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation of the District of Columbia
915 15th St. NW, 2nd Floor
Washington, D.C. 20005
Telephone: +1 202.457.0800
E-mail:  aspitzer@acludc.org


Counsel for Plaintiffs


July 19, 2019