## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EVELYN ARTHUR, *et al.,*

      Plaintiffs,

      v.

DISTRICT OF COLUMBIA HOUSING
AUTHORITY, *et al.*,

      Defendants.

No. 1:18-cv-2037 (DLF)

## PLAINTIFFS' OPPOSITION TO DEFENDANTS DISTRICT OF COLUMBIA HOUSING AUTHORITY AND CIH PROPERTIES, INC.'S MOTION TO DISMISS AND TO STRIKE PUNITIVE DAMAGES

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 2

LEGAL STANDARD................................................................................................................. 5

ARGUMENT ............................................................................................................................. 6

I.      Plaintiffs' Claims Under the ADA, the Rehabilitation Act, and the DCHRA are
Not Time-Barred....................................................................................................... 6

      A.      Plaintiffs' Hostile Living Environment Claims are Timely Even Under
a One-Year Statute of Limitations .............................................................. 6

      B.      In the Non-Employment Context, the Applicable Statute of Limitations
for ADA and Rehabilitation Act Claims is Three Years ............................ 8

      C.      Even if the Statute of Limitations Were One Year, the ADA,
Rehabilitation Act and DCHRA Claims Are Not Time Barred Because
Many Alleged Acts Occurred Within One Year of the Complaint........... 12

II.     Ms. Arthur Requested Reasonable Accommodations ........................................... 13

III.    CIH Is Covered by the ADA................................................................................... 14

      A.      CIH Is Covered by Title II ........................................................................ 14

      B.      Alternatively, CIH Is Covered by Title III................................................ 17

IV.    Defendants' Motion to Dismiss "Claim 10" Addresses a Claim Not Made......... 20

V.     Ms. Arthur Sufficiently Stated a Claim for Violation of Her Implied Warranty
of Habitability and Covenant of Quiet Enjoyment ............................................... 21

VI.    Mr. Arthur Sufficiently Stated a Claim Under Section 1983................................. 23

VII.   Ms. Arthur Sufficiently Stated a Claim for Breach of Lease................................. 25

VIII.  Ms. Arthur Sufficiently Stated a Claim Under the Fair Housing Act................... 27

      A.      Plaintiff's FHA Claim Was Timely Filed................................................. 27

      B.      DCHA Did Not Provide Ms. Arthur With Reasonable
Accommodations ..................................................................................... 28

IX.      Defendants' Motion to Strike Should Be Denied ................................................... 30

         A.      Defendants' Motion is Not a Proper Motion to Strike.............................. 30

         B.      Motions to Strike Punitive Damages are Premature at the Pleading
                 Stage......................................................................................................... 30

         C.      Plaintiffs are not Seeking Punitive Damages for Violations of the ADA
                 and Rehabilitation Act ............................................................................. 31

         D.      Plaintiffs May Seek Punitive Damages for the Alleged Breach of the
                 Common Law Implied Warranty of Habitability and Covenant of Quiet
                 Enjoyment ................................................................................................ 31

CONCLUSION........................................................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Hunter ex rel A.H. v. D.C.*,
   64 F. Supp. 3d 158 (D.D.C. 2014)...............................................................................15, 16, 29

*Abuelhawa v. United States*,
   556 U.S. 816 (2009)................................................................................................................11

*Access Living of Metropolitan Chicago, Inc. v. City of Chicago*,
   372 F. Supp. 3d 663 (N.D. Ill. 2019) .......................................................................................6

*Arceneaux v. Marin Housing Auth.*,
   No. 15–cv–00088–MEJ, 2015 WL 3396673 (N.D. Cal. May 26, 2015).................................19

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................................5, 7

*Banks v. Chesapeake and Potomac Telephone Co.*,
   802 F.2d 1416 (D.C. Cir. 1986)................................................................................................9

*Barnes v. District of Columbia*,
   289 F.R.D. 1 (D.D.C. 2012).......................................................................................................6

*Barry Farm Tenants & Allies Ass'n v. D.C. Housing Authority*,
   311 F. Supp. 3d 57 (D.D.C. 2018).........................................................................................25

*Hahn ex rel. Barta v. Linn Cty., Iowa*,
   191 F. Supp. 2d 1051 (N.D. Iowa 2002).................................................................................20

*Bean v. U.S.*,
   709 A.2d 85 (D.C. 1998) ........................................................................................................22

*Beltway Management Co. v. Lexington-Landmark Ins. Co.*,
   746 F. Supp. 1145 (D.D.C. 1990)......................................................................................22, 23

*Bernstein v. Fernandez*,
   649 A.2d 1064 (D.C. 1991) ....................................................................................................31

*Brown v. Coates*,
   253 F.2d 36 (D.C. Cir. 1958)..................................................................................................31

*Comer v. Wells Fargo Bank, N.A.*,
   108 A.3d 364 (D.C. 2015) ......................................................................................................27

*Commonwealth v. Nelson*,
  909 N.E.2d 42 (Mass. App. Ct. 2009) ....................................................................................22

*Congress v. District of Columbia*,
  324 F. Supp.3d 164 (D.D.C. 2018) ..........................................................................................9

*Di Lella v. University of District of Columbia David A. Clarke School of Law*,
  570 F. Supp.2d 1 (D.D.C. 2008) (ADA)....................................................................................9

*Disabled Rights Action Committee v. Las Vegas Events, Inc.*,
  375 F.3d 861 (9th Cir. 2004) ..................................................................................................16

*Doe v. Southeastern University*,
  732 F. Supp. 7 (D.D.C. 1990)...................................................................................................9

*Doe v. U.S. Dep't of Justice*,
  753 F.2d 1092 (D.C. Cir. 1985)................................................................................................6

*Gaona v. Town Country Credit*,
  324 F.3d 1050 (8th Cir. 2003) .................................................................................................8

*Goodman v. Lukens Steel Co.*,
  482 U.S. 656 (1987)...................................................................................................8, 10, 11

*Gordon v. D.C.*,
  605 F. Supp.2d 239 (D.D.C. 2009)...........................................................................................9

*Hooper v. United States HUD*,
  No. 6:17-cv-00031-MC, 2017 WL 2380176 (D. Or. May 31, 2017) .....................................19

*Jaiyeola v. District of Columbia*,
  40 A.3d 356 (D.C. 2012) ..........................................................................................9, 10, 11

*Javins v. First Nat'l Realty Corp.*,
  428 F.2d 1071 (D.C. Cir. 1970)..............................................................................................26

*Jones v. Rogers Memorial Hospital*,
  442 F.2d 773 (D.C. Cir. 1971)..................................................................................................6

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*,
  224 F.R.D. 261 (D.D.C. 2004)...........................................................................................5, 30

*Kersey v. Washington Metropolitan Area Transit Authority*,
  533 F. Supp.2d 181 (D.D.C. 2008) (ADA)................................................................................9

*Koch v. White*,
  134 F. Supp. 3d 158 (D.D.C. 2015)....................................................................................5, 30

*Long v. Howard University*,
   512 F. Supp. 2d 1 (D.D.C. 2007), *aff'd*, 550 F.3d 21 (D.C. Cir. 2008) .....................................9

*Lotus Square Apartments v. McVae*,
   No. 2015 LTB 31179, 2016 WL 10956500 (D.C. Super. Sept. 1, 2016) ...............................21

*Mark Keshishian & Sons, Inc. v. Washington Square, Inc.*,
   414 A.2d 834 (D.C. 1980) ........................................................................................................31

*McFadden v. Wash. Metro. Area Transit Auth.*,
   204 F. Supp. 3d 134 (D.D.C. 2016) ...........................................................................................9

*McNamara v. Ohio Building Auth.*,
   697 F. Supp. 2d 820 (N.D. Ohio 2010)....................................................................................16

*Millennium Square Residential Ass'n v. 2200 M St. LLC*,
   952 F. Supp. 2d 234 (D.D.C. 2013) ..........................................................................................26

*Morton v. D.C. Housing Authority*,
   720 F. Supp. 2d 1 (D.D.C. 2010) .........................................................................................30, 31

*Nat'l Ass'n of Mfrs. v. Dep't of Defense*,
   138 S. Ct. 617 (2018)................................................................................................................25

*Nat'l R.R. Passenger Corp. v. Morgan*,
   536 U.S. 101 (2002)....................................................................................................................7

*North Star Steel Co. v. Thomas*,
   515 U.S. 29 (1995)....................................................................................................................10

*Oliver v. Mustafa*,
   929 A.2d 873 (D.C. 2007) ........................................................................................................31

*Owens v. BNP Paribas, S.A.*,
   897 F.3d 266 (D.C. Cir. 2018)....................................................................................................5

*Parham v. CIH Properties, Inc.*,
   208 F. Supp. 3d 116 (D.D.C. 2016)..........................................................................................22

*Parham v. CIH Props.*,
   148 F. Supp. 3d 5 (D.D.C. 2015)..............................................................................................19

*PGA Tour, Inc. v. Martin*,
   532 U.S. 661 (2001)..................................................................................................................20

*Pierce v. District of Columbia*,
   128 F. Supp. 3d 250 (D.D.C. 2015)..........................................................................................14

*Potts v. Howard University Hospital*,
    623 F. Supp. 2d 68 (D.D.C. 2009) ............................................................................................. 6

*Runyon v. McCrary*,
    427 U.S. 160 (1976) .................................................................................................................... 8

*Ryan v. Gonzales*,
    568 U.S. 57 (2013) .................................................................................................................... 11

*Sobelsohn v. American Rental Mgmt. Co.*,
    926 A.2d 713 (D.C. 2007) ....................................................................................................... 21

*State of Connecticut v. Schaffel*,
    229 A.2d 552 (Conn. Cir. Ct. 1966) ........................................................................................ 22

*State of Vermont v. Dixon*,
    725 A.2d 920 (Vt. 1999) .......................................................................................................... 22

*Stewart v. District of Columbia*,
    Civ. No. 04-1444-CKK, 2006 WL 626921 (D.D.C. Mar. 12, 2006) .......................................... 8

*Union Travel Assocs., Inc. v. Int'l Assocs., Inc.*,
    401 A.2d 105 (D.C. 1979) ....................................................................................................... 21

*Whittlestone, Inc. v. Handi–Craft Co.*,
    618 F.3d 970 (9th Cir. 2010) ............................................................................................. 5, 30

*Williams v. Savage*,
    538 F. Supp.2d 34 (D.D.C. 2008) ............................................................................................. 9

*Winston v. United States*,
    106 A.3d 1087 (D.C. 2015) ..................................................................................................... 22

*Young v. D.C. Housing Authority*,
    31 F. Supp. 3d 90 (D.D.C. 2014) ............................................................................................ 29

**Statutes**

28 U.S.C. § 1292(b) .................................................................................................................... 13

28 U.S.C. § 1658 ........................................................................................................................ 11

42 U.S.C. § 1983 .......................................................................................................... 23, 24, 25

42 U.S.C. § 2000e-5 ........................................................................................................ 8, 10, 11

42 U.S.C. § 3604(f) .................................................................................................................... 27

42 U.S.C. § 3613(a) .................................................................................................................... 27

42 U.S.C. § 12117(a) .................................................................................................................8, 10

42 U.S.C. § 12131.............................................................................................................................14

42 U.S.C. § 12181(7)(K)..................................................................................................................17

42 U.S.C. § 13663(d) ............................................................................................23, 24, 25, 29

Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*...................................... *passim*

Americans with Disabilities Act Title I ...............................................................................8, 10, 11

Americans with Disabilities Act Title II................................................................................. *passim*

Americans with Disabilities Act Title III................................................................................ *passim*

D.C. Code § 42-3505.02 ...............................................................................................................20

D.C. Code Title 14 .........................................................................................................................22

D.C. Human Rights Act, D.C. Code § 2-1402.01 *et seq.* ...................................................... *passim*

Rehabilitation Act, 29 U.S.C. § 701 *et seq.* ........................................................................... *passim*

**Other Authorities**

28 C.F.R. § 35.104..........................................................................................................................15

56 Fed. Reg. 35,544 (July 26, 1991)............................................................................................20

14 DCMR § 6121.2.........................................................................................................................24

14 DCMR § 6121.4.........................................................................................................................24

Fed. R. Civ. P. 12(b)(6)............................................................................................................27, 29

Fed. R. Civ. P. 12(f)....................................................................................................................5, 30

H.R. Rep. 101–485(II) ...................................................................................................................20

United States Dep't of Justice, Civil Rights Div., *The Americans With Disabilities
    Act: Title II Technical Assistance Manual* § II-1.2000, *available at*
    https://www.ada.gov/taman2.html...........................................................................................16

United States Dep't of Justice, Civil Rights Div., *The Americans With Disabilities
    Act: Title III Technical Assistance Manual* § III-1.7000, *available at*
    https://www.ada.gov/taman3.html#II-1.2000. ...................................................................17, 18

**INTRODUCTION**

Defendants District of Columbia Housing Authority ("DCHA") and its property management company, CIH Properties, Inc. ("CIH"), have created a hostile living environment and engaged in an ongoing practice of disability discrimination and retaliation against Plaintiff Evelyn Arthur, a 78-year old, profoundly deaf resident of District of Columbia public housing, and her son and primary caregiver, Plaintiff Robert Arthur, Sr., in contravention of federal and local law. Plaintiffs repeatedly have requested reasonable accommodation for Ms. Arthur's disability, and their requests have been rejected or ignored. Defendants wrongfully have denied Ms. Arthur care by, and companionship with, her son, even when she was in medical distress and even though she is largely dependent on him. Defendants have denied her other guests access to her apartment. Plaintiffs' Amended Complaint seeks to hold Defendants accountable for their unlawful behavior and to halt the ongoing violations of Plaintiffs' rights under applicable law

Defendants' Motion to Dismiss the Amended Complaint and to Strike Punitive Damages ("Motion") rests on legal and factual errors and meritless procedural objections. Defendants do not afford Plaintiffs' plausibly pleaded allegations the required presumption of truth, and in some instances wholly ignore Plaintiffs' allegations. Defendants' arguments rest on a misconception of the nature of Plaintiffs' claims and on Defendants' failure to apply the controlling legal standards. Defendants have refused and failed to address or remedy the substantial, ongoing discrimination against Plaintiffs and the hostile living environment, as set forth in their Amended Complaint.

Under well-established precedent, Plaintiffs properly have pleaded their claims for injuries they have sustained as a result of Defendants' unlawful conduct, pursuant to the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, the Fair Housing Act

("FHA"), the District of Columbia Human Rights Act ("DCHRA"), the D.C. Code, and the common law. Accordingly, this Court should deny Defendants' Motion and permit Plaintiffs to proceed to discovery. The Court also should deny Defendants' request to strike Plaintiffs' prayer for punitive damages as premature and contrary to governing law.

## FACTUAL BACKGROUND

During the period covered by the Amended Complaint, Ms. Arthur was (and remains) a tenant in Claridge Towers, a public housing facility owned by DCHA and operated by CIH. Butler Security Inc., no longer a party to this case, provides security services under contract to CIH.

Because Ms. Arthur is deaf, Defendants initially waived their Phone Call Policy of requiring the building security guards to call a tenant and receive oral consent before a visitor is allowed upstairs. From 2014 to January 2017, Defendants permitted Ms. Arthur's son to visit her apartment by presenting his identification to the guard and signing in to the register; he also was allowed to consent to Ms. Arthur's other visitors. Amend. Compl. ¶ 18. In January 2017, Defendants withdrew this accommodation and insisted that the guard call Ms. Arthur—who is unable to hear a phone ring—for an affirmative response prior to allowing her son to visit. *Id.* at ¶ 21. They ostensibly withdrew their prior accommodation because her son had a Video Relay System ("VRS") installed in her bedroom. *Id.*[1] However, this system enabled her to see that her phone was ringing only if she was in her bedroom, awake, and looking at the phone. Mr. Arthur objected on numerous occasions to the rescission of the Phone Call Policy waiver, and Ms.

---

[1] A VRS permits hearing-impaired individuals to communicate telephonically with individuals who are not impaired through the use of a sign-language interpreter who visually reads the deaf person's sign language and relays the information orally to the hearing correspondent, and vice versa.

Arthur repeatedly requested that her son be allowed to visit upon showing his identification and that he be allowed to authorize entry by her other visitors. *Id.* at ¶ 21, 58–61.

While Mr. Arthur gained access to his mother's apartment on several occasions after January 2017, he was denied access on several occasions between March 29, 2017 and June 17, 2017, when his mother did not answer the telephone. *Id.* at ¶ 22. In each case he signed the register, showed his identification to the guard, and advised the guards that he was there to help his mother. On the evening of June 17, 2017, Ms. Arthur called her son and asked him to come over promptly as she was having breathing problems. *Id.* at ¶ 23. When Mr. Arthur arrived at Claridge Towers and presented his identification, the guard refused to allow him upstairs when Ms. Arthur did not answer her telephone, and the guard refused to check on her himself. *Id.* at ¶ 25. Fearful for his mother's health, Mr. Arthur went to his mother's apartment to check on her. He promptly returned with her to the lobby, where she confirmed that she had called him in medical distress and had asked him to come over right away. *Id.* at ¶ 26.

Despite Ms. Arthur confirming that her son was her invited guest, and in violation of DCHA regulations allowing visitors to enter the premises when authorized by the tenant, the guard called CIH and the DCHA police and requested the issuance of a "Bar Notice" precluding Mr. Arthur from entering Claridge Towers. *Id.* at ¶ 27. After the DCHA officer who reported to the scene refused to issue a Bar Notice, the CIH guard called a DCHA supervisor, who authorized the immediate issuance of a two-month Bar Notice, which was served on Mr. Arthur. *Id.* The basis for that notice was "Entering DCHA property without presenting identification or properly signing the visitor log." *Id.* at ¶¶ 27, 31, 46. That was false, as Mr. Arthur had presented his identification and the DCHA officer documented that he had signed Mr. Arthur into the visitor log. *Id.* at ¶¶ 23–24, 31.

Subsequently, Defendants issued, without notice to or service on the Arthurs as required by DCHA's regulations, a second Bar Notice for a six month period against Mr. Arthur, purportedly based on an alleged violation of the earlier Bar Notice, for "Entering DCHA property without presenting identification or properly signing the visitor log." *Id.* at ¶¶ 52–53. Neither Bar Notice complied with applicable regulations and, therefore, they were not legally valid. Mr. Arthur's requests to lift the first Bar Notice on the ground that Mr. Arthur is his mother's caregiver and she needs his assistance on a daily basis as he handles her food, medicine, household supplies, doctor appointments and more were denied. *Id.* at ¶ 44. The Bar Notices were in effect from June 17, 2017 through January 11, 2018. *Id.* at ¶¶ 27, 31, 48, 52.

The Arthurs redoubled their efforts to obtain reasonable accommodation for Ms. Arthur's disability but their efforts were, and continue to be, met with resistance, hostility and retaliation by Defendants. Ms. Arthur's friends, family and service technicians have been denied entry into Claridge Towers, even when advance notice was provided by the Arthurs. *Id.* at ¶¶ 57–58. Defendants also provided a key to Ms. Arthur's apartment to Metropolitan Police Department officers when they sought to arrest Mr. Arthur for purported violations of the two Bar Notices, which led to further violations of the Arthurs' rights. *Id.* at ¶ 68.

Although Defendants installed additional assistive equipment in October and November 2018, the Arthurs repeatedly have advised them that the equipment is not a reasonable or effective accommodation. *Id.* at ¶¶ 59, 82. Plaintiffs subsequently discovered that Defendants had altered the justifications for issuance of the First Bar Notice after it had been issued and served, which did not comply with DCHA's regulations. *Id.* at ¶ 46. Since the filing of Plaintiffs' original complaint, Defendants have continued to maintain a hostile living environment for Ms. Arthur. *Id.* at ¶¶ 22, 58, 60–61, 82–85.

4

## LEGAL STANDARD

***Motion to dismiss.*** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556), but "[t]he plausibility standard is not akin to a 'probability requirement." *Id.*, quoting *Twombly*, 550 U.S. at 556. "In determining a complaint's plausibility, [the court must] accept as true all of the complaint's factual allegations and draw all reasonable inferences in favor of the plaintiffs." *Owens v. BNP Paribas, S.A.,* 897 F.3d 266, 272 (D.C. Cir. 2018).

***Motion to strike.*** A court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A matter is immaterial or impertinent when it is "not relevant to the resolution of the issue at hand." *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 224 F.R.D. 261, 263 (D.D.C. 2004). A matter is scandalous when it "'unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court.'" *Id.* (quoting 2 *Moore's Federal Practice* § 12.37 [3], at 12–97). Rule 12(f) "is not 'a proper way to procure the dismissal of all or a part of a complaint' based on the legal insufficiency of the pleading." *Koch v. White*, 134 F. Supp. 3d 158, 164 (D.D.C. 2015) (citing 5C Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1380 (3d ed. 2015)); *see also Whittlestone, Inc. v. Handi–Craft Co.,* 618 F.3d 970, 974–75 (9th Cir. 2010) (Rule 12(f) "does not authorize district

courts to strike claims for damages on the ground that such claims are precluded as a matter of law"). Motions to strike are "strongly disfavored," and the moving party bears a "formidable burden." *Barnes v. District of Columbia*, 289 F.R.D. 1, 6 (D.D.C. 2012).

## ARGUMENT

### I.    Plaintiffs' Claims Under the ADA, the Rehabilitation Act, and the DCHRA are Not Time-Barred

Defendants' motion to dismiss Plaintiffs' discrimination and retaliation claims as time-barred rests on two propositions, both of which must be accepted for their motion to succeed: (1) that the relevant statute of limitations for Plaintiffs' claims is one year; and (2) that Plaintiffs have not pled a hostile living environment claim based in part on events that occurred on or after August 30, 2017. Neither of those propositions should be accepted at this stage of the litigation.

#### A.    Plaintiffs' Hostile Living Environment Claims are Timely Even Under a One-Year Statute of Limitations

"[A] motion to dismiss may be granted on the basis that the action is time-barred only when it appears *from the face of the complaint* that the relevant statute of limitations bars the action." *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1115 (D.C. Cir. 1985) (emphasis added). *Accord Jones v. Rogers Memorial Hospital*, 442 F.2d 773, 775 (D.C. Cir. 1971) ("the complaint cannot be dismissed [on statute of limitations grounds] unless it appears beyond doubt that the plaintiff can prove no state of facts in support of his claim that would entitle him to relief."); *Potts v. Howard University Hospital*, 623 F. Supp. 2d 68, 71 (D.D.C. 2009) ("the court should grant a motion to dismiss only if the complaint on its face is conclusively time-barred."). In other words, "[d]ismissal of a complaint based on a statute of limitations is appropriate only where the plaintiff has 'affirmatively plead himself out of court.'" *Access Living of Metropolitan Chicago, Inc. v. City of Chicago*, 372 F. Supp. 3d 663, 672 (N.D. Ill. 2019) (citation omitted).

6

Defendants cannot meet this exacting standard. As they acknowledge, Plaintiffs have made "numerous allegations" that Defendants' actions "were so severe and pervasive as to render Claridge Towers a hostile living environment." Motion at 13, citing Amend. Compl. ¶¶ 86, 102, 109, 116, 131, 143, 157. And they do not dispute that a hostile environment claim can rest in part on conduct occurring prior to the limitations date, so long as some relevant conduct occurred within the limitations period. Indeed, their own leading case so held. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.").

Defendants want the Court to disregard Plaintiffs' allegations of a hostile living environment, but that would be improper on a motion to dismiss, where Plaintiffs' alleged facts must be taken as true, and where Plaintiffs need not prove their claims, but simply "nudge" their allegations "across the line . . . to plausible." *Iqbal*, 556 U.S. at 680.

Plaintiffs have amply "nudged" their allegations here. As alleged, from the time Defendants began requiring the deaf Ms. Arthur to answer her ringing telephone (January 2017) through and after the filing of the Complaint (August 2018), Defendants engaged in a persistent course of conduct that was sufficiently severe or pervasive to create an abusive living environment. They refused repeatedly to allow her son, who was her known caregiver, to visit her. Amend. Compl. ¶¶ 22, 25. They ultimately barred him from visiting her for seven months. *Id.* at ¶¶ 27, 52. They refused to allow other guests to visit. *Id.* at ¶ 58. They threatened her with eviction. *Id.* at ¶ 40. They refused to allow a serviceperson to visit because she didn't answer her phone. *Id.* at ¶ 56. Ultimately, they provided D.C. police officers with a key to her apartment so

that the police could enter—without an interpreter—to arrest her son. *Id.* at ¶ 68. Several of these contributing incidents occurred after August 30, 2017. *See Id.* at ¶¶ 54, 58, 84-85.

The question whether Plaintiffs can *prove* a hostile living environment is a question properly reserved for trial. Defendants' attempt to have the Court engage in that fact-finding on a motion to dismiss should be rejected.

### B.   In the Non-Employment Context, the Applicable Statute of Limitations for ADA and Rehabilitation Act Claims is Three Years

Even if Plaintiffs' ADA and Rehabilitation Act claims would be barred by a one-year statute of limitations, that is immaterial, because the statute of limitations for non-employment claims under the ADA and Rehabilitation Act is three years. Many cases so hold; we are not aware of any cases to the contrary.

In general, neither the ADA nor the Rehabilitation Act has an explicit statute of limitations for claims of disability discrimination or retaliation.[2] Rather, courts borrow a limitations period from the state statute "most closely analogous" to the federal cause of action. *See, e.g., Runyon v. McCrary,* 427 U.S. 160, 180 (1976).

After the Supreme Court's ruling in *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 661–62 (1987), holding that a state's statute of limitations for general personal injury should apply to federal civil rights laws, almost all federal courts "applied the state statute of limitations for personal injury actions to claims under the Rehabilitation Act and the ADA." *Gaona v. Town Country Credit*, 324 F.3d 1050, 1055 (8th Cir. 2003). That has been true of the courts in this

---

[2] Title I of the ADA does have a defined statute of limitations; claims under that Title are subject to the limitations period set forth in 42 U.S.C. § 2000e-5 (Title VII of the Civil Rights Act of 1964). *See* 42 U.S.C. § 12117(a); *Stewart v. District of Columbia*, Civ. No. 04-1444-CKK, 2006 WL 626921, at *3 (D.D.C. Mar. 12, 2006).

District; to the best of our knowledge every court in this District that has considered the matter has held that the most analogous local statute for non-employment discrimination claims under the ADA and the Rehabilitation Act is the D.C. three-year limit for general personal injury. *See, e.g., Long v. Howard University,* 512 F. Supp. 2d 1, 12 (D.D.C. 2007) ("In the District of Columbia, this limitations period is three years, and thus a three-year limitations period is applied in Rehabilitation Act and ADA cases."), *aff'd*, 550 F.3d 21 (D.C. Cir. 2008); *Di Lella v. University of District of Columbia David A. Clarke School of Law,* 570 F. Supp.2d 1, 8–9, n.9 (D.D.C. 2008) (ADA); *Williams v. Savage,* 538 F. Supp.2d 34, 39–40 (D.D.C. 2008) (ADA); *Kersey v. Washington Metropolitan Area Transit Authority,* 533 F. Supp.2d 181, 190 (D.D.C. 2008) (ADA); *Gordon v. D.C.*, 605 F. Supp.2d 239, 245 (D.D.C. 2009) (Rehabilitation Act); *Doe v. Southeastern University,* 732 F. Supp. 7, 8–9 (D.D.C. 1990) (Rehabilitation Act). Defendants cite no case to the contrary.

Instead, Defendants ask this Court to extend the reasoning of the D.C. Court of Appeals in *Jaiyeola v. District of Columbia*, 40 A.3d 356 (D.C. 2012), which held that the one-year statute of limitations contained in the D.C. Human Rights Act ("DCHRA") should apply to an employment discrimination claim under the Rehabilitation Act. Two cases in this Court have followed *Jaiyeola* in cases that likewise involved employment discrimination claims under the Rehabilitation Act. *McFadden v. Wash. Metro. Area Transit Auth.*, 204 F. Supp. 3d 134 (D.D.C. 2016); *Congress v. District of Columbia*, 324 F. Supp. 3d 164 (D.D.C. 2018).

Of course, decisions of the D.C. Court of Appeals are not binding here on questions of federal law, and the question of which local statute of limitations is most analogous is a question of federal law. *See Banks v. Chesapeake and Potomac Telephone Co.*, 802 F.2d 1416, 1420 (D.C. Cir. 1986) ("[A] particular state's characterization of a federal claim for purposes of

determining which statute of limitations is applicable is not binding on a federal court."). And as the *Jaiyeola* court recognized, "[a] majority of federal courts in other jurisdictions have chosen to apply the forum state's limitations periods for personal injury claims to claims of disability discrimination under § 504 of the Rehabilitation Act," because "claims for discrimination are essentially claims for personal injury." *Jaiyeola*, 40 A.3d at 364–65 (quoting *Hickey v. Irving Indep. Sch. Dist.*, 976 F.2d 980, 982 (5th Cir. 1992)).

Plaintiffs submit that the Supreme Court got it right: discrimination "is a fundamental injury to the individual rights of a person." *Goodman v. Lukens Steel Co*., 482 U.S. at 661. It follows that the "limitations period governing personal injury actions" is the appropriate period to borrow for federal statutes prohibiting discrimination. *Id*. at 662.

Moreover, even if the *Jaiyeola* decision was right with regard to the subset of employment discrimination cases, extending it to a housing discrimination case would improperly "stymie the policies underlying the federal cause of action" and "be 'at odds with the purpose or operation of federal substantive law.'" *North Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995) (quoting *DelCostello v. Int'l Brotherhood. of Teamsters*, 462 U.S. 151, 161 (1983)).

Title I of the ADA, which applies to employment discrimination, has a federal statute of limitations that is in the neighborhood of one year.[3] Applying the one-year limitation period of the D.C. Human Rights Act to employment discrimination claims under the Rehabilitation Act

---

[3] Title I, 42 U.S.C. § 12117(a), explicitly incorporates the "powers, remedies, and procedures" of Title VII of the Civil Rights Act of 1964 for ADA employment discrimination claims. Section 706 of the Civil Rights Act, in turn, creates a limitations period of 300 days in the District of Columbia and in other jurisdictions in which there is a "State or local agency with authority to grant or seek relief from such [discriminatory] practice or to institute criminal proceedings with respect thereto." 42 U.S.C. § 2000e–5 (e)(1) (2006). In jurisdictions than have no such agency, the Title VII limitations period is 180 days. *Id. See also Jaiyeola,* 40 A.3d at 363–64 & nn. 16–17.

therefore makes all claims of employment discrimination based on disability—whether under the ADA, the Rehabilitation Act, or the D.C. Human Rights Act—subject to a similar limitations period. The *Jaiyeola* court recognized as much, *see Jaiyeola*, 40 A.3d at 366, and perhaps that makes sense. But the same is not true with respect to non-employment cases. Titles II, III, and IV of the ADA do not incorporate Title VII limitations, so it is clear that Congress did not intend for them to be subject to such a short limitation period. Indeed, by the time the ADA was enacted in 1990, the Supreme Court already made clear that the borrowed statute of limitations for federal civil rights statutes should be a state's general personal injury statute, *Goodman*, 482 U.S. at 661. It follows that when Congress did not carve out an exception, as it did for Title I, it expected that rule to apply. *See, e.g., Ryan v. Gonzales*, 568 U.S. 57, 66 (2013) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent.") (citation omitted); *Abuelhawa v. United States*, 556 U.S. 816, 821 (2009) ("As we have said many times, we presume legislatures act with case law in mind."). That presumption is further supported by 28 U.S.C. § 1658, the general four-year statute of limitations for civil actions arising under federal statutes enacted after December 1, 1990. While that law does not apply to the ADA because it was enacted in July 1990, it reflects Congress's view that a one-year statute of limitations would be inappropriate for civil rights laws not involving employment discrimination.

The appropriate limitation period for Plaintiffs' ADA and Rehabilitation Act claims is therefore three years.

C.   **Even if the Statute of Limitations Were One Year, the ADA, Rehabilitation Act and DCHRA Claims Are Not Time Barred Because Many Alleged Acts Occurred Within One Year of the Complaint**

Even if this Court were to find that the appropriate statute of limitations for Plaintiffs' ADA and Rehabilitation Act claims is one year,[4] Plaintiffs have alleged discriminatory and retaliatory acts by DCHA and CIH that occurred after August 30, 2017, and are therefore timely.

First, during this time period, DCHA and CIH repeatedly denied access to Ms. Arthur's invited guests and visitors due to their enforcement of the Phone Call Policy, for which Ms. Arthur repeatedly requested reasonable accommodation due to her deafness and, thus, inability to hear the phone ring. Amend. Compl. ¶ 58 (citing incidents in September and November 2017, as well as additional incidents, upon information and belief, during this time period).

Second, DCHA's "Phone Call Policy" remained in effect throughout the August 2017 to August 30, 2018 time period, and beyond. The Amended Complaint alleged, upon information and belief, that Ms. Arthur was denied the opportunity to visit with other guests when she did not answer the phone because she could not hear or see it. *Id.* at ¶ 58.

Third, a retaliatory Bar Notice against Mr. Arthur remained in place until January 11, 2018, less than eight months before the Complaint was filed. *Id.* at ¶ 54.

Fourth, on August 30, 2017, Defendants provided D.C. police officers with a key to Ms. Arthur's apartment to facilitate their entry, without an interpreter, for the purpose of arresting Mr. Arthur on a warrant that DCHA had requested and which it knew or should have known was supported only by an invalid Bar Notice. *Id.* at ¶ 68. That arrest, in turn, resulted in physical and emotional injury to both Plaintiffs on account of Ms. Arthur's deafness. *Id.* at ¶¶ 1, 76–81.

_____

[4] The DCHRA has a one year limitation period.

Because each of these acts occurred within one year of the filing of the complaint, Plaintiffs' claims arising under the ADA, the Rehabilitation Act and DCHRA against DCHA and CIH cannot be dismissed as time-barred.[5]

## II.    Ms. Arthur Requested Reasonable Accommodations

Defendants assert that even claims based on events within the one-year statute of limitations must be dismissed "for failure to make a request for a reasonable accommodation in the first instance." Motion at 14.

Defendants point to the incidents in paragraph 58, in which Ms. Arthur's friends and family were denied entry to her apartment from January 2017 to the present, including two specific instances in September and November 2017. These visitors were denied entry because, when they arrived at Claridge Towers, the security desk enforced its Phone Call Policy when Ms. Arthur did not answer her phone. In one incident, during the week of September 24, 2017, a group of friends were denied access to Ms. Arthur's apartment when they came to offer condolences following the murder of Ms. Arthur's teenage grandson. Amend. Compl. ¶ 58.

Defendants' position appears to be that a person with a disability must request accommodation in advance with respect to each particular instance of discrimination that may occur in the future. That would require the impossible: Ms. Arthur could not know in advance

---

[5] If the Court rejects Defendants' statute of limitations argument, Defendants urge the Court to stay the case and allow them to seek an immediate appeal under 28 U.S.C. § 1292(b). Motion at 5 n.5. The Court should decline Defendants' invitation. The denial of *any* motion to dismiss will force a defendant to continue litigating in the trial court, even though some such denials may later be reversed. Defendants do not suggest that they would be entitled to an interlocutory appeal under the collateral order doctrine, and nothing about the limitations issue in this case distinguishes it from other legal issues presented in motions to dismiss.

Additionally, as noted above, an appellate decision that the applicable statute of limitations is one year would not result in the termination of this lawsuit, even as to the DCHA and CIH defendants.

which of her friends would seek to pay a condolence visit on which day and at what time. But *lex non cogit ad impossibilia*—the law does not compel the doing of impossibilities—and Congress did not intend to require people with disabilities to predict the particular instances in which others would inflict discrimination upon them.

As stated in the Amended Complaint, the Arthurs repeatedly requested reasonable accommodations and advised Defendants that the Video Relay equipment was ineffective. *Id.* at ¶¶ 21, 59–61. That is sufficient at the pleading stage. Defendants' other examples are of similar tenor, *see* Motion at 15. None were specifically predictable; all were reasonably covered by Plaintiffs' general request for accommodation and the Defendants' undoubted knowledge of her deafness. In any event, the ADA and the Rehabilitation Act "mandate that entities act *affirmatively* to evaluate the programs and services they offer and to ensure that people with disabilities will have meaningful access to those services." *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 269 (D.D.C. 2015).

## III.   CIH Is Covered by the ADA

CIH is covered by Title II or, in the alternative, Title III of the ADA for discriminatory acts against Ms. Arthur. Title II of the ADA prohibits discrimination against individuals on the basis of disability by state and local governments and their instrumentalities. Title III of the ADA prohibits discrimination against individuals on the basis of disability by an entity that operates a place of public accommodation. CIH is one or the other.

### A.   CIH Is Covered by Title II

Title II of the ADA imposes non-discrimination duties on public entities. 42 U.S.C. § 12132. It defines a "public entity" as including "any . . . instrumentality of a State or local government." *Id.* § 12131(1)(B). The term "State" includes the District of Columbia. *Id.* §

14

12103(2). The Department of Justice regulation defining "public entity" does not further define "instrumentality." *See* 28 C.F.R. § 35.104.

In its capacity as the management company for a government building, CIH is (or at least may be, pending factfinding) an instrumentality of the government and therefore a public entity for purposes of Title II. *See Hunter ex rel. A.H. v. District of Columbia*, 64 F. Supp. 3d 158 (D.D.C. 2014). That case is on all fours with this one: a private company, the Community of Hope ("COH"), was contracted to "manage the day-to-day operations at the District-owned Girard Street Apartments." *Id*. at 164. The complaint alleged that COH violated plaintiffs' rights under ADA Title II, and COH moved to dismiss on the ground that it was not a public entity for purposes of Title II. *Id*. at 171. The court (Kessler, J.), denied the motion to dismiss, on the ground that the complaint sufficiently alleged that COH was a public entity, and factual development was needed to establish whether that was true or false. *Id*. at 171–72.

The court looked for guidance to the Justice Department's ADA Title II Technical Assistance Manual ("Manual"), which indicates that factfinding may be necessary to establish whether an entity such as COH or CIH is covered by Title II. The Manual acknowledges that "[i]n some cases it is difficult to determine whether a particular entity that is providing a public service … is in fact a public entity." *Id*. at 171 (quoting Title II Manual § II-1.2000). It sets forth four factors to evaluate "the relationship between the entity and the governmental unit to determine whether the entity is public or private":

1) Whether the entity is operated with public funds;
2) Whether the entity's employees are considered government employees;
3) Whether the entity receives significant assistance from the government by provision of property or equipment; and
4) Whether the entity is governed by an independent board selected by members of a private organization or a board elected by the voters or appointed by elected officials.

15

United States Dep't of Justice, Civil Rights Div., *The Americans With Disabilities Act: Title II Technical Assistance Manual* § II-1.2000, available at https://www.ada.gov/taman2.html.[6] The Manual notes that an entity need not meet all four factors to be considered a public entity, but rather that these are "[f]actors to be considered." *Id*. Plaintiffs have alleged sufficient facts to satisfy the DOJ Manual factors. As in *Hunter*, "[g]iven that there is no full factual record … the Court [should] not dismiss the ADA claim against [COH] at this time." *Hunter*, 64 F. Supp. 3d at 172.

*McNamara v. Ohio Building Auth.*, 697 F. Supp. 2d 820 (N.D. Ohio 2010), is to the same effect. There, the corporate defendant managed a government building in Toledo, Ohio. It allegedly discriminated against a disabled individual, but moved to dismiss a claim under ADA Title II on the ground that "a private corporation by definition 'is not a public entity for purposes of Title II coverage.'" *Id*. at 827. The court denied the motion to dismiss, holding that the company was "a public entity, in view of its extensive (indeed, from all that appears, exclusive) control over the publicly-owned DiSalle Building." *Id*. at 828.

Additionally, the court in *McNamara* pointed out that Title II "states that no qualified individual with a disability may 'be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity.'" *Id. at* 828, n.5 (quoting 42 U.S.C. § 12132), and that a "plain reading of the statute," therefore, supports the conclusion that Title II prohibits not only discrimination by public entities, but any action by a public *or private* entity that restricts access or participation in a public entity's activities. *Id.* Because DCHA is a public

---

[6] "The guidance provided in the technical assistance manual is an interpretation of the DOJ's regulation … and, as such, is entitled to significant weight as to the meaning of the regulation." *Disabled Rights Action Committee v. Las Vegas Events, Inc*., 375 F.3d 861, 875 (9th Cir. 2004) (referring to the Title III Manual).

entity and CIH restricted Ms. Arthur's access or participation in DCHA's activities by denying her equal participation on account of her disability, CIH is covered by the plain language of Title II.

**B.      Alternatively, CIH Is Covered by Title III**

If the Court finds that CIH is not covered by Title II, then it should find that CIH, as a private entity, is covered by Title III.[7] Defendants have mischaracterized Plaintiffs' claims on this point. Plaintiffs do not allege that CIH manages a "place of lodging," Motion at 18, but rather that Claridge Towers qualifies as a day care or senior citizen center which squarely falls within the definition of public accommodation under 42 U.S.C. § 12181(7)(K). If a private entity operates a publicly owned facility where social services are provided, then that entity operates a public accommodation subject to Title III of the ADA.

Claridge Towers is not just a residential apartment complex. It is, in every way, an operational senior citizen center. *See* Amend. Compl. ¶ 13 ("Claridge Towers … provides … senior center services"; "Claridge Towers provides a significant level of social services and activities including assistance with daily living activities, provision of meals, transportation, counseling and organized recreational activities."); ¶ 16 ("Claridge Towers provides a significant level and numerous social services and activities on-site to its senior citizen residents, including assistance with daily living activities, provision of meals, transportation, counseling and

---

[7] The ADA Title III Technical Assistance Manual notes that "[p]ublic entities, by definition, can never be subject to title III of the ADA, which covers only private entities. Conversely, private entities cannot be covered by title II. There are many situations, however, in which public entities stand in very close relation to private entities that are covered by title III, with the result that certain activities may be affected, at least indirectly, by both titles." Title III Manual § III-1.7000, *available at* https://www.ada.gov/taman3.html#II-1.2000.

organized recreational activities."). These allegations must be taken as true (and Defendants do

not suggest they are false).

The ADA Title III Technical Assistance Manual addresses such a situation directly. As

an illustration, the Manual provides the following scenario:

> A private, nonprofit corporation operates a number of group homes under contract with a State agency for the benefit of individuals with mental disabilities. These particular homes provide a significant enough level of social services to be considered places of public accommodation under title III. The State agency must ensure that its contracts are carried out in accordance with title II, and the private entity must ensure that the homes comply with title III.

Title III Manual, § III-1.7000. The relationship between the public entity (DCHA) and the

private entity (CIH) would be that "[w]here public and private entities act jointly, the public

entity must ensure that the relevant requirements of title II are met; and the private entity must

ensure compliance with title III." *Id.* The Department of Justice's 1994 Supplement to the Title

III Manual elaborated further on when certain residential facilities would be covered by Title III:

> *Are nursing homes, congregate care facilities, independent living centers, and retirement communities covered as places of public accommodation?* Some may be. Nursing homes are expressly covered in the title III regulation as social service center establishments. Similar residential facilities, such as congregate care facilities, independent living centers, and retirement communities, are covered by title III, if they provide a significant enough level of social services that they can be considered social service center establishments. *Social services in this context include medical care, assistance with daily living activities, provision of meals, transportation, counseling, and organized recreational activities.* No one of these services will automatically trigger ADA coverage. Rather, the determination of whether a private entity provides a significant enough level of social services will depend on the nature and degree of the services.

Title III Manual 1994 Supplement § III-1.2000, *available at* https://www.ada.gov/taman3up.html

(second emphasis added). The test is this: "If a facility provides a significant enough level of

social services such that it can be considered a social service center establishment, all of those

portions of the facility that are used in the provision of the social services are covered by the

ADA. For example, if the social services are provided throughout the facility, including in the

18

individual housing units, then the entire facility is a place of public accommodation, covered by title III." *Id.*

Accepting the allegations of the Amended Complaint as true, Claridge Towers, managed by CIH, plainly meets this test. The building provides a significant level of social services to its low-income elderly residents. The building provides activities on-site to its senior citizen residents, including assistance with daily living activities, provision of meals, transportation, counseling and organized recreational activities. For example, residents at Claridge Tower have been provided "transportation to local stores, boat and restaurant trips, including transportation to such events, a food bank, daily lunch, routine grocery truck deliveries, Alcoholics Anonymous meetings, health fairs, weekday coffee events, mix and mingle activities, news and current events and in the news events, dances and games and other activities such as board games, painting, Bingo and movie night." Amend. Compl. ¶ 16.

The cases cited by Defendants on this point relate to apartment buildings that were not alleged to provide the myriad of senior citizen services that Claridge Towers provides. As far as the case reports indicate, they involved ordinary residential buildings that did not offer the types of social services that elevate a private complex to a public accommodation. *See Parham v. CIH Properties, Inc,* No. 14–1613 (RJL), 2015 WL 5294683 (D.D.C. Sept. 6, 2015) (Dupont Park Apartments); *Parham v. CIH Properties, Inc.,* 148 F. Supp. 3d 5 (D.D.C. 2015) (same); *Hooper v. United States HUD,* No. 6:17-cv-00031-MC, 2017 WL 2380176 (D. Or. May 31, 2017); *Arceneaux v. Marin Housing Auth.,* No. 15–cv–00088–MEJ, 2015 WL 3396673 (N.D. Cal. May 26, 2015).

The categories of public accommodations listed in the statute and regulations "should be construed liberally to afford people with disabilities equal access to the wide variety of

establishments available to the nondisabled." *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 676–77 (2001) (internal quotation marks and citations omitted); H.R. Rep. 101–485(II), at 100, 1990 U.S.C.C.A.N. 303, 383 (1990) ("The Committee intends that the 'other similar' terminology should be construed liberally, consistent with the intent of the legislation that people with disabilities should have equal access to the array of establishments that are available to others who do not currently have disabilities."). Accordingly, courts have construed the definition of public accommodation to include other residential facilities where individuals may reside for varying lengths of time. *See, e.g., Hahn ex rel. Barta v. Linn Cty., Iowa,* 191 F. Supp. 2d 1051, 1055 n.3 (N.D. Iowa 2002) (finding that a private nonprofit that provided residential support services to persons with disabilities was "akin to a social service center establishment" and subject to Title III); Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed. Reg. 35,544, 35,551 (July 26, 1991) (noting that other residential facilities, such as substance abuse treatment centers and halfway houses, would also meet the definition of public accommodation).

CIH, through its operation of a public accommodation—a residential senior citizen center at Claridge Towers—is covered by Title III of the ADA. Because Plaintiff has plausibly and sufficiently pleaded this claim, Defendants' Motion to dismiss it should be denied.

**IV.     Defendants' Motion to Dismiss "Claim 10" Addresses a Claim Not Made**

Defendants move to dismiss "Claim 10," which they characterize as a claim for "retaliatory action in violation of the DCRA, [D.C. Code § 42-3505.02]." Motion at 21. There is no such claim in the Amended Complaint. Claim 10 of the Amended Complaint is asserted against other Defendants. Defendants' motion should therefore be disregarded in this respect.

**V.      Ms. Arthur Sufficiently Stated a Claim for Violation of Her Implied Warranty of Habitability and Covenant of Quiet Enjoyment**

Ms. Arthur has sufficiently pleaded a claim for breach of the common-law covenant of quiet enjoyment and the implied warranty of habitability. The covenant of quiet enjoyment is "essentially a covenant of title, which assure[s] the tenant that his possessory interest [will not] be invaded by the landlord or with anyone with rights superior to those of the landlord." *Sobelsohn v. American Rental Mgmt. Co.,* 926 A.2d 713, 715 (D.C. 2007). *See also Union Travel Assocs., Inc. v. Int'l Assocs., Inc.*, 401 A.2d 105, 107 (D.C. 1979) ("[A] lease confers upon a tenant exclusive possession of the subject premises as against all the world, *including the owner*.") (emphasis added).

Accordingly, residential landlords are obligated to "not act in . . . ways that interfere unreasonably with permissible uses of the leased premises." *Sobelsohn*, 926 A.2d at 716. The landlord breaches its obligations "if, during the period the tenant is entitled to possession of the lease property, the landlord . . . interferes with a permissible use of the leased property by the tenant," for example, by unauthorized possession of part of the premises or excessive noise in the common areas. *Id.* (quoting Restatement (Second) of Property: Landlord and Tenant § 6.1 (1977)).

D.C. courts have recognized, in line with precedent elsewhere, "a tenant's right of possession as prohibiting the landlord from determining who may be admitted to or excluded from the subject property." *Lotus Square Apartments v. McVae*, No. 2015 LTB 31179, 2016 WL 10956500, at *1 (D.C. Super. Sept. 1, 2016). As a Connecticut appellate court explained, "the implication which necessarily flows from the tenant's control and possession is that it is the tenant, not the landlord, who has the final word as to the person or persons who may enter upon the demised premises. The landlord has neither the power of exclusion nor the power of

21

selection." *State of Connecticut v. Schaffel*, 229 A.2d 552, 561 (Conn. Cir. Ct. 1966) (citing

*Driskill v. United States*, 281 F.146, 147 (9th Cir. 1922)). Similarly, a Massachusetts appellate

court held that a tenant has "license to admit whom he wishes." *Commonwealth v. Nelson*, 909

N.E.2d 42, 45 (Mass. App. Ct. 2009) (reversing a defendant's conviction for criminal trespass in

public housing when the landlord had previously barred the defendant from the premises and the

tenant "legitimate[ly] invit[ed]" the defendant to the premises as her guest).[8]

    "The warranty of habitability, activated upon the landlord signing the lease, is non-

waivable and read into all leases for residential housing in the District of Columbia." *Parham v.*

*CIH Properties, Inc.*, 208 F. Supp. 3d 116, 124 (D.D.C. 2016). A landlord's failure to comply

with D.C. housing regulations, set out in Title 14 of the D.C. Code, constitutes a "privately-

enforceable breach of the warranty of habitability." *Id.* The warranty of habitability also ensures,

more broadly, that "leased premises are fit for use." *Beltway Management Co. v. Lexington-*

*Landmark Ins. Co.*, 746 F. Supp. 1145, 1150 (D.D.C. 1990). A violation of the implied warranty

of habitability is "an invasion of the right of private occupancy." *Id.* If a landlord prohibits a

---

[8] Even if DCHA could unilaterally bar individuals from visiting a public housing tenant, it would have to comply with applicable regulations; otherwise, such a bar would be invalid. *See Winston v. United States*, 106 A.3d 1087, 1092 (D.C. 2015) (holding that, in order to prove unlawful entry onto DCHA property, the government had to show that "the barring order was issued for a reason described in DCHA regulations and must offer evidence that the DCHA official had an objectively reasonable basis" to believe the regulatory requirements were satisfied). Further, a court's survey of the common law across the country found that "the law is clear that an invitee or licensee who [enters the subject premises], even after a specific prohibition by the landlord, is not a trespasser and does not violate a criminal trespass statute." *State of Vermont v. Dixon*, 725 A.2d 920, 921 (Vt. 1999). *Cf. Bean v. U.S.*, 709 A.2d 85, 86–87 (D.C. 1998) (where a barring notice applied to an individual when present on the premises for no legitimate reason, the state needed to prove beyond a reasonable doubt that the individual was not on the premises for a legitimate reason, *e.g.*, visiting a resident).

tenant from inviting guests and visitors to her home, that is a clear invasion of the right of private

occupancy, essentially rendering her apartment not "fit for use." *See id.*

Ms. Arthur has plainly pleaded that DCHA and CIH unlawfully prohibited visitors,

caregivers, and repairmen from entering her apartment, even when granted express permission

by Ms. Arthur. *See, e.g.*, Amend. Compl. ¶ 25 (Mr. Arthur), ¶ 52 (Mr. Arthur), ¶ 56 (service

technician), ¶ 58 (friends paying condolences for death of Ms. Arthur's grandson). DCHA and

CIH have unreasonably obstructed Ms. Arthur's right to receive guests, which is a permissible

and protected use of her apartment, and have thereby violated the implied covenant of quiet

enjoyment and the implied warranty of habitability.

## VI.    Mr. Arthur Sufficiently Stated a Claim Under Section 1983

Robert Arthur's claim under 42 U.S.C. § 1983 (Claim 15) is that his application to be his

mother's live-in aide was denied without affording him the procedural protections provided by

42 U.S.C. § 13663(d). Amend. Comp. ¶¶ 167–68.

Section 13663(d) provides that

> Before an adverse action is taken with respect to an applicant for federally
> assisted housing on the basis that an individual is subject to a lifetime
> registration requirement under a State sex offender registration program, the
> public housing agency obtaining the record shall provide the tenant or
> applicant with a copy of the registration information and an opportunity to
> dispute the accuracy and relevance of that information.

Defendants argue that Mr. Arthur has no enforceable right under 42 U.S.C. § 1983

because, according to Defendants, he was not an "applicant" under 42 U.S.C. § 13663(d).

Motion at 25. But their actions speak louder than their words. In fact, DCHA relied on 42 U.S.C.

§ 13663(d) as the basis for its denial of his application for live-in aide residency. Plaintiffs'

Amended Complaint expressly references Defendants' August 2, 2017 letter, in which it applied

those very provisions to deny him live-in aide status. Amend. Compl. ¶ 43. DCHA should

therefore not be heard to claim that that provision does not apply to Mr. Arthur, and that he has no rights thereunder.

While the term "applicant" is not defined in the statute, DCHA unequivocally treated Mr. Arthur as an applicant to reside in federally assisted housing. As it confirms in its motion to dismiss, Mr. Arthur had to be approved by DCHA "prior to occupancy" in a unit at Claridge Towers, Motion at 32, and "[a] live-in aide resides in a unit identified on a lease." [9] *Id.* Just so.

A live-in aide applies to occupy and reside in a dwelling unit in public housing, and in deciding whether to grant or deny that application, DCHA employs the standards set forth in Section 13663(d). DCHA cannot treat Mr. Arthur as an applicant under that provision and later deny that he was one.

Section 13663(d) provides that a "the public housing agency shall provide the … applicant with a copy of the [sex offender] registration information and an opportunity to dispute the accuracy and relevance of that information." DCHA did not comply with the federal regulations applicable in this case as Mr. Arthur was not given an opportunity to dispute his registration prior to the adverse action of denying his application. This forms the basis for his claim under Section 1983.

Because the statute provides that an applicant may dispute the "relevancy" as well as the "accuracy" of his registration, there cannot be an absolute bar for all registrants. DCHA's

---

[9] Under D.C. Municipal Regulations, a live-in aide is "a person who resides with one or more elderly persons, or near-elderly persons, or persons with disabilities, and who: (a) Is determined to be essential to the care and well-being of the person(s); (b) Is not otherwise legally or financially obligated for the support of the person(s); and (c) Would not be living in the unit except to provide the necessary supportive services." 14 DCMR § 6121.2. A live-in aide "must abide by all the rules and regulations of DCHA as well as those of the particular property where they reside." 14 DCMR § 6121.4. As applied by DCHA in the instant case, this includes a live-in aide conforming with the residency requirements of public housing.

position that there is an absolute bar would read the term "relevancy" out of the law, contrary to the fundamental canon that courts are "obliged to give effect, if possible, to every word Congress used." *Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 138 S. Ct. 617, 632 (2018) (quoting *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339 (1979)).

The cases cited by Defendants do not hold otherwise. *Barry Farm Tenants & Allies Ass'n v. D.C. Housing Authority*, 311 F. Supp. 3d 57, 69 (D.D.C. 2018), states that "Section 1983 thus confers a private right of action to safeguard certain rights created by federal statutes. Therefore, to bring a Section 1983 claim, a plaintiff must assert a violation of a federal *right*, not merely a violation of federal *law*." Mr. Arthur has asserted a violation of a federal right: the procedural right conferred by 42 U.S.C. § 13663(d).

Had he been afforded the right that § 13663(d) confers, Mr. Arthur could have shown that his sex offender registration has no relevance to his ability to care for his mother while residing at Claridge Towers. Maryland, the state where Mr. Arthur was convicted of a sex offense after entering an *Alford* plea, has determined that Mr. Arthur does not need to be on its sex offender list, and has removed him; Mr. Arthur is in the process of appealing the District's refusal to follow suit. Amend. Compl. ¶ 43. DCHA should have considered those facts and not applied an absolute bar.

DCHA inflicted on Mr. Arthur precisely the type of procedural harm which finds its remedy in Section 1983. He has sufficiently pleaded this claim, and Defendants' motion to dismiss it should be denied.

## VII.    Ms. Arthur Sufficiently Stated a Claim for Breach of Lease

Evelyn Arthur properly asserts a claim against DCHA for breach of lease, namely, the violation of Sections 15.2 and 15.3 of her lease, which govern scheduled and unscheduled inspections. Amend. Compl. ¶¶ 170–71. Section 15.2 states that "The Lessee shall permit the

25

Authority, *upon advance written notice*, to enter the Leased Premises during normal business hours so that the Authority may perform routine inspections or maintenance, . . . [or] take photographs or otherwise document the condition of the unit or repairs" (emphasis added). Section 15.3 states that "The Authority may enter the Leased Premises at any time without advance notice when it has cause to believe that an emergency exists, or when the Lessee has agreed to such entry."

DCHA does not deny that it sent a maintenance employee to Ms. Arthur's apartment without first notifying her in violation of her lease. After DCHA falsely accused Mr. Arthur of removing the strobe light system, the DCHA/CIH agent burst into Ms. Arthur's apartment a few days later, without even announcing himself, and proceeded to take photographs (which showed that the equipment was still installed). Amend. Compl. ¶ 84. The unauthorized entry of a DCHA agent into her home, as well as the agent's unconsented photography within her home, constitute a breach of Sections 15.2 and 15.3 of her lease. Claims for breach of lease are analyzed under the general test for a breach of contract. *Javins v. First Nat'l Realty Corp.*, 428 F.2d 1071, 1075 (D.C. Cir. 1970) ("[L]eases of urban dwelling units should be interpreted and construed like any other contract."). The elements for a claim of breach of contract under D.C. law are: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Millennium Square Residential Ass'n v. 2200 M St. LLC*, 952 F. Supp. 2d 234, 250 (D.D.C. 2013). DCHA does not deny the first three elements, *see* Motion at 29, but complains that Ms. Arthur "fails to identify the remedy she seeks." *Id.*

Ms. Arthur's complaint plainly asserts that she is seeking damages for this breach. Claim 16 states, "Defendants DCHA and CIH are liable to Plaintiff Evelyn Arthur for breach of her

lease." Amend. Compl. ¶ 171. And her Request for Relief seeks compensatory and punitive damages, as well as any other relief deemed just and proper by the court. *Id*. at ¶¶ 39–40.

Ms. Arthur's claim for breach of lease meets the pleading requirement for Rule 12(b)(6). Defendants' Motion should be denied.

## VIII.   Ms. Arthur Sufficiently Stated a Claim Under the Fair Housing Act

Defendants accurately note that Section 3604(f)(2) of the Fair Housing Act makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of a [disability] of that person." Motion at 31 (quoting 42 U.S.C. § 3604(f)(2)(A)). Discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* at § 3604(f)(3)(B). The Amended Complaint alleges that DCHA has repeatedly refused to make reasonable accommodations for Ms. Arthur, and therefore states a claim under the FHA.

### A.     Plaintiff's FHA Claim Was Timely Filed

DCHA first argues that Ms. Arthur's FHA claims must be dismissed because the continuing violations doctrine does not apply to FHA claims. Motion at 29-31. But there seems to be no point to that argument. FHA claims have a two-year statute of limitations, *see* 42 U.S.C. § 3613(a); *Comer v. Wells Fargo Bank, N.A.*, 108 A.3d 364, 369 n.7 (D.C. 2015), and all of the events relating to the FHA claim took place within the two years prior to Plaintiffs' filing of the original complaint. *See* Amend. Compl. ¶ 174. The FHA claim does not need to rely on the continuing violations doctrine.

**B.      DCHA Did Not Provide Ms. Arthur With Reasonable Accommodations**

Defendants assert that it is "undisputed that DCHA granted Ms. Arthur's requests for reasonable accommodations." Motion at 31. That is simply not true. Some were simply ignored. Others were theoretically granted but not actually provided. To "grant" an accommodation and then fail actually to provide it does not satisfy Defendants' obligation. DCHA's failure to actually provide Ms. Arthur with reasonable accommodation is at the heart of this litigation and is far from undisputed.

As alleged, Ms. Arthur has made numerous requests for reasonable accommodation that have been ignored. For example, since January 2017, the Arthurs repeatedly requested reinstatement of the waiver of the Phone Call Policy to allow Mr. Arthur to enter Ms. Arthur's apartment without a phone call, and for Mr. Arthur to grant permission for other guests when Ms. Arthur is unable to see or hear the telephone ring. Amend. Compl. ¶¶ 21, 59–61. This entirely reasonable request was never granted. If this request had been granted, it would have prevented some of the discriminatory events described by Defendants in their own motion, including visitors being denied entry because Ms. Arthur did not hear the telephone ring. *See* Motion at 33 (citing Amend. Compl. ¶ 58). Additionally, Ms. Arthur requested that her son be approved as her live-in aide, as he is her only family member in D.C. and the only person capable of fulfilling this role. *Id.* at ¶¶ 42–43. That request was denied. DCHA argues that it approved Ms. Arthur's request for a live-in aide, only denying her candidate. However, this denial was effectively a denial of her request, as she has no one else who could serve in this role. *See, e.g.*, Amend. Compl. ¶ 38 ("her son was her only family in Washington and 'the only person I have to help me'"); ¶ 99. Although DCHA argues that approving Mr. Arthur would have violated federal law, Motion at 33, Plaintiffs dispute that conclusion. As explained above, federal law, and the federal and local regulations thereunder, provide that a housing agency must

28

"provide the tenant or applicant with … an opportunity to dispute the accuracy and relevance of that [sex offender] information." 42 U.S.C. § 13663(d). No such opportunity was afforded.

Although DCHA asserts that it made accommodations for Ms. Arthur *after* she brought suit against them, *see* Motion at 32 (noting that in October and November 2018, "DCHA installed 'additional lights and equipment in Ms. Arthur's apartment and provided rechargeable watches that flash to signal an incoming video relay call'"), any accommodations made following the commencement of this case do not moot Ms. Arthur's damages claims. In demonstrating that an accommodation was reasonable, a party must show that there is no reasonable expectation that the discriminatory behavior will be repeated. *See Young v. D.C. Housing Authority*, 31 F. Supp. 3d 90, 96 (D.D.C. 2014) (finding there was reasonable expectation that the discriminatory conduct would occur despite DCHA's fixes). As in *Young*, Ms. Arthur has set forth a multi-year history of DCHA failing to provide the reasonable accommodations to which she is entitled. While DCHA has made some improvements, none are so effective as to provide a reasonable expectation that DCHA would not reverse course and leave Ms. Arthur in the same position she was in prior to the litigation. In any event, Plaintiffs' Amended Complaint makes clear that the alleged accommodations have been insufficient. Amend. Compl. ¶¶ 21, 59, 82, 128.

Under Rule 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[ ] [his or her] claims across the line from conceivable to plausible." *See Hunter ex rel. A.H. v. District of Columbia*, 64 F. Supp. 3d 158 (D.D.C. 2014). Defendants' motion to dismiss the FHA claim should be denied.

## IX.     Defendants' Motion to Strike Should Be Denied

Defendants' motion to strike Plaintiffs' request for punitive damages is an improper use of a motion to strike. On the merits, whether considered as a motion to strike or a motion to dismiss, it is both premature and unsupported.

### A.     Defendants' Motion is Not a Proper Motion to Strike

As noted above, motions to strike must relate to "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A matter is immaterial or impertinent when it is "not relevant to the resolution of the issue at hand." *Judicial Watch, Inc. v. U.S. Dep't of Commerce,* 224 F.R.D. 261, 263 (D.D.C. 2004). A matter is scandalous when it "'unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court.'" *Id.* (quoting 2 Moore's Federal Practice § 12.37 [3], at 12–97). Defendants do not assert—nor could they—that Plaintiffs' request for punitive damages is not relevant, or that it is scandalous.

It follows, as courts have explained, that a motion to strike "is not 'a proper way to procure the dismissal of all or a part of a complaint' based on the legal insufficiency of the pleading." *Koch v. White*, 134 F. Supp. 3d 158, 164 (D.D.C. 2015) (citing 5C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1380 (3d ed. 2015)); *see also Whittlestone, Inc. v. Handi–Craft Co*., 618 F.3d 970, 974–75 (9th Cir. 2010) (Rule 12(f) "does not authorize district courts to strike claims for damages on the ground that such claims are precluded as a matter of law"). The motion to strike should therefore be denied as improper.

### B.     Motions to Strike Punitive Damages are Premature at the Pleading Stage

Even if not denied as improper, the pleading phase is not the appropriate time to determine whether punitive damages are appropriate. In *Morton v. D.C. Housing Authority*, 720 F. Supp. 2d 1 (D.D.C. 2010), the same defendant sought the same relief, and this Court denied its

motion to strike punitive damages because it was necessary for the Court to "evaluate at the conclusion of the presentation of all evidence whether the evidence merits the jury being permitted to consider an award of punitive damages." *Id*. at 11. The instant motion is likewise premature and should be denied for that reason.

## C.      Plaintiffs are not Seeking Punitive Damages for Violations of the ADA and Rehabilitation Act

With respect to Defendants' arguments that punitive damages cannot be recovered with respect to violations of the ADA and the Rehabilitation Act, Plaintiffs clarify that they are not seeking punitive damages with respect to Defendants' violations of the ADA and the Rehabilitation Act.

## D.      Plaintiffs May Seek Punitive Damages for the Alleged Breach of the Common Law Implied Warranty of Habitability and Covenant of Quiet Enjoyment

Notwithstanding Defendants' arguments to the contrary, punitive damages are appropriate for and applicable to breaches of both the implied warranty of habitability and the covenant of quiet enjoyment.

Courts regularly impose punitive damages for breaches to the covenant of quiet enjoyment and the implied warranty of habitability. *See e.g. Oliver v. Mustafa*, 929 A.2d 873, 878-79 (D.C. 2007) (awarding punitive damages for breach of the covenant of quiet enjoyment). This is especially true when the breach "merges with" a willful tort. *See Bernstein v. Fernandez*, 649 A.2d 1064 (D.C. 1991) (recognizing that punitive damages are available when the breach in the warranty of habitability assumes the character of a willful tort); *Brown v. Coates*, 253 F.2d 36, 40 (D.C. Cir. 1958) ("The types of behavior that courts have considered sufficiently 'wrongful' so as to warrant the assessment of punitive damages, have varied greatly.") (Burger, J.); *see also Mark Keshishian & Sons, Inc. v. Washington Square, Inc*., 414 A.2d 834, 842 (D.C.

31

1980) (holding that punitive damages may be recovered for breach of contract in D.C.). The

factual allegations of the Amended Complaint would support a conclusion that Defendants'

conduct rose to the level of a willful tort; any further assessment of the propriety of punitive

damages should be left for summary judgment or trial.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss and to Strike Punitive

Damages should be denied in its entirety.

Respectfully submitted,

*/s/  Rebecca J. Michael*
Brian D. Israel (D.C. Bar No. 471023)
Rebecca J. Michael (D.C. Bar No. 450808)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001-3743
Telephone: +1 202.942.5000
Fax: +1 202.942.5999
E-mail:  brian.israel@arnoldporter.com
              rebecca.michael@arnoldporter.com

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation of
the District of Columbia
915 15th St. NW, 2nd Floor
Washington, D.C. 20005
Telephone: +1 202.457.0800
E-mail:  aspitzer@acludc.org

Counsel for Plaintiffs

July 19, 2019

.