# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EVELYN ARTHUR, *et al.*,

        *Plaintiffs*,

    v.

DISTRICT OF COLUMBIA HOUSING
AUTHORITY, *et al.*,

        *Defendants*.

No. 18-cv-2037 (DLF)

## MEMORANDUM OPINION

Plaintiffs Evelyn Arthur and her son Robert Arthur bring this action against the District of Columbia Housing Authority (DCHA), CIH Properties, Inc. (CIH), the District of Columbia (D.C.), and seven individual Metropolitan Police Department (MPD) officers. *See* First Am. Compl. (Complaint or Compl.) ¶¶ 9–14, Dkt. 32. The complaint alleges eighteen claims. *Id.* ¶¶ 86–177. Before the Court are DCHA and CIH's Motion to Dismiss, Dkt. 43,[1] and D.C. and the MPD officers' Motion to Dismiss and for Summary Judgment, Dkt. 44. For the reasons that follow, the Court will grant in part and deny in part the defendants' motions.

## I.    BACKGROUND

Evelyn Arthur is a 78-year-old resident of Claridge Towers, a facility in the District of Columbia owned by the District and operated by CIH. Compl. ¶ 9. Ms. Arthur is "profoundly deaf," *id.*, and her son Robert acts as her primary caregiver, *id.* ¶ 10.

---

[1] The DCHA and CIH also moved to strike punitive damages for several of the plaintiffs' claims: ADA, Rehabilitation Act, and breaches of the implied warrant of habitability and covenant of quiet enjoyment. *See* DCHA's Mot. to Dismiss, at 34–36. Because the Court will dismiss each of these claims, it need not address this motion to strike.

This suit involves a number of defendants: the District of Columbia; DCHA, an independent authority within the D.C. government that operates public housing programs and has "a legal existence separate from the District government," *see* D.C. Code § 6–202(a); Compl. ¶ 11; CIH, a Maryland corporation which does business in the District and manages Claridge Towers, *see id.* ¶ 12; and MPD officers Harry Singleton, Tammy Whittington, Eldrick Creamer, Kenneth Daniels, Orlando Teel, Rodney Anderson, and William Lyke (together, the "MPD officers"), *see id.* ¶ 13.

Much of the case involves DCHA's "phone call policy" for visitors to its properties. *Id.* ¶ 17.  Under that policy:

> A visitor must present identification to the security officer on duty.  The security officer records the visitor's name in a log book and then calls the resident to confirm that the resident is at home and wishes to receive the guest.  If the resident does not answer the phone, the visitor must leave the property.

*Id.*  Because Ms. Arthur is deaf, she cannot hear the phone ring when she has a visitor, so prior to January 2017, DCHA modified its "phone call policy" for her.  *Id.* ¶ 18.  This modification allowed Ms. Arthur's son Robert to visit her without calling ahead of time, and it allowed him to receive calls from and give permission to guests who visited Ms. Arthur.  *Id.*

In January 2017, Mr. Arthur installed in his mother's apartment a video relay system, which "enables a deaf person to communicate with a hearing person by connecting both parties to a trained sign-language interpreter."  *Id.* ¶¶ 19–20.  Because of its operation and location, calls from the video relay system were "visible to [Ms. Arthur] only when she was in her bedroom, awake and looking in the direction of the television."  *Id.* ¶ 20.

On January 18, 2017, CIH rescinded its prior modification of the "phone call policy" for Ms. Arthur.  *Id.* ¶ 21.  In a letter, it "stated that 'effective immediately the Claridge Guest/Visitor Policy is back in place.  This means that you [Ms. Arthur] must first be called by security and

then say yes before anyone requesting to see you enters the building.'" *Id.* ¶ 21. Mr. Arthur complained about this unexpected change in practice, explaining that his mother was only aware of visitor calls when she was in her bedroom and looking at the television. *Id.* Despite "numerous requests," CIH refused to revert to its prior practice and applied its standard "phone call policy" to Ms. Arthur. *Id.* ¶ 21.

In May and June 2017, a security officer refused to permit Mr. Arthur to visit his mother when she failed to answer the video relay system. *Id.* ¶ 22. On June 17, 2017, Ms. Arthur asked her son to come to her apartment right away because she was having breathing problems. *Id.* ¶ 23. When Mr. Arthur arrived, he signed into the log book and presented identification, *id.* ¶¶ 23–24, but his mother did not answer the video relay system, *id.* ¶ 24. Even though Mr. Arthur told the officer that his mother was in medical distress, the officer refused to allow him to enter his mother's apartment, and the officer refused to conduct a wellness check himself. *Id.* ¶ 25. In fear for his mother's health, Mr. Arthur checked on her anyway and returned to the lobby with his mother so that she could confirm for the security officer that she was indeed in medical distress and had called her son for help. *Id.* ¶ 26.

Relying on DCHA's barring policy, *see* 14 DCMR § 9600, the security officer called CIH and the DCHA police to issue a "Bar Notice" to prevent Mr. Arthur from entering the premises in the near future. *Id.* ¶ 27–30. Though the initial police officer on the scene concluded that a Bar Notice was unwarranted, the security officer called another police sergeant, who remotely ordered the issuance of a 60-day Bar Notice against him. *Id.* ¶ 27. The Bar Notice "stated that [Mr. Arthur] was barred for 'Entering DCHA property without presenting identification or properly signing the visitor log.'" *Id.* ¶ 31.

That day, Ms. Arthur sent a letter to "Housing Authority/Claridge Towers" granting

permission for her son to enter her apartment after signing in. *Id.* ¶ 35. In the letter, "[s]he explained that, due to her well-known and documented disability, she was unable to hear the phone ringing and would be unaware she has a phone call unless she was sitting directly in front of her television monitor in her bedroom on which the Video Relay System hardware is installed." *Id.* She also explained that she is "dependent on her son Robert for her daily care and requested that Claridge Towers resume its prior practices of: (a) allowing her son to visit her without requiring her to answer the phone, and (b) of having security call her son to approve other visitors on her behalf." *Id.* ¶ 36. Ms. Arthur received no response to this letter. *Id.* ¶ 37. Several days later, she wrote a second letter to "Claridge Towers Management" in which "she reiterated her request for an accommodation of her disability so that her son would be allowed to enter her home after signing in but without having to call first and without being harassed by 'any officer.'" *Id.* ¶ 38. This letter "pointed out that her son was her only family in Washington and 'the only person I have to help me.'" *Id.* She again received no response. *Id.* ¶ 39.

On June 26, Claridge Towers sent Ms. Arthur a letter (which did not reference her previously sent letters) informing her of the Bar Notice issued for Mr. Arthur. *Id.* ¶ 40. The letter stated that the Bar Notice would expire on August 17, 2017 and that she could face eviction and landlord-tenant court proceedings if she permitted her son to access the premises. *Id.* Mr. Arthur twice applied to the DCHA Office of Public Safety to have the Bar Notice lifted, yet he was denied each time. *Id.* ¶¶ 44–47. Ms. Arthur and her son claim that the version of the Bar Notice provided to the reviewing Office of Public Safety stated an additional and previously unchecked reason for issuance: that Mr. Arthur was "excessively loud" and engaged in "disruptive conduct or disturbing the peace of DCHA residents/employees." *Id.* ¶ 46.

On June 20 and July 18, 2017, Ms. Arthur submitted formal requests to DCHA for

"additional hearing-impaired hardware" and a live-in aide. *Id.* ¶ 42. Both were approved on July 20, 2017. *Id.* Ms. Arthur also requested that her son be designated as her live-in aide, but on August 2, 2017, DCHA rejected her request on the ground that he was a registered sex offender in the District. *Id.* ¶ 43.

On August 10, 2017, Mr. Arthur confirmed with the DCHA police that the last day of his Bar Notice was August 17 and that he could reenter the premises on August 18. *Id.* ¶ 48. He called the DCHA police again on August 18, and the officer on duty "confirmed that there was no Bar Notice in effect for [Mr. Arthur] at Claridge Towers." *Id.* ¶ 49. However, later that day when he arrived at Claridge Towers, the security officer "stated that a *second* Bar Notice had been issued against Mr. Arthur on July 11, 2017," preventing him from entering the premises for six months. *Id.* ¶¶ 50–52. Neither Mr. Arthur nor his mother had been informed of this second Bar Notice. *Id.* ¶ 53. "The Bar Notice was stamped with a fax date of August 18, 2017 from Claridge Towers to DCHA, more than a month after its alleged issuance." *Id.*

Other visitors also were denied entry to Ms. Arthur's apartment. On August 22, 2017, the security officer refused to allow a service technician into Ms. Arthur's apartment to fix her video relay system. *Id.* ¶ 56. Though she "had notified Claridge Towers' staff in advance and in writing that her Video Relay System was not working and had notified them, as provided by 14 DCMR § 9600.3, of the date and time the service technician would arrive," the technician was turned away when Ms. Arthur did not answer the video relay system he was there to fix. *Id.* Friends of Ms. Arthur's also were turned away in September and November 2017 when she failed to answer the video relay system. *Id.* ¶ 58.

On August 30, 2017, MPD officers executed a warrant for Mr. Arthur's arrest while he was at his mother's apartment in Claridge Towers. Defs.' Statement of Undisputed Material

Facts (Defs.' Statement of Facts) ¶¶ 2–3, Dkt. 44-1.  Mr. Arthur did not respond to the officers' knocking at his mother's door for more than ten minutes.  D.C.'s Mot. Ex. 1 (Video 1) at 11:06; *see* R. Arthur Decl. ¶¶ 5, 8, Dkt. 45-5.  The officers entered the apartment with a key.  Video 1 at 11:53; Defs.' Statement of Facts ¶ 5; R. Arthur Decl. ¶ 12.  Once the officers entered her apartment, Ms. Arthur became agitated and Mr. Arthur attempted to calm his mother down.  Video 1 at 12:05–:35.  The officers told Mr. Arthur to let her go and he initially refused.  D.C.'s Mot. Ex. 2 (Video 2) at 00:22–:50.  After the officers told Mr. Arthur to put his hands behind his back several times, he put one hand back and the officers handcuffed it.  Video 1 at 12:30–:33; Video 2 at 00:51.  One officer again instructed him to put his hands behind his back, but Mr. Arthur did not put his other hand behind his back, instead pulling against the officers and telling them to "hold up."  Video 1 at 12:33–:48; Video 2 at 0:51–:57.  Mr. Arthur then swore at the officers and told them that he was "going to talk to [his] mother."  Video 1 at 12:38–:43; Video 2 at 00:57–1:02.  The officers then took Mr. Arthur into an adjoining bedroom.  Video 1 at 12:43–46; Video 2 at 1:02–05.

What happened in the bedroom is not clearly captured by the body camera footage.  It appears that the officers pushed Mr. Arthur onto a bed in an attempt to handcuff him.  Video 2 at 1:05–08.  In his declaration, Mr. Arthur asserts that the officers punched him once he was on the bed, *see* R. Arthur Decl. ¶ 21, but the video does not capture this.  At one point, Mr. Arthur disappeared from the frame of the body camera, which is pointed at the bed, as one officer tells him to "stop resisting" and "stop trying to get up."  Video 2 at 1:14–:20.  The officers appear to push him back down on the bed, and he reenters the camera frame.  Video 2 at 1:20–:28.  After several seconds, the officers were then able to handcuff Mr. Arthur as he laid on his stomach.  Video 2 at 1:37–1:56.  One officer asked for "shackles," Video 2 at 1:57, and placed the shackles

on Mr. Arthur, *see* R. Arthur Decl. ¶ 24. According to Mr. Arthur's declaration, an officer accused Mr. Arthur of spitting on him, but Mr. Arthur denies this. *See* R. Arthur Decl. ¶ 26; Video 2 at 4:20. Mr. Arthur asserts that the officer actually spit on him. *Id.* Mr. Arthur also says that the officers cut his head at one point, and an ambulance was called to the scene but he declined treatment by paramedics. *Id.* ¶ 35.

Meanwhile, while the officers were attempting to arrest Mr. Arthur, the body camera footage shows that Ms. Arthur moved forward and grabbed at either her son or the officer who was attempting to handcuff him. *See* Video 1 at 12:42–:45. When another officer separated Ms. Arthur from her son, she became increasingly agitated and hysterical. *Id.* at 12:45–:50. And as officers took Mr. Arthur into an adjoining room, Ms. Arthur struggled to escape from the officer and continually made indiscernible loud noises. *Id.* at 12:45–13:03. Officers grabbed her wrists as she struggled to break free. *Id.* Only after Ms. Arthur continued to struggle did the officer handcuff her and sit her down on the couch. *Id.* at 13:07–:33.[2] The officer supervised Ms. Arthur while other officers arrested and removed her son from the apartment and then released her. *Id.* at 16:35.

After the officers removed her son from the apartment, Ms. Arthur used a hand-held device to contact a sign language interpreter, and an interpreter from MPD subsequently arrived. Compl. ¶ 79. Ms. Arthur was later transported to a hospital and treated for injuries resulting from the incident. E. Arthur Decl. ¶¶ 19–20, Dkt. 45-4.

---

[2] The parties dispute whether Ms. Arthur attempted to bite one of the officers in her attempt to break free, *see* Defs.' Statement of Facts ¶ 13; E. Arthur Decl. ¶ 17. Although an attempt to bite an officer would add to the reasonableness of the officers' decision to handcuff Ms. Arthur, it is unclear from the video whether this in fact occurred. Video 1 at 1: 12:46–:53. Construing the facts in the light most favorable to Ms. Arthur, the Court assumes that Ms. Arthur did not attempt to bite the officer.

The plaintiffs filed the present action on August 30, 2018. *See* Compl., Dkt. 1. After the filing of this suit, in October and November 2018, DCHA installed strobe lights and equipment in Ms. Arthur's apartment and provided rechargeable watches that flash to signal an incoming video relay call. Compl. ¶ 82. On October 26, 2018, DCHA accused Mr. Arthur of removing one of the strobe lights. *Id.* ¶ 83. Three days later, "a person believed to be a public housing maintenance man acting at the request of CIH entered Ms. Arthur's apartment with a key without notice or ringing her special hearing impaired doorbell system." *Id.* ¶ 84. Ms. Arthur was home at the time and was "surprised and terrified" by the entry. *Id.* Without providing any information to Ms. Arthur, the maintenance man took photographs of the strobe-light equipment inside the apartment and left. *Id.*

Finally, on February 22, 2019, a CIH representative provided Ms. Arthur a "Final Notice" letter directing her to vacate the premises for failing to pay rent. *Id.* ¶¶ 68, 85. Mr. Arthur had communicated with the same CIH representative two months earlier about an Emergency Rental Assistance Payment that was in process for back payments of rent. *Id.* The plaintiffs allege "[u]pon information and belief" that at the time the agent gave the Final Notice letter to Ms. Arthur, the agent "already had in her possession a copy of the letter approving such payment." *Id.*

The complaint alleges eighteen claims against the DCHA, CIH, District of Columbia, and MPD officers. The claims against DCHA and CIH include violations of: Title II of the Americans with Disabilities Act (ADA) by DCHA (Claim 1), Compl. ¶¶ 86–101; Title II of the ADA by CIH (Claim 2), *id.* ¶¶ 102–08; Title III of the ADA by CIH (Claim 3), *id.* ¶¶ 109–15; Title IV of the ADA by both DCHA and CIH (Claim 4), *id.* ¶¶ 116–23; Section 504 of the Rehabilitation Act by DCHA (Claims 6 and 8), *id.* ¶¶ 143–50; the D.C. Human Rights Act

(DCHRA) by both DCHA and CIH (Claim 11), *id.* ¶¶ 157–58; Section 1983 by DCHA (Claim 15), *id.* ¶¶ 167–69; and the Fair Housing Act (FHA) by both DCHA and CIH (Claim 18), *id.* ¶¶ 174–77. The complaint also alleges that both DCHA and CIH violated the common law implied warranty of habitability and right of quiet enjoyment (Claim 12), *id.* ¶¶ 159–60; and that DCHA breached Ms. Arthur's lease (Claim 16), *id.* ¶¶ 170–71. DCHA and CIH have moved to dismiss all of these claims.

As to D.C. and the MPD officers, the plaintiffs allege violations of: Title II of the ADA by D.C. (Claim 5), *id.* ¶¶ 124–30; Section 504 of the Rehabilitation Act by D.C. (Claim 7), *id.* ¶¶ 137–42; the Fourth Amendment based on excessive force used against both plaintiffs by the MPD officers (Claims 9 and 10), *id.* ¶¶ 151–56; and Section 1983 for failure to train police officers by D.C. (Claim 17), *id.* ¶¶ 172–73. The complaint also alleges assault and battery of both plaintiffs by the MPD officers and D.C. (Claims 13 and 14), *id.* ¶¶ 161–66. D.C. and the MPD officers have moved for either dismissal or summary judgment as to all of these claims.

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss

Rule 12(b)(6) allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint need not contain "detailed

factual allegations," but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Id.* (internal quotation omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation omitted). But the assumption of truth does not apply to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal quotation omitted). An "unadorned, the defendant-unlawfully-harmed-me accusation" is not credited; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Ultimately, "[d]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

**B.      Motion for Summary Judgment**

A party may move "for summary judgment at any time," including at the beginning of a case before discovery has commenced. Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one that could affect the outcome of the lawsuit. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). And a dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. In reviewing the record, the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or

weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

However, "[w]hen opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court should not adopt

that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v.

Harris*, 550 U.S. 372, 380 (2007).

It is well-established that "a plaintiff opposing summary judgment" must "substantiate

[his allegations] with evidence" that "a reasonable jury could credit in support of each essential

element of her claims." *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015). The

moving party is entitled to summary judgment if the nonmoving party "fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.  ANALYSIS

### A.  Claims Against DCHA and CIH

#### 1.  *ADA, Rehabilitation Act, and DCHRA (Claims 1-4, 6, 8, 11)*

All of the plaintiffs' claims arising under Title II, Title III, and Title IV of the ADA,

Section 504 of the Rehabilitation Act, and the DCHRA are untimely. The DCHRA has a one-

year statute of limitations. *See* D.C. Code § 2-1403.16. Although neither the ADA nor the

Rehabilitation Act include a limitations period, it is well-established that when a federal law does

not specify a time limitation in which to bring a claim, courts should look to "the state statute

most closely analogous to the federal act." *N. Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995)

(internal quotation omitted). The DCHRA is the most closely analogous state statute to the

provisions of the ADA or Rehabilitation Act at issue here, so its one-year statute of limitation

applies to those statutes as well.

The Rehabilitation Act and the DCHRA both "create private causes of action for individuals who have been victimized by disability discrimination," have a "shared purpose and ambitious aims" to eliminate disability discrimination, "employ substantially the same definition of the term 'disability,'" and afford similar equitable and compensatory relief to plaintiffs. *Jaiyeola v. District of Columbia*, 40 A.3d 356, 367 (D.C. 2012); *see also Congress v. District of Columbia*, 324 F. Supp. 3d 164, 172 (D.D.C. 2018); *Ware v. Hyatt Corp.*, No. 12-cv-0395, 2013 WL 12321372, at *15 (D.D.C. Mar. 27, 2013).

Likewise, the text of the ADA and the DCHRA are substantially similar. *See Brown v. District of Columbia*, No. 16-cv-0947, 2019 WL 4345710, at *5 (D.D.C. Sept. 12, 2019). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The DCHRA makes it unlawful for "a District government agency or office . . . to limit or refuse to provide any facility, service, program, or benefit to any individual on the basis of an individual's . . . disability." D.C. Code § 2-1402.73. Title III of the ADA states that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182. The DCHRA likewise prohibits "deny[ing], directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations." D.C. Code § 2-1402.31(a)(1). Title IV of the ADA prohibits any person from retaliating against or intimidating one who engages in protected activity under the ADA. 42 U.S.C. § 12203(a)–(b). The DCHRA also makes it unlawful to retaliate against or intimidate any individual for engaging

in protected activity under the Act. D.C. Code § 2-1402.61. Even if there "is not a perfect match" between the ADA and the DCHRA—for example, the DCHRA also prohibits discrimination based on other characteristics like race or sex—their "core similarities outweigh the differences in determining which statute of limitations to borrow for claims of disability discrimination." *Jaiyeola*, 40 A.3d at 367; *see Congress*, 324 F. Supp. 3d at 172.

Applying the DCHRA's one-year statute of limitations, the plaintiffs' ADA, Rehabilitation Act, and DCHRA claims are time-barred because the plaintiffs filed their initial complaint on August 30, 2018, more than a year after any of the alleged discriminatory or retaliatory acts occurred. And the fact that DCHA and CIH continued to enforce the "phone call policy" and second Bar Notice beyond the August 30, 2017 cutoff date, *see* Pls.' Opp'n to DCHA's Mot. at 12–13, does not render the plaintiffs' claims timely. Both policies were instituted well before August 30, 2017. *See* Compl. ¶¶ 21, 52. The "proper focus is upon the time of the discriminatory *acts*, not upon the time at which the *consequences* of the acts" are felt by a plaintiff. *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (internal quotation omitted). As a result, "the only alleged discrimination occurred—and the filing limitations periods therefore commenced—at the time the . . . decision[s]" to enact these two measures were "made and communicated to" the plaintiffs. *Id.* "That is so even though one of the *effects* of" the measures—denying entry to Mr. Arthur and other visitors—"did not occur until later." *Id.*

Although the complaint alleges that the defendants' actions rendered Claridge Towers "a hostile living environment," *e.g.*, Compl. ¶ 86, a type of claim that makes actionable events occurring after the limitations period, "many courts have held that an alleged failure to provide a requested accommodation under the Rehabilitation Act or the ADA" constitutes a "discrete act" of discrimination and cannot support a hostile environment claim. *Long v. Howard Univ.*, 512 F.

Supp. 2d 1, 16 (D.D.C. 2007) *aff'd*, 550 F.3d 21 (D.C. Cir. 2008) (collecting cases); *see also Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 130 (1st Cir. 2009). Because "discrete discriminatory acts are not actionable if time barred," *Long*, 512 F. Supp. 2d at 15–16, and all of the discriminatory acts occurred more than a year before this action was filed, the Court will dismiss Claims 1, 2, 3, 4, 6, 8, and 11 without prejudice as untimely.[3]

### 2. *Implied Warranty of Habitability (Claim 12)*

Claim 12 alleges that DCHA and CIH "unreasonably obstructed [Ms. Arthur's] right to receive guests, caregivers, and repairmen, in violation of the common law implied warranty of habitability." Compl. ¶ 159. "[A] warranty of habitability, measured by the standards set out in the Housing Regulations for the District of Columbia, is implied by operation of law into leases of urban dwelling units covered by those Regulations." *Javins v. First Nat'l Realty Corp.*, 428 F.2d 1071, 1072–73 (D.C. Cir. 1970); *see* 14 DCMR § 301.1. The scope of this implied warranty "coincides exclusively with the requirements of the Housing Regulations of the District of Columbia." *Winchester Mgmt. Corp. v. Staten*, 361 A.2d 187, 189 (D.C. 1976). Because Ms. Arthur has not alleged that the defendants violated any provision of the D.C. housing code, *see* 14 DCMR § 100 *et seq.*, the Court will dismiss the implied warranty of habitability component of Claim 12.

### 3. *Covenant of Quiet Enjoyment (Claim 12)*

Claim 12 also alleges a violation of the common law covenant of quiet enjoyment.

---

[3] When a limitations defense is raised at the motion-to-dismiss stage, "[a] dismissal with prejudice is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (internal quotation omitted). Because the plaintiffs could theoretically cure the deficiency if they alleged, for example, that Ms. Arthur made additional requests to accommodate within a year of filing, the Court will dismiss these claims without prejudice.

Compl. ¶ 159. "Courts set a high bar for finding a breach of the covenant of quiet enjoyment—there is no breach of the covenant 'unless there is an eviction from, or some actual disturbance in, the [tenant's] possession by the landlord or by some third person under paramount title.'" *Whole Foods Mkt. Grp. v. Wical Ltd. P'ship*, 288 F. Supp. 3d 176, 191 (D.D.C. 2018) (quoting *Hyde v. Brandler*, 118 A.2d 398, 400 (D.C. 1955)). "Absent departure from the premises, a tenant has great difficulty in claiming a 'constructive eviction' equivalent to the actual physical interference with his possessory rights." *Sobelsohn v. Am. Rental Mgmt. Co.*, 926 A.2d 713, 716 (D.C. 2007). Ms. Arthur does not dispute that she remained in possession of her apartment; she merely alleges that DCHA interfered with her "right to receive guests." Compl. ¶ 159. That is insufficient as a matter of law to sustain a claim alleging a breach of the covenant of quiet enjoyment. *See Weisman v. Middleton*, 390 A.2d 996, 1001 (D.C. 1978). Therefore, the Court will dismiss her breach of the covenant of quiet enjoyment component of Claim 12.

### 4. *Section 1983 (Claim 15)*

Robert Arthur bases his Section 1983 claim on an alleged violation of 42 U.S.C. § 13663(d). Section 1983 "confers a private right of action to safeguard certain rights created by federal statutes. Therefore, to bring a Section 1983 claim, a plaintiff must assert a violation of a federal *right*, not merely a violation of federal *law*." *Barry Farm Tenants & Allies Ass'n v. D.C. Hous. Auth.*, 311 F. Supp. 3d 57, 69 (D.D.C. 2018) (citing *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 106 (1989)); *see* 42 U.S.C. § 1983. "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefited.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692 n.13 (1979)).

Robert claims that DCHA violated his procedural rights contained in 42 U.S.C. § 13663(d) by not providing him with an opportunity to dispute the relevance of his sex-offender

registration before denying his mother's request to have him as a live-in aide.  Compl. ¶¶ 43,

168. Section 13663(d) provides:

> Before an adverse action is taken with respect to *an applicant* for federally
> assisted housing on the basis that an individual is subject to a lifetime registration
> requirement under a State sex offender registration program, the public housing
> agency obtaining the record shall provide *the tenant or applicant* with a copy of
> the registration information and an opportunity to dispute the accuracy and
> relevance of that information.

42 U.S.C. § 13663(d) (emphasis added).

Section 13633(d) does not apply to Mr. Arthur because he is neither a "tenant" nor an

"applicant" for federally assisted housing within the meaning of the statute.  The pertinent

regulations define "applicant" as "a person or a family that has applied for housing assistance."

*See* 24 C.F.R. § 5.403; *see also id.* § 960.102(a)(2) (cross-referencing 24 C.F.R. § 5.403); *id.*

§ 5.403 (defining "family" as a "single person" or "group of persons residing together").  The

complaint does not allege that Robert applied for housing assistance; he simply requested to

become his mother's live-in aide.  *See* Compl. ¶ 43; *cf.* 14 DCMR § 6121.3 (noting that a live-in

aide "is not a lessee with rights of tenancy").  Because Mr. Arthur has no statutorily enforceable

right, the Court will dismiss his Section 1983 claim.

### 5.    *Breach of Lease (Claim 16)*

Ms. Arthur asserts a breach of lease claim against DCHA for violating Sections 15.2 and

15.3 of her lease, which govern inspections.  "[L]eases of urban dwelling units should be

interpreted and construed like any other contract."  *Javins*, 428 F.2d at 1075.  "To prevail on a

claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an

obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused

by breach."  *Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014) (quoting *Tsintolas Realty*

*Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)).

Ms. Arthur has stated a valid breach of lease claim based on the DCHA agent's "unauthorized and unlawful entry" into her apartment to take photographs on October 29, 2018. Compl. ¶ 170. DCHA does not dispute that Ms. Arthur has met the first three elements of a breach of contract claim; it only argues that she has failed to allege damages. *See* DCHA's Mot. to Dismiss, at 28–29. But "the settled rule in the District is that '[e]ven where monetary damages cannot be proved, a plaintiff who can establish a breach of contract is entitled to an award of nominal damages.'" *Alston v. Flagstar Bank, FSB*, 609 F. App'x 2, 3 (D.C. Cir. 2015) (quoting *Wright v. Howard Univ.*, 60 A.3d 749, 753 (D.C. 2013)). The Court therefore will deny DCHA's motion to dismiss with respect to claim 16.

### 6. *Fair Housing Act—Failure to Accommodate (Claim 18)*

Ms. Arthur does not specifically identify any requests that support her FHA failure to accommodate claim.[4] But she appears to base her claim on three requests she made to DCHA and CIH: (1) to resume the "prior practices of: (a) allowing her son to visit her without requiring her to answer the phone, and (b) of having security call her son to approve other visitors on her behalf," Compl. ¶ 36; (2) to provide "additional hearing-impaired hardware," *id.* ¶ 42; and (3) to permit her son to serve as her live-in aide, *id.* ¶ 43.

The FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1). Such discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B). Unlike the

---

[4] The plaintiffs in their complaint assert that the defendants engaged in "multiple and recurring failures" to accommodate her requests, *see* Compl. ¶ 176, but they do not point to any specific requests.

ADA and Rehabilitation Act, the FHA provides for a two-year statute of limitations.  *Id.*
§ 3613(a)(1)(A).  The FHA claim is therefore timely; all allegedly discriminatory acts in the
complaint occurred after August 30, 2016.

The FHA requires a plaintiff to show: (1) she had a handicap within the meaning of the
FHA; (2) defendants knew or reasonably should have known of the handicap; (3) an
accommodation may be necessary to afford her an equal opportunity to use and enjoy the
dwelling; and (4) defendants refused to make the requested accommodation.  *United States v.
District of Columbia*, 538 F. Supp. 2d 211, 217–18 (D.D.C. 2008).  "An underlying assumption
of any reasonable accommodation claim is that the plaintiff[] has requested an accommodation
which the defendant[] has denied."  *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir.
1999).  "Ordinarily, an accommodation is reasonable under the [FHA] when it imposes no
fundamental alteration in the nature of the program or undue financial or administrative
burdens."  *Giebeler v. M&B Assocs.*, 343 F.3d 1143, 1157 (9th Cir. 2003) (internal quotation
omitted).

Taking the facts alleged in the complaint as true, Ms. Arthur's first request—to modify
the phone call policy for her—supports a claim under the FHA.  According to the complaint, the
Arthurs repeatedly requested that the defendants modify the existing phone call policy.  As Ms.
Arthur explained in her initial letter to DCHA, "[u]nless she was sitting directly in front of her
television monitor in her bedroom on which the Video Relay System hardware is installed," she
was unaware that she had a visitor.  Compl. ¶ 35–36, 38.  The defendants never responded to Ms.
Arthur's requests, *id.* ¶¶ 37, 39, and they refused to adapt their "phone call policy" to
accommodate her needs as a deaf tenant, *id.* ¶ 61–62.  A modification of the "phone call policy"
would have been reasonable because it would have allowed Ms. Arthur to see visitors when they

arrived, *see id.* ¶¶ 22, 56, 58, while imposing no financial costs and de minimis administrative

burdens on the defendants. This failure to accommodate alone is sufficient to state an FHA

claim.

Ms. Arthur's second request—to provide additional hearing-impaired hardware—also

states an FHA claim. Though the defendants eventually approved Ms. Arthur's request for

hearing-impaired hardware on July 20, 2017, *id.* ¶ 42, they waited an unreasonable period of

time—over one year—to make this accommodation, *id.* ¶ 82. Indeed, the defendants did not

install additional equipment until October and November of 2018, two months *after* the plaintiffs

filed the present suit. *Id.*

The defendants' post-filing modifications do not render Ms. Arthur's claim moot for two

reasons. First, the plaintiffs seek compensatory damages, punitive damages and attorneys' fees,

*see* Compl. at 39–40, and plausible claims for money damages "ensure a live controversy" that

cannot be dismissed on mootness grounds, *see Mission Prod. Holdings v. Tempnology, LLC*, 139

S. Ct. 1652, 1660 (2019). Second, even though the defendants may have remedied their

allegedly unlawful conduct, *see* DCHA's Reply at 17–18, Dkt. 50, such action "ordinarily does

not suffice to moot a case," *see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,

528 U.S. 167, 174 (2000); *see also Young v. D.C. Hous. Auth.*, 31 F. Supp. 3d 90, 96 (D.D.C.

2014). According to the complaint, the defendants failed to provide reasonable accommodations

for over a year, and they only installed the requested hardware once litigation began. *See, e.g.*,

Compl. ¶¶ 21, 38 (declining to reinstate a previous effective accommodation); *id.* ¶¶ 23–27

(refusing to allow Robert to assist his mother during a medical emergency); *id.* ¶¶ 37, 39 (failing

to respond to Ms. Arthur's letters requesting accommodations). In light of the defendants'

sustained conduct, it is not "absolutely clear the allegedly wrongful behavior could not

reasonably be expected to recur." *Laidlaw*, 528 U.S. at 190. The defendants have not met the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Id.* at 189 (internal quotation omitted).

Ms. Arthur's third request—to have her son Robert serve as a live-in aide—would be unreasonable because it would violate federal law to allow Robert Arthur, a registered sex offender, to live in his mother's apartment. A live-in aide is subject to approval of DCHA, and DCHA "may refuse to approve a particular person as a live-in aide." 14 DCMR § 6121.3. By statute, an owner of federally assisted housing "shall prohibit" any individual "who is subject to a lifetime registration requirement under a State sex offender registration program" from admission in such housing. *See* 42 U.S.C. § 13663(a). The defendants' refusal to permit Mr. Arthur to serve as his mother's live-in aide was eminently reasonable given his criminal history. *See Parham v. CIH Properties, Inc.*, No. 14-cv-1613, 2015 WL 5294683, at *4 (D.D.C. Sept. 8, 2015) (noting that "a tenant is not entitled to the exact accommodation of its choice").

For these reasons, the Court will deny the defendants' motion to dismiss claim 18 with respect to Ms. Arthur's first two requests for accommodation and grant it with respect to her third.

### B.   Claims Against D.C. and the MPD Officers

#### 1.   *ADA and Rehabilitation Act (Claims 5 and 7)*

The plaintiffs seek to hold District of Columbia liable for the actions of its police officers in failing to bring a sign language interpreter and refusing to give Mr. Arthur a reasonable amount of time to explain the situation to his mother using sign language. As stated above, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs,

or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "A plaintiff may recover compensatory damages for violations of Title II of the ADA or Section 504 of the Rehabilitation Act if he proves that the defendant's discriminatory actions were intentional." *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 278 (D.D.C. 2015). While the D.C. Circuit has not yet addressed the legal standard for establishing "intentional" discrimination, other circuits and other judges on this court have required a showing of "deliberate indifference" akin to the liability standard for municipal liability in a Section 1983 claim. *Id.* at 278–79 (collecting cases); s*ee also Montgomery v. D.C.*, No. 18-cv-1928, 2019 WL 3557369, at *9 (D.D.C. Aug. 5, 2019); *Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d 233, 277 (D.D.C. 2018).

Whether Title II of the ADA and the Rehabilitation Act permit such vicarious liability "is an open question." *Gray v. Cummings*, 917 F.3d 1, 17 (1st Cir. 2019). The D.C. Circuit has yet to address the issue, and there is a division of authority among the circuit courts. *Compare Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 348–49 (11th Cir. 2012) (finding no *respondeat superior* liability), *with Duvall v. County of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001) (stating that a "public entity is liable for the vicarious acts of its employees" under Title II).

Both Title II of the ADA and section 504 of the Rehabilitation Act expressly adopt the "remedies, procedures, and rights" available under Title VI of the Civil Rights Act of 1964. 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2); *see Barnes v. Gorman*, 536 U.S. 181, 185 (2002).

Because entities cannot be vicariously liable on a *respondeat superior* theory under Title VI, *see United States v. Cty. of Maricopa*, 889 F.3d 648, 652 (9th Cir. 2018), the same principle applies to Title II ADA or Rehabilitation Act claims. Absent a clear congressional intent to the contrary, it would be inconsistent to permit a theory of vicarious liability that Title VI forbids. *See Jones v. City of Detroit*, No. 17-cv-11744, 2019 WL 2355377, at *6 (E.D. Mich. June 4, 2019); *see also Ravenna v. Vill. of Skokie*, 388 F. Supp. 3d 999, 1008 (N.D. Ill. 2019).

Further, the plain text of Title II of the ADA does not provide for vicarious liability, in contrast to other provisions in the ADA. Title I of the ADA expressly defines "employer" to include "any agent" of the employer, *see* 42 U.S.C. § 12111(5)(A), but Title II defines "public entities" as "any department, agency, special purpose district, or other instrumentality of a State or States or local government" in relevant part and omits any "agent" language, 42 U.S.C. § 12131(1)(A)–(B). *See, e.g., Hooper v. City of St. Paul*, No. 17-cv-3442, 2019 WL 4015443, at *9–10 (D. Minn. Aug. 26, 2019) (holding Title II does not give rise to vicarious liability by comparing its text with that of Title I); *Gary v. Long*, 59 F.3d 1391, 1399 (D.C. Cir. 1995) (holding that "the obvious purpose" of an analogous "agent provision [in Title VII] was to incorporate *respondeat superior* liability into the statute" (internal quotation omitted)).

Finally, the Supreme Court's logic in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998), suggests that the Rehabilitation Act does not permit vicarious liability. In that case, the Court held that Title IX, which was "modeled after Title VI," did not allow recovery based on vicarious liability. *Id.* at 286, 288. The Court concluded that vicarious liability did not align with Title IX's "deliberate indifference" standard of liability, which is the same standard used under the Rehabilitation Act. *See id.* at 290. Subsequent courts have applied *Gebser*'s logic to the Rehabilitation Act. *See Liese*, 701 F.3d at 348; *Loeffler v. Staten Island Univ. Hosp.*, 582

F.3d 268, 275–76 (2d Cir. 2009).  Absent clear authority, the Court will not hold the District of Columbia liable for the actions of its officers.  The Court will therefore dismiss Claims 5 and 7.

### 2.    *Section 1983—Failure to Implement Policy (Claim 17)*

Plaintiffs contend that the District is liable under 42 U.S.C. § 1983 for failing to train its MPD officers to provide reasonable accommodations for a disabled civilian "who neither called the police for service nor was being arrested but who foreseeably was involved in police operations."  Compl. ¶ 172.  This claim is without merit.

Because Section 1983 does not permit vicarious liability, plaintiffs suing local governments under Section 1983 must "prove that 'action pursuant to official municipal policy' caused their injury."  *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Id.*

Here, the plaintiffs allege—without pointing to any specific statute, regulation, or practice—that D.C. failed to implement a policy to train MPD officers.  But to prevail on a failure-to-train claim under Section 1983, the failure to train "must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact."  *Connick*, 563 U.S. at 61 (internal quotation omitted).  Such "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997).  Indeed, "[a] pattern of similar . . . violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train," though there are rare circumstances in which "the unconstitutional consequences of failing to train could be so

patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 62, 64 (internal quotation omitted).

The plaintiffs have not pointed to any pattern—or any instances at all—of similar violations which might alert the District to provide better training to its officers. *See Cherry v. District of Columbia*, 330 F. Supp. 3d 216, 226 (D.D.C. 2018); *Bell v. District of Columbia*, 82 F. Supp. 3d 151, 158 (D.D.C. 2015). Nor have the plaintiffs alleged facts that support their claim that the unlawful "consequences of failing to train [were] so patently obvious" that the District's failure to train "rises to the functional equivalent of a decision by the [District] itself to violate the [ADA]." *Robinson v. Pezzat*, 818 F.3d 1, 13 (D.C. Cir. 2016) (internal quotation omitted). Aside from alleging that the District "knew" it would encounter these circumstances and violate the ADA because it "has a large deaf and hearing-disabled community of more than 16,000 persons," Compl. ¶ 172, the plaintiffs have alleged no other facts supporting this conclusory allegation. And regardless, to satisfy the deliberate indifference standard, the plaintiffs must show "more than mere negligence." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004). The Court will therefore dismiss Claim 17.

3.        *Fourth Amendment—Use of Excessive Force (Claims 9 and 10)*

The officers seek summary judgment as to the plaintiffs' excessive force claims. Based on a careful review of the body camera footage, *see* Video 1 & 2, and the affidavits of both plaintiffs, *see* R. Arthur Decl.; E. Arthur Decl., the Court holds that the officers are entitled to qualified immunity as to both claims.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-*

24

*Kidd*, 563 U.S. 731, 735 (2011) (internal quotation omitted). "Even if there is a genuine dispute about the reasonableness of an officer's use of force, he is protected by qualified immunity unless his force violated clearly established law." *Hedgpeth v. Rahim*, 893 F.3d 802, 809 (D.C. Cir. 2018). A clearly established violation "must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam). While a case need not have identical facts, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741.

The plaintiffs allege that the MPD officers violated their Fourth Amendment right against "unreasonable" seizures by using excessive force against them. U.S. Const. amend. IV; Compl. ¶¶ 151–56. "[C]laims that law enforcement officers have used excessive force—deadly or not— in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Courts determine the reasonableness of force based on the facts and circumstances of each case, including "the severity of the crime at issue," whether the suspect was "actively resisting arrest or attempting to evade arrest by flight," and whether the suspect "pose[d] an immediate threat to the safety of the officers or others." *Id.* at 396. A plaintiff can only prevail on an excessive force claim if "a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions." *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993).

i.     Robert Arthur's Excessive Force Claim (Claim 9)

Under either prong of the qualified immunity analysis, Mr. Arthur's excessive force

claim fails.  First, no reasonable jury could find that the officers' use of force was so excessive

that no reasonable officer could have believed in the lawfulness of his actions.  *See Wardlaw*, 1

F.3d at 1303.  The body camera footage shows that Mr. Arthur swore at the officers and refused

to comply with their repeated orders to step away from his mother and put his hands behind his

back.  *See* Video 2 at 00:26–1:02.  Regardless of Mr. Arthur's motivations for not complying

with the officers' orders, *see* R. Arthur Decl. ¶ 17 (stating that he "was trying to calm [his

mother] down"), the video clearly reveals that Mr. Arthur resisted the officers' attempts to

handcuff him.  And although the video does not fully capture what occurred in the bedroom, it

shows Mr. Arthur pushing back on the officers as they attempted to hold him down on the bed to

handcuff him.  *See* Video 2 at 1:05–:13.  Mr. Arthur cut his head as a result of his resistance, but

his injury was not severe enough to seek medical treatment.  *See* R. Arthur Decl. ¶ 35; *Wardlaw*,

1 F.3d at 1304, 1304 n.7 (D.C. Cir. 1993) (noting that the fact that the plaintiff "did not consider

his injuries severe enough to require medical attention" was a "relevant factor" in the excessive

force inquiry).  Even though the officers were arresting Mr. Arthur for a non-violent offense, *see*

R. Arthur Decl. ¶ 8, based on the body camera footage, the Court cannot conclude that no

reasonable officer on the scene would have legitimately perceived Mr. Arthur's actions as

resisting arrest.  *See Lash v. Lemke*, 971 F. Supp. 2d 85, 95–97 (D.D.C. 2013) (officers did not

use excessive force in using taser on individual who yelled at officers and physically struggled

with them as they tried to constrain him); *Scott v. District of Columbia*, 101 F.3d 748, 759–60

(D.C. Cir. 1996) (officers who struck the plaintiff, knocked him to the ground, rolled him over

and pinned him with their knees so that he could be handcuffed did not "use[] more force than

reasonably appeared necessary" to make arrest).

       Furthermore, even if the officers did use unreasonable force, they did not violate clearly

established law.  The plaintiffs point to no case with similar facts to rebut the officers' qualified immunity defense.  *See Kisela v. Hughes*, 138 S.Ct. 1148, 1153 ("police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue" (internal citation omitted)).  Caselaw clearly establishes that officers cannot use force *after* an individual has already been placed in handcuffs and subdued.  *See, e.g.*, *Arrington v. United States*, 473 F.3d 329, 331–33 (D.C. Cir. 2006) (officers used unreasonable force on individual who was punched, beaten with a baton, pistol-whipped and attacked by a police dog when the individual had already been disarmed and handcuffed).  But here, the officers used "no more than the ordinary 'degree of physical coercion'" to handcuff and subdue Mr. Arthur after he repeatedly disobeyed their orders and physically resisted their attempts to handcuff him.  *See Cromartie v. D.C.*, 479 F. App'x 355, 357 (D.C. Cir. 2012) (officers did not use excessive force when they "slammed to the ground, handcuffed, and forcibly kept on the ground" an individual who was belligerent and refused to obey instructions).  Because the officers' actions did not violate a clearly established right, the defendants are entitled to summary judgment on Claim 9.

   ii.   Evelyn Arthur's Excessive Force Claim (Claim 10)

  The officers are also entitled to qualified immunity with respect to Ms. Arthur's excessive force claim.  It is reasonable for an officer to handcuff an individual who is "resisting the officer's efforts to restrain her and to keep her from interfering with another arrest," *Armbruster v. Frost*, 962 F. Supp. 2d 105, 112-13 (D.D.C. 2013) (officer who held down an individual who was interfering in the arrest of another and pushed her on the hood of a car did not use unreasonable force); *L.A. Cty. v. Rettele*, 550 U.S. 609, 614 (2007) (holding that "officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy" of the arrest).  In fact, it is *unlawful* in the District of Columbia to interfere with

another's arrest. *See* D.C. Code § 22-405.01(b). Ms. Arthur claims that she did not interfere with her son's arrest, but she concedes that "an officer could have misunderstood [her] efforts to communicate by making noise and waving [her] arms as some sort of interference." E. Arthur Decl. ¶ 18. Considering the totality of the circumstances, an officer on the scene could have reasonably believed that it was necessary to handcuff Ms. Arthur to prevent her from hindering her son's arrest or causing injury to the officers or herself. *See Armbruster*, 962 F. Supp. 2d at 113. The fact that Ms. Arthur was not restrained "for a prolonged and unnecessary period of time" supports the reasonableness of the officers' actions. *Rettelle*, 550 U.S. at 614. And her injured shoulder is an unfortunate consequence of her resistance and of Mr. Arnold's refusal to respond to the officers' initial requests to open the door and come out of the apartment.

The officers also did not violate clearly established law in their seizure of Ms. Arthur. Neither party points to any existing precedent from the Supreme Court or the D.C. Circuit finding a Fourth Amendment violation in circumstances which "squarely govern the specific facts at issue." *Kisela*, 138 S. Ct. at 1153. The officers are therefore entitled to qualified immunity for their handcuffing of Ms. Arthur, and the Court will grant defendants' motion on Claim 10.

### 4. *Assault and Battery (Claims 13 and 14)*

The plaintiffs rely on the same allegations to support their assault and battery claims. "A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary." *Scales v. District of Columbia*, 973 A.2d 722, 730 (D.C. 2009) (internal quotation omitted). "[T]he test for qualified privilege in an assault and battery suit is both subjective and objective: the officer must subjectively believe that he or she used no more force than necessary,

but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation." *Id.* Because the objective piece is "similar to the excessive force standard applied in the Section 1983 context," *Rogala v. District of Columbia*, 161 F.3d 44, 57 (D.C. Cir. 1998), "an unreasonable use of force also is an assault and battery under D.C. law," *Hundley v. District of Columbia*, 494 F.3d 1097, 1101 (D.C. Cir. 2007).

For the reasons stated in III.B.3, no jury could reasonably conclude that the defendants used excessive force against the plaintiffs. And the complaint does not allege that the officers subjectively believed they were using any more force than necessary. Accordingly, the Court will grant summary judgment in favor of the defendants for Claims 13 and 14.

## CONCLUSION

For the foregoing reasons, the Court grants DCHA and CIH's Motion to Dismiss Claims 1, 2, 3, 4, 6, 8, 11, 12, and 15; it grants the motion in part and denies it in part as to Claim 18; and it denies the motion outright as to Claim 16. The Court also grants D.C. and the MPD officers' Motion to Dismiss Claims 5, 7, and 17, and it grants summary judgment in favor of D.C. and the MPD officers on Claims 9, 10, 13, and 14. A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

April 11, 2020