**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

EVELYN ARTHUR, *et al.*,

       *Plaintiffs*,

   v.

DISTRICT OF COLUMBIA HOUSING
AUTHORITY, *et al.*,

       *Defendants*.

No. 18-cv-2037 (DLF)

---

**MEMORANDUM OPINION**

Before the Court is the District of Columbia Housing Authority (DCHA) and CIH Properties, Inc.'s (CIH) renewed partial Motion to Dismiss the plaintiffs' Second Amended Complaint. Dkt. 74. For the reasons that follow, the Court will grant the defendants' motion to dismiss in part and deny it in part.

## I.  BACKGROUND[1]

Evelyn Arthur is a 79-year-old resident of Claridge Towers, a public housing facility in the District of Columbia owned by the District of Columbia and operated by CIH. Second Am. Compl. ¶ 9, Dkt. 70. Ms. Arthur is deaf, and her son, Robert, serves as her primary caregiver. *Id.* ¶¶ 9–10. DCHA is the local governmental entity tasked with operating public housing programs within the District of Columbia. *Id.* ¶ 11.

The claims against DCHA and CIH concern the adoption and implementation of DCHA's "phone call policy" as applied to Ms. Arthur. *Id.* ¶¶ 17, 21, 58–60. The policy requires visitors

---

[1] Because the Court has previously set out the plaintiffs' factual allegations in detail in an initial Memorandum Opinion, *see* Mem. Op. of Apr. 11, 2020, Dkt. 57, it limits its recitation here to those facts most relevant to the pending motion to dismiss.

to Claridge Towers to present identification to a security officer who then records the visitor's information and calls the resident to confirm that the resident wishes to receive the guest. *Id.* ¶ 17. If the resident does not answer, the visitor must leave the property. *Id.*

The plaintiffs allege that because Ms. Arthur is deaf, she cannot hear the phone ring when she has a visitor. *Id.* ¶ 18. As a result, before January 2017, DCHA permitted Ms. Arthur's son, Robert, to visit her without calling ahead of time and to receive calls from and give permission to his mother's guests. *Id.*

On January 18, 2017, CIH rescinded its prior modification of the "phone call policy" for Ms. Arthur after Robert Arthur installed a "video relay system" in his mother's apartment. The system "enables a deaf person to communicate with a hearing person by connecting both parties to a trained sign-language interpreter." *Id.* ¶¶ 19–21. The Arthurs complained about this unexpected change because the video relay system was not "an effective solution" or replacement for the "previous accommodation." *Id.* ¶ 21. Ms. Arthur could only see the video relay system "when she was in her bedroom, awake and looking in the direction of the television." *Id.* ¶ 20. According to the plaintiffs, "[t]he act of withdrawing the accommodation marked the beginning of a series of recurring and continuing discriminatory acts" in which the defendants refused to accommodate Ms. Arthur's disability and retaliated against her and Robert Arthur for their continued requests for accommodation. *Id.* ¶¶ 21–85.

The plaintiffs filed this action on August 30, 2018. *See* Compl., Dkt. 1. After the filing of this suit, in October and November 2018, DCHA installed strobe lights and equipment in Ms. Arthur's apartment and provided rechargeable watches that flash to signal an incoming video relay call. Second Am. Compl. ¶ 82. On October 26, 2018, DCHA accused Robert Arthur of removing one of the strobe lights, *id.* ¶ 83, and three days later, "a person believed to be a public

2

housing maintenance man acting at the request of CIH entered Ms. Arthur's apartment with a key without notice," *id.* ¶ 84.  Ms. Arthur was "surprised and terrified" by the entry.  *Id.*

Months later, on February 22, 2019, a CIH representative provided Ms. Arthur a "Final Notice" informing her that a "notice to cure or quit has been prepared by our legal team" and that she would "soon" receive another notice "in regard to appearing for a date that [she] would need to vacate" the premises for failure to pay rent.  *Id.* ¶ 85.  According to the plaintiffs, Robert Arthur had previously informed the representative about an "Emergency Rental Assistance Payment" that was in process for back payments of rent.  *Id.*  "Upon information and belief" the representative "already had in her possession a copy of the letter approving such payment" when she sent the notice to Ms. Arthur.  *Id.*

In its opinion of April 11, 2020, this Court determined that claims 1, 2, 3, 4, 6, 8, and 11 were time-barred under the one-year statute of limitations for Titles II, III, and IV of the ADA, § 504 of the Rehabilitation Act, and the D.C. Human Rights Act.  Mem. Op. at 11–14.  The Court found that the alleged discriminatory conduct—the revocation of Ms. Arthur's previously granted accommodation to the phone call policy—occurred in January 2017 and that plaintiffs "filed their initial complaint on August 30, 2018, more than a year after any of the alleged discriminatory or retaliatory acts occurred."  *Id.* at 13.

In their Second Amended Complaint, the plaintiffs allege that they, as well as counsel on their behalf, made additional requests to accommodate in September 2017, November 2017, and January 2018, and that those additional requests came within one year of the filing date of their initial complaint.  Second Am. Compl. ¶¶ 58–60.  Specifically, they allege that on or about September 27, 2017, the plaintiffs urged CIH to suspend their phone call policy as an accommodation for Ms. Arthur's disability, that the request was temporarily granted for a four-

day period, and then denied again, *id.* ¶ 58; plaintiffs again requested the same accommodation in November 2017 from CIH, but CIH ignored the request, *id.*; and in January 2018, plaintiffs' counsel spoke with counsel for DCHA and again requested that the phone call policy be suspended on a permanent basis, but DCHA denied the request, *id.*

## II.    LEGAL STANDARD

### A. Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint need not contain "detailed factual allegations," but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Id.* (internal quotation omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). But the assumption of truth does not apply to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). An "unadorned, the defendant-unlawfully-harmed-me accusation" is

4

not credited; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  Ultimately, "[d]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"The statute of limitations is an affirmative defense, and [it] may be invoked on a 12(b)(6) motion only 'when the facts that give rise to the defense are clear from the face of the complaint.'"  *Floyd v. Lee*, 968 F. Supp. 2d 308, 326 (D.D.C. 2013) (quoting *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998)).  "[S]tatute of limitations issues often depend on contested questions of fact," and as a result, "dismissal is appropriate only if the complaint on its face is conclusively time-barred."  *de Csepel v. Republic of Hungary*, 714 F.3d 591, 603 (D.C. Cir. 2013) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996)). In other words, "dismissal at the Rule 12(b)(6) stage is improper" if "a plaintiff's potential 'rejoinder to the affirmative defense [is not] foreclosed by the allegations in the complaint.'"  *Id.* at 608 (quoting *Goodman v. Praxair, Inc.*, 494 F.3d 458, 466 (4th Cir. 2007) (en banc)).

## III.   ANALYSIS

The plaintiffs assert claims against DCHA and CIH under Title II of the Americans with Disabilities Act (ADA) (claim 1 and 2), Second Am. Compl. ¶¶ 86–101, 102–08; against CIH under Title III of the ADA (claim 3), *id.* ¶¶ 109–15; against both DCHA and CIH under Title IV of the ADA (claim 4), *id.* ¶¶ 116–23; against DCHA under § 504 of the Rehabilitation Act (claims 6 and 8), *id.* ¶¶ 131–36, 143–50; and against both DCHA and CIH under the D.C. Human Rights Act (claim 11), *id.* ¶¶ 157–58.

DCHA and CIH urge dismissal based on two grounds.  First, they argue that the plaintiffs' ADA and Rehabilitation Act claims remain time-barred because the plaintiffs'

September 2017, November 2017, and January 2018 requests for accommodation were, in

reality, "[r]equests for reconsideration of a previously denied request for accommodation" and

"[m]ere requests to reconsider . . . cannot extend the limitations periods applicable to civil rights

laws." Defs.' Mot. to Dismiss at 5 (quoting *Del. State Coll. v. Ricks*, 449 U.S. 250, 261 n.15

(1980)). Second, they contend that the plaintiffs' retaliation claims, even if timely, fail to state a

claim for which relief can be granted. Defs.' Reply at 8. The Court will analyze each argument

in turn.

### A. Timeliness of Claims

"Courts have divided on the question of whether a new limitations clock begins running

each time that a request for accommodations is made anew and denied again." *Floyd*, 968 F.

Supp. 2d at 324. *Compare Hill v. Hamstead Lester Morton Ct. Partners LP*, 581 F. App'x 178,

180–81 (4th Cir. 2014) (stating that the statute of limitations clock resets whenever "a plaintiff

. . . renews a request for a previously denied accommodation"), *Tobin v. Liberty Mut. Ins.*, 553

F.3d 121, 125–27, 134 (1st Cir. 2009) (similar); *Cherosky v. Henderson*, 330 F.3d 1243, 1248

(9th Cir. 2003) (suggesting the same in dicta), *with Stewart v. District of Columbia*, No. 04-cv-

1444, 2006 WL 626921, at *6 (D.D.C. Mar. 12, 2006) (holding that plaintiff's failure to

accommodate claim "accrued as soon as her first request was denied"). Though the D.C. Circuit

has not yet addressed the issue, in this district, courts have generally heeded the Supreme Court's

guidance that "mere requests to reconsider" are insufficient to reset the statute of limitations

clock, *see Ricks*, 449 U.S. at 261 n.15, while acknowledging that a denial of a new request for

accommodation can constitute a "discrete act[]" that is "independently discriminatory" such that

it resets the limitations clock, *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113

(2002); *see also Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 628 (2007) ("[I]f an

employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed.").  In *Owens-Hart v. Howard University*, for example, the court determined that the "focus must be on discerning whether the facts presented reflect a situation in which the employer commits multiple acts, each of which is *independently discriminatory*, or one in which an employee attempts to rely on either the *ongoing effects* of the employer's single discriminatory act or the employee's efforts to *obtain reversal* of that singular act of alleged discrimination."  220 F. Supp. 3d 81, 93 (D.D.C. 2016) (internal quotation marks omitted) (emphasis added); *see also Long v. Howard Univ.*, 512 F. Supp. 2d 1, 23 (D.D.C. 2007) (analyzing as a factual question whether requests for accommodation were new requests or merely requests for reconsideration).

In deciding whether a request for accommodation constitutes a new request or merely a request for reconsideration, courts have generally considered five factors.  These include whether the request (1) was made as part of a formal appeals process, *see Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 553 (7th Cir. 1996); (2) was for the same previously denied accommodation, *see Owens-Hart*, 220 F. Supp. 3d at 94; (3) concerned the same or substantially similar disability, *Stewart*, 2006 WL 626921, at *6; (4) was made significantly later in time than the initial request, *see Owens-Hart*, 220 F. Supp. 3d at 94; or (5) came after a change in circumstances sufficient to alter the nature of the request or the burden of such an accommodation to the defendant, *see Tobin*, 553 F.3d at 133; *Barrett v. Covington & Burling LLP*, 979 A.2d 1239, 1249–50 (D.C. 2009).

Here, based on the complaint alone, the Court cannot determine whether the September 2017, November 2017, and January 2018 requests for accommodation are untimely because the complaint does not "foreclose[]" the plaintiffs' potential "rejoinder[s] to the affirmative defense"

of the statute of limitations.  *See de Csepel*, 714 F.3d at 608.  "The statute of limitations is an affirmative defense, and [it] may be invoked on a 12(b)(6) motion only when the facts that give rise to the defense are clear from the face of the complaint."  *Floyd*, 968 F. Supp. 2d at 326 (internal quotation marks omitted).  According to the plaintiffs, in July 2017, Ms. Arthur requested and received permission to "have a live-in aid" and "additional hearing-impaired hardware," Second Am. Compl. ¶ 42, and in September 2017, the defendants temporarily granted and then later revoked an accommodation to the phone call policy, *id.* ¶ 58.  At this time, the Court lacks sufficient information about these intervening events to determine whether they altered either the nature of the requests for accommodation or the burden of the desired accommodation such that the subsequent denials could be viewed as new, discrete acts of discrimination within the limitations period, rather than mere denials to reconsider the plaintiffs' original request for accommodation.  *See Tobin*, 553 F.3d at 132–33 (citing *Long*, 512 F. Supp. 2d at 17).  Accordingly, the Court will deny the defendants' motion to dismiss with regards to claims 1, 2, 3, 6, and 11.

## B.  Plaintiffs Fail to Plausibly State a Retaliation Claim

The outcome is different, however, with regards to claims 4 and 8.  The plaintiffs allege in claim 4 that DCHA and CIH retaliated against the plaintiffs in violation of § 503 of the ADA when a maintenance staff member "unlawful[ly] ent[ered] into Ms. Arthur's home in October 2018" and again when CIH issued a "Final Notice" to "cure or quit"  in February 2019.  Second Am. Compl. ¶¶ 84–85, 120.  Based on the same conduct, the plaintiffs allege in claim 8 that

DCHA retaliated against them in violation of § 504 of the Rehabilitation Act.[2]  *Id.* ¶¶ 84–85,

147.  The Court will dismiss both claims.

To state a claim of retaliation under the ADA and the Rehabilitation Act, a plaintiff must

show "that 1) she engaged in protected activity, 2) she was subjected to adverse action by the

defendant[,] and 3) there is a causal connection between the adverse action and the protected

activity."  *Alston v. District of Columbia*, 561 F. Supp. 2d 29, 40 (D.D.C. 2008) (internal

quotation marks omitted); *see also Walker v. District of Columbia*, 279 F. Supp. 3d 246, 271

(D.D.C. 2017) (explaining that "[c]ourts frequently interpret the ADA and the Rehabilitation Act

the same way," and that the standards articulated in the Title VII employment context apply to

both ADA and Rehabilitation Act claims).  A plaintiff need not plead a prima facie case to

survive a motion to dismiss.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002) ("The

prima facie case . . . is an evidentiary standard, not a pleading requirement."); *Gordon v. U.S.*

*Capitol Police*, 778 F.3d 158, 161–62 (D.C. Cir. 2015) (applying *Swierkiewicz* in the retaliation

context).  But she must plead facts sufficient to nudge her claims "across the line from

conceivable to plausible," *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570); *Menoken*

*v. McGettigan*, 273 F. Supp. 3d 188, 201–03 (D.D.C. 2017) (applying *Iqbal*'s pleading standard

in the retaliation context), and courts may look to the prima facie elements as a guide in

accessing the plausibility of a plaintiff's claim for relief, *see id.* (analyzing plausibility through

---

[2] The Court previously determined that the other alleged retaliatory acts in claims 4 and 8 are time-barred as each discrete act occurred before August 30, 2017.  *See* Mem. Op. of Apr. 11, 2020 at 13.  To the extent the plaintiffs identify the denial of requests for accommodation as retaliatory acts, *see* Second Am Compl. ¶¶ 120, 147, the caselaw in this district is clear that a denial of a request for accommodation alone does not amount to a retaliatory action.  *See Hargrove v. AARP*, 205 F. Supp. 3d 96, 116 (D.D.C. 2016) ("[T]he denial of a request for accommodation does not by itself support a claim of retaliation based on the request." (internal quotation marks omitted)); *Buie v. Berrien*, 85 F. Supp. 3d 161, 178 (D.D.C. 2015) (noting that a defendant's failure to accommodate "does not supply grounds for a separate retaliation claim").

the lens of the three prima facie elements for a claim of retaliation).  A plaintiff may fail to meet her burden when, crediting all inferences in her favor, her charge of retaliation "is not plausible in light of [an] 'obvious alternative explanation.'"  *See Woods v. City of Greensboro*, 855 F.3d 639, 647–48 (4th Cir. 2017) (quoting *Iqbal*, 556 U.S at 678).

Applying this standard, the October 2018 unannounced visit of a maintenance staff member did not constitute an adverse action.[3]  "Retaliation claims do not protect an individual from all retaliation, but from retaliation that produces an injury or harm."  *Walker*, 279 F. Supp. 3d at 271 (internal quotation marks and brackets omitted).  An individual is not protected from "petty slights or minor annoyances."  *Burlington Northern & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 68 (2006).  The question is whether the alleged action would "dissuade a reasonable [person] from making or supporting a charge of discrimination."  *Walker*, 279 F. Supp. 3d at 274 (quoting *Weber v. Battista*, 494 F.3d 179, 186 (D.C. Cir. 2007)).  Though Ms. Arthur alleges she was "surprised and terrified" by the unannounced entry of maintenance staff, Second Am. Compl. ¶ 84, her subjective shock and dismay alone did not convert the unannounced entry into an adverse action, *see Buie*, 85 F. Supp. 3d at 178 ("The law is clear that purely subjective injuries . . . are not adverse actions.") (internal quotation marks and brackets omitted); *Koch v. Schapiro*, 699 F. Supp. 2d 3, 14 (D.D.C. 2010) (dismissing plaintiff's retaliation claim because his allegations that his supervisor yelled at and verbally assaulted him did not qualify as adverse actions).  While perhaps inappropriate or discourteous, the unannounced entry by the maintenance staff member did not result in any harm.  *See* Second Am. Compl. ¶ 84.  He merely

---

[3] Because the defendants do not directly challenge whether the plaintiffs engaged in a protected activity, the Court assumes for the purposes of this analysis that the plaintiffs' requests for accommodation and filing of this lawsuit were protected under the ADA and Rehabilitation Act. *See* Defs.' Reply at 11 ("[a]ssuming *arguendo*" that the plaintiffs' requests "are protected activities").

"took photographs . . . of the DCHA strobe light equipment . . . and left." *Id.*  These actions would not plausibly dissuade a reasonable person from making a charge of discrimination.  *See Walker*, 279 F. Supp. 3d at 274 (explaining a plaintiff must show the action resulted in a "tangible consequence in her circumstances").

For a different reason, the plaintiffs' allegations concerning the February 2019 Final Notice to cure or quit also do not state a claim for retaliation.  Here, the Court will assume that the Final Notice constituted an adverse action.  *See Neudecker v. Boisclair Corp.*, 351 F.3d 361, 363–64 (8th Cir. 2003) (holding that a plaintiff sufficiently alleged an adverse action under the Rehabilitation Act when he alleged the defendant "threatened to evict him as reprisal for his complaints").  *But see Congdon v. Strine*, 854 F. Supp. 355, 364 (E.D. Pa. 1994) (holding that a "one-time threat" of eviction did not violate the Fair Housing Act's anti-retaliation provisions when the defendant "took no further action to evict").  Even so, the plaintiffs' claim fails because they do not plausibly allege facts supporting a causal connection between the alleged retaliatory action and the protected activity.

The plaintiffs offer no factual allegations that support a direct causal connection between their requests for accommodation and the Final Notice.  *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (explaining that direct evidence is usually a "statement that itself shows" "discriminatory intent").  Nor do they allege facts that plausibly support a finding of causation based on temporal proximity or other circumstantial evidence.  With respect to temporal proximity, CIH issued the Final Notice six months after the plaintiffs filed their complaint in this case, *see* Compl., Dkt. 1, and thirteen months after the plaintiffs lodged their most recent request for accommodation, *see* Second Am. Compl. ¶¶ 58, 85.  Such a lengthy gap between the alleged protected activity and the alleged retaliatory action undermines any

11

inference of a causal connection between the two.  *See Jones v. Greenspan*, 402 F. Supp. 2d 294, 300 (D.D.C. 2005) ("To qualify as a causal connection . . . , the temporal proximity between the [defendant's] knowledge of the protected activity and the adverse . . . action must be 'very close'") (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)); *see also Drielak v. Pruitt*, 890 F.3d 297, 301 (D.C. Cir. 2018) (stating that a six-month gap is "far from the temporal proximity *Clark County* thought worthy of evidentiary value").  Courts in "this Circuit ha[ve] generally found that a two- or three-month gap between the protected activity and the adverse employment action does not establish the temporal proximity needed to prove causation," *Jones v. D.C. Water & Sewer Auth.*, 922 F. Supp. 2d 37, 42 (D.D.C. 2013), and "[t]he case law supports the conclusion that, as a matter of law, a six-month delay by itself is insufficient to demonstrate the close temporal proximity necessary to infer a retaliatory motivation," *Cooke v. Rosenker*, 601 F. Supp. 2d 64, 88 (D.D.C. 2009).

Plaintiffs have also failed to allege facts that could plausibly support a causal connection based on circumstantial evidence.  The complaint alleges that when the defendants issued the Final Notice in February 2019, the defendants had already received a letter from the plaintiffs informing the defendants that Ms. Arthur had been approved for an "Emergency Rental Assistance Payment."  Second Am. Compl. ¶ 85.  But it does not allege that Ms. Arthur had cured her delinquency before the notice was issued or that the defendants' focus on her delinquency was pretextual because the defendants treated Ms. Arthur differently than other similarly situated tenants or violated a policy or procedure in issuing the Final Notice.  *See Brown v. Sessoms*, 774 F.3d 1016, 1023 (D.C. Cir. 2014) (holding that a plaintiff had raised her right to relief "above the speculative level" where she pleaded that the university had granted tenure to "a similarly-situated employee who [was] not in her protected class").  To the contrary,

the complaint confirms that defendants waited at least three months before they issued a Final

Notice for Ms. Arthur's failure to pay timely rent, and they did so after providing her with *new*

accommodations in October and November 2018.  Second Am. Compl. ¶ 82.  Moreover, the

defendants never evicted Ms. Arthur, and she continues to "reside[] in Claridge Towers."  *Id.* ¶ 9.

A plaintiff need not "anticipate legitimate, non-discriminatory reasons . . . nor allege pretext to

survive a motion to dismiss."  *Easaw v. Newport*, 253 F. Supp. 3d. 22, 26–27 (D.D.C. 2017).

But "[i]n assessing causation in the retaliation context, courts must ask whether there was an

unbroken connection between the wrongful act and the injury, or whether there was some new

and independent cause intervening between the wrong and the injury."  *Buie*, 85 F. Supp. 3d at

179 (internal quotation marks omitted).  Here, the allegations in the complaint, even when

viewed in the light most favorable to the plaintiffs, support an explanation for the defendants'

conduct that is "so obviously . . . irrefutably sound[,] . . . unambiguously nondiscriminatory[,]

and non-pretextual" that "it renders [the plaintiffs' claim of retaliation] implausible."  *Woods*,

855 F.3d at 649; *see also Easaw*, 253 F. Supp. 3d at 32 (dismissing a plaintiff's race

discrimination complaint where, among other deficiencies, "an entirely race-neutral rationale"

put forward in the complaint "undermine[d]" her claim that she was terminated from her

employment because of her race).

## CONCLUSION

For the foregoing reasons, the Court grants DCHA and CIH's motion to dismiss with

respect to claims 4 and 8 and denies the motion with respect to claims 1, 2, 3, 6, and 11.  A

separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH

United States District Judge

December 2, 2020

13